# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EUEL L. MASON, DONOVAN L. BENTON, and MABLE A. GAINES,<br><br>  Plaintiffs,<br><br>  v.<br><br>TIMOTHY F. GEITHNER, Secretary, U.S. Department of the Treasury,<br><br>  Defendant. | Civil Action No. 09-00462 (CKK) |
| EUEL L. MASON,<br><br>  Plaintiff,<br><br>  v.<br><br>TIMOTHY F. GEITHNER, Secretary, U.S. Department of the Treasury,<br><br>  Defendant. | Civil Action No. 10-00184 (CKK) |
| MABLE A. GAINES,<br><br>  Plaintiff,<br><br>  v.<br><br>TIMOTHY F. GEITHNER, Secretary, U.S. Department of Treasury,<br><br>  Defendant. | Civil Action No. 10-00683 (CKK) |

## MEMORANDUM OPINION
(September 12, 2011)

In the three above-captioned actions,[1] Plaintiffs Mable Gaines ("Gaines"), Euel Mason

("Mason"), and Donovan Benton ("Benton") (collectively, "Plaintiffs"), each a former employee

of the Internal Revenue Service ("IRS"), bring suit under Title VII of the Civil Rights Act of

1964, as amended, 42 U.S.C. § 2000e-1 *et seq.* ("Title VII") against the Secretary of the U.S.

Department of the Treasury (the "Secretary").   There are currently two motions before the Court:

(1) the Secretary's Motion for Summary Judgment; and (2) the Secretary's Motion for Sanctions.

Upon consideration of the parties' submissions, the relevant authorities, and the record as a

whole, the Court shall grant the Secretary's Motion for Summary Judgment, deny the Secretary's

Motion for Sanctions, and dismiss all three actions in their entirety.[2]

## I.   BACKGROUND

On August 14, 2003, Plaintiffs, along with other African American employees at the IRS,

brought suit against the Secretary alleging that they had been discriminated against on the basis

of race in connection with a variety of employment actions (the "2003 Litigation").   *See* Compl.,

*Mason v. Snow*, Civil Action No. 03-1730 (CKK) (D.D.C. Aug. 14, 2003).   On May 1, 2006, the

action was dismissed with prejudice when the parties reached an agreement to settle their dispute

---

[1]   The three actions have been consolidated only for the briefing of the pending motions.

[2]   While the Court renders its decision today on the record as a whole, its consideration has focused on the following documents, listed in chronological order of their filing: Def.'s Mem. of P. & A. in Supp. of Mot. for Summ. J. ("Def.'s MSJ Mem."); Def.'s Stmt. of Material Facts Not in Genuine Dispute ("Def.'s Stmt."); Pls.' Mem. in Opp'n to Def.'s Mot. for Summ. J. ("Pls.' MSJ Opp'n"); Pls.' Stmt. of Material Facts in Genuine Dispute ("Pls.' Stmt."); Def.'s Reply to Pls.' Opp'n to Def.'s Mot. for Summ. J. ("Def.'s Reply"); Def.'s Resp. to Pls.' Stmt. of Material Facts Not in Genuine Dispute ("Def.'s Resp."); Def.'s Mem. of P. & A. in Supp. of Mot. for Sanctions; Pls.' Mem. in Opp'n to Def.'s Mot. for Sanctions; Def.'s Reply to Pls.' Opp'n to Def.'s Mot. for Sanctions.

(the "2006 Settlement").[3]  *See* Stip. & Compromise Settlement & Dismissal With Prejudice,

*Mason v. Snow*, Civil Action No. 03-1730 (CKK) (D.D.C. May 1, 2006).  In the actions now

before the Court, Plaintiffs claim that they were retaliated against for their participation in the

2003 Litigation, including the 2006 Settlement.  *See* Fourth Am. Compl. (Civil Action No. 09-

462) ¶¶ 21, 23, 25; Compl. (Civil Action No. 10-184) ¶ 12; Compl. (Civil Action No. 10-683) ¶

12.

    *A.*    *Factual Background Relating to Plaintiff Mable Gaines*

In 1981, Mable Gaines began working at IRS Headquarters in Washington, D.C., as a

clerk-typist.  Def.'s Stmt. ¶ 1; Pls.' Stmt. ¶ 1.  Around ten years later, she became an Inventory

Management Specialist in the Distribution Division of the IRS's Media and Publications

("M&P") Organization, a position that she held until her prolonged absence from work that

began on December 21, 2004, and lasted until June 4, 2007.  Def.'s Stmt. ¶ 2; Pls.' Stmt. ¶ 2.

    1.    <u>Gaines's Physical Altercation with a Co-Worker</u>

Gaines alleges that on the morning of December 21, 2004, a former co-worker entered her

cubicle and—without saying a word—struck her on the right arm with such force that it could be

---

[3] The parties' written settlement agreement contains a broad release of claims. Specifically, Plaintiffs agreed to waive any and all claims that they might have raised at the time of their execution of the agreement. *See* Stip. & Compromise Settlement & Dismissal With Prejudice ¶ 4, *Mason v. Snow*, Civil Action No. 03-1730 (CKK) (D.D.C. May 1, 2006). In the actions now before the Court, Plaintiffs occasionally raise allegations relating to events pre-dating their execution of the Settlement Agreement. For example, Gaines alleges that she was involved in a physical altercation with a co-worker on December 21, 2004, long before she executed the settlement agreement on March 21, 2006. *See* Pls.' MSJ Opp'n at 46-47. Because the Secretary has not argued that the settlement agreement bars Plaintiffs from pursuing relief in connection with allegations pre-dating their execution of the agreement, the Court has considered those allegations in the course of resolving the merits of the pending motions. Nonetheless, it is not altogether clear how these allegations remain viable in light of the 2006 Settlement.

heard across the room and caused a nerve in her shoulder to "pop."  Def.'s Stmt. ¶ 3; Pls.' Stmt. ¶ 3; Dep. of Mable A. Gaines ("Gaines Dep.") at 72-78.  During this incident, the co-worker was laughing and told Gaines that she was just "playing."  Gaines Dep. at 78.  Thereafter, Gaines—in what she describes as an attempt to "diffuse the situation"—responded by shoving the co-worker across the walkway and into an adjacent cubicle, "slamm[ing]" the co-worker against a file cabinet, and "cursing a whole lot."  Def.'s Stmt. ¶ 5; Pls.' Stmt. ¶ 5; Gaines Dep. at 87, 90-91.  Gaines has consistently claimed that the only reason the co-worker struck her was because Gaines refused to attend a breakfast outing earlier that morning.  Def.'s Stmt. ¶ 6; Pls.' Stmt. ¶¶ 5-6; Gaines Dep. at 106.

  2.  Gaines's Prolonged Absence from Work

Following the alleged assault, Gaines claimed that she was totally incapacitated as a result of the injuries she sustained and was unable to work.[4]  Def.'s Stmt. ¶ 7; Pls.' Stmt. ¶ 7.  She did not return to work at the IRS until June 4, 2007—an absence of approximately two-and-a-half years.  Def.'s Stmt. ¶ 7; Pls.' Stmt. ¶ 7.

In the weeks following her departure in December 2004, Gaines's supervisors maintained contact with her and they honored her request to be reassigned from the Distribution Division

---

[4]  Because Gaines is not pursuing a claim for disability discrimination, the question of whether she was or was not "totally incapacitated" or "disabled" is largely immaterial.  However, the Court observes that when Gaines avers that, "[d]espite [the Secretary's] innuendo to the contrary, there is ample evidence to support [her] status as disabled," Pls.' Stmt. ¶ 7 (citing Pls.' Ex. 2 (Pls.' Resp. to Def.'s First Set of Interrogs. (hereinafter, "Pls.' Interrog. Resps.") No. 11); Pls.' Ex. 58 (Ltr. from R. Swick to S. Becker dated July 21, 2009)), the only direct "medical evidence" specifically cited concerns Gaines's medical condition in June 2009—several years after the alleged assault—and does not describe her condition in the period from December 21, 2004, to June 4, 2007.

within the M&P Organization to the Tax Forms and Publications Division.[5]  Def.'s Stmt. ¶ 8;

Pls.' Stmt. ¶ 8.  During her extended absence, Gaines's application to receive annual leave

donations through the IRS's Leave Transfer Program, which allows IRS employees to transfer

accrued annual leave to an approved recipient for a medical emergency, was approved and a

memorandum soliciting donations was distributed on her behalf.[6]  Def.'s Stmt. ¶ 9; Pls.' Stmt. ¶

9; Def.'s Ex. A (Mem. from G. Plater to All Employees dated Apr. 19, 2005); Def.'s Ex. C

(Frequently Asked Questions about the Leave Sharing Program) at 2.

On June 9, 2005, Gaines was examined by a board-certified orthopedic surgeon, who

concluded that she was able to return to work full-time so long as she was not required to lift

more than ten pounds.[7]  Def.'s Stmt. ¶ 10; Pls.' Stmt. ¶ 10.  On August 19, 2005, the Office of

Workers' Compensation Programs ("OWCP") within the Department of Labor ("DOL") notified

the IRS that Gaines was fit to return to work with the stated lifting limitation.  Def.'s Stmt. ¶ 11;

---

[5]  In responding to the Secretary's proffered factual statement, Gaines first concedes that the statement is admitted, but then proceeds to allege that she "did not request to be reassigned to the Tax Forms and Publications Division during her time of total disability" and that the decision was made to "minimize the seriousness of the unprovoked assault."  Pls.' Stmt. ¶ 8.  Because these extraneous factual allegations are unaccompanied by "references to the parts of the record relied on [for] support," LCvR 7(h)(1), the Court will disregard them.

[6]  In responding to the Secretary's proffered factual statement, Gaines first concedes that the statement is admitted, but then proceeds to claim that the facts are "mischaracterized."  Pls.' Stmt. ¶ 9.  Because Gaines fails to provide any explanation as to why she believes the facts have been mischaracterized, let alone support that belief with references to the record, the Court will deem the proffered statement to be admitted.

[7]  In responding to the Secretary's proffered factual statement, Gaines first concedes that the statement is admitted, but then proceeds to allege that "a complete examination was not performed by the assigned doctor."  Pls.' Stmt. ¶ 10.  Because this extraneous factual allegation is unaccompanied by "references to the parts of the record relied on [for] support," LCvR 7(h)(1), the Court will disregard the allegation.

Pls.' Stmt. ¶ 11.  On August 29, 2005, upon receiving the OWCP's notification, the IRS sent

Gaines a letter offering her a position as a Tax Analyst in the Tax Forms and Publications

Division of the M&P Organization, acknowledging her lifting limitation, and instructing her to

report to work on September 6, 2005.[8]  Def.'s Stmt. ¶ 12; Pls.' Stmt. ¶ 12; Gaines Dep. Ex. 7

(Ltr. to M. Gaines dated Aug. 29, 2005) at 1.  The letter further stated that Gaines's failure to

respond would be construed as a rejection of the offer and that her refusal to accept suitable

employment could result in the termination of her workers' compensation benefits.  Gaines Dep.

Ex. 7 (Ltr. to M. Gaines dated Aug. 29, 2005) at 3.  Nonetheless, Gaines failed to return the

"Acceptance/Declination Statement" attached to the letter.  Def.'s Stmt. ¶ 13; Pls.' Stmt. ¶ 13.

Even so, Gaines was not disciplined when she failed to return to work on September 6, 2005, as

she had been instructed.  Def.'s Stmt. ¶ 14; Pls.' Stmt. ¶ 14.

    On October 27, 2005, the DOL's OWCP contacted Gaines a second time, informing her

---

[8]  In responding to the Secretary's proffered factual statement, Gaines first concedes that the statement is admitted, but then proceeds to allege that she "was still under doctors' care as a result of the physical assault and was determined to be totally disabled by her orthopedic surgeon" and that a "Letter of Reply was forwarded to IRS Management [and the] Department of Labor . . . informing them of [her] physical status and [that she] could not return to work due to the severity of her injury."  Pls.' Stmt. ¶ 12 (citing Def.'s Ex. B (Attending Physician's Report dated May 31, 2007); Pls.' Ex. 58 ((Ltr. from R. Swick to S. Becker dated July 21, 2009; Attending Physician's Report dated June 26, 2009)).  However, the medical records and correspondence relied upon by Gaines in support of these extraneous factual allegations pertain to her medical condition in mid-2007 and mid-2008—years after the events described in the Secretary's proffered factual statement had transpired.  If anything, the medical reports cited by Gaines undermine rather than support her contention that she was totally disabled at or around the time that she was instructed to return to work in early September 2005.  The two cited medical reports state that Gaines was receiving ongoing treatment beginning as early as February 2, 2005, but specifically identify her only two periods of "total disability" as extending from April 25, 2007, to June 3, 2007, and from June 26, 2009, to June 4, 2007.  *See* Def.'s Ex. B (Attending Physician's Report dated May 31, 2007); Pls.' Ex. 58 (Attending Physician's Report dated June 26, 2009).

in a letter that she had thirty days to either accept the Tax Analyst position that had been offered

to her or to provide an explanation for her refusal.  Def.'s Stmt. ¶ 15; Pls.' Stmt. ¶ 15.  The letter

again warned Gaines that her refusal to accept suitable work could result in the termination of her

workers' compensation benefits.  Def.'s Stmt. ¶ 15; Pls.' Stmt. ¶ 15.

After a considerable amount of time had elapsed,[9] Gaines eventually submitted medical

documentation showing that she was totally disabled in the period extending from April 25,

2007, to June 3, 2007, and was unable to work during that period.  Def.'s Stmt. ¶ 16; Pls.' Stmt. ¶

16; Def.'s Ex. B (Attending Physician's Report dated May 31, 2007) at 1.  Gaines's period of

total disability ended on June 3, 2007, and Gaines was deemed fit to resume light work the

following day.  Def.'s Ex. B (Attending Physician's Report dated May 31, 2007) at 1.

3.    Gaines's Return to Work

On June 4, 2007, Gaines returned to work, serving as a Tax Analyst in the IRS's New

Carrollton office located in Lanham, Maryland.  Def.'s Stmt. ¶ 17; Pls.' Stmt. ¶ 17.  Upon her

return, Gaines's chain-of-command was as follows:

- First-line supervisor: Sidney Gardner ("Gardner");

- Second-line supervisor: Ann Gelineau ("Gelineau");

- Third-line supervisor: Stacy Becker ("Becker")

- Fourth-line supervisor: Denise Fayne ("Fayne") from June 2007, to

    September 2008; and Karen Becton-Johnson ("Becton-Johnson") from

    September 2008, to September 2009.

---

[9]  The record does not clearly explain exactly what transpired in the period from October 27, 2005, to April 25, 2007, though the parties agree that Gaines remained on leave-without-pay status until June 2007.  Def.'s Stmt. ¶ 17; Pls.' Stmt. ¶ 17.

Def.'s Stmt. ¶¶ 18-22; Pls.' Stmt. ¶¶ 18-22.  Gaines's first- and second-line supervisors were

located at the IRS's New Carrollton office, while her third- and fourth-line supervisors were

located at IRS Headquarters in Washington, D.C.  Def.'s Stmt. ¶¶ 18-22; Pls.' Stmt. ¶¶ 18-22.

The day of Gaines's return to work, she was taken on an office tour by her second-line

supervisor, Gelineau.  Def.'s Stmt. ¶ 23; Pls.' Stmt. ¶ 23.  During the tour, Gelineau explained to

Gaines that the entire office was conducting a week-long "clean building initiative," in

connection with which employees were encouraged to cull their files of excess paperwork,

organize their workspace, and remove any extraneous boxes or office supplies.  Def.'s Stmt. ¶

23; Pls.' Stmt. ¶ 23.  Gelineau instructed Gaines to clean and organize the area surrounding

Gaines's workplace, which would include removing boxes, equipment, and files, an instruction

that Gaines admits applied to everyone in the office.  Gaines Dep. at 227-33, 235; Dep. of Ann

Gelineau ("Gelineau Dep.") at 89.  Gaines admits that she did not inform Gelineau that she could

not lift items of a certain weight, but speculates that Gelineau was otherwise aware of her lifting

limitation.  Gaines Dep. at 229-30.  She also admits that she did not actually clean and organize

the area and was never instructed to do so again, by Gelineau or anyone else.  *Id.* at 233.

As a Tax Analyst within the Tax Forms and Publications Division, Gaines was expected

to perform "plain language" review of tax forms, notices, and publications.  Def.'s Stmt. ¶ 25;

Pls.' Stmt. ¶ 25.  However, upon her return to work, Gaines did not immediately begin "plain

language" review work and was instead assigned to work on a "front-line manager readiness

course" with her second-line supervisor, Gelineau.  Def.'s Stmt. ¶ 26; Pls.' Stmt. ¶ 26.

Subsequently, Gaines's supervisors made arrangements for her to obtain informal training in

order to get her acclimated to her new position.[10]  Dep. of Sidney Gardner ("Gardner Dep.") at

17, 35; Gaines Dep. at 235, 239.  Because Gaines had no prior experience in the field, she needed

more formal training in "plain language" review.  Def.'s Stmt. ¶ 28; Pls.' Stmt. ¶ 28; Gaines Dep.

at 236.  The training that Gaines required was typically conducted in a classroom setting in

Atlanta, Georgia, and required all-day attendance.  Def.'s Stmt. ¶ 29; Pls.' Stmt. ¶ 29.  However,

Gaines's first-line supervisor, Gardner, arranged for a course to be held for Gaines at the New

Carrollton office in August 2008, though by the time that date came, Gaines was no longer

working.  Def.'s Stmt. ¶ 30; Pls.' Stmt. ¶ 30; Gardner Dep. at 37.

####    4.    Gaines's Requests for a "Flexiplace" Assignment and Accommodations

In March 2008, Gaines submitted an application for a "flexiplace" assignment, requesting

that she be allowed to work at home full-time following a surgical procedure that she planned to

undergo at the end of the month.  Def.'s Stmt. ¶ 31; Pls.' Stmt. ¶ 31.  However, Gaines's

supervisors informed her that they were unable to accommodate her request for a "flexiplace"

assignment and accommodations to work from home because she was yet to complete the

---

[10]  Relying exclusively upon her deposition testimony, Gaines purports to dispute that her "supervisors arranged for her to obtain training from coaches and a senior analyst."  Pls.' Stmt. ¶ 27 (citing Gaines Dep. at 235-40).  However, in the deposition testimony she cites, Gaines plainly testified that she viewed a senior analyst in her office as her "go-to person when [she] had a question about the document [she] was working on," and the person to whom she would speak "to help [her] complete her tasks . . . since [she] was new to that area," and concedes that her first-line supervisor, Gardner, attempted to find her an on-the-job coach.  Gaines Dep. at 236, 239.  Gaines further alleges that "other new analysts" were provided an on-the-job coach, Pls.' Stmt. ¶ 27 (citing Gaines Dep. 235-40), but the testimony relied upon for this contention only suggests that a single employee, Roseanne Nuss ("Nuss"), was coached by a senior analyst for an unspecified duration at some point after Gaines started in her new position, Gaines Dep. at 237.  At no point in her opposition does Gaines attempt to show that she and Nuss were similarly situated in all material respects or explain in any meaningful factual detail the nature of the coaching that Nuss allegedly received and how it differed from the training opportunities Gaines was provided.

requisite "plain language" review training.  Def.'s Stmt. ¶ 33; Pls.' Stmt. ¶ 33; Gardner Dep. at

28, 35; Gelineau Dep. at 26-27.  Gardner told Gaines that he would be able to "better justify" her

working from home following the completion of her training.[11]  Gardner Dep. at 28, 35.

Like she was during her absence from work from December 2004 through June 2007,

Gaines was again approved to participate in the Leave Transfer Program.  Def.'s Stmt. ¶ 32; Pls.'

Stmt. ¶ 32.  However, Gaines's first-line supervisor, Gardner, admitted he "dropped the ball" and

failed to send out notice of Gaines's approval for the Leave Transfer Program to other employees

for them to make contributions of donated leave on her behalf.  Gardner Dep. at 41-42.

### 5.    Gaines's Suspension for Tax Non-Compliance

The IRS's Employee Tax Compliance ("ETC") Branch is responsible for the

identification of IRS employees who fail various computerized compliance checks related to the

failure to file or the late filing of tax returns or the non-payment of taxes.  Def.'s Stmt. ¶ 35; Pls.'

Stmt. ¶ 35.  On January 24, 2008, after performing a routine computerized comparison of payroll

and tax account records, the ETC Branch determined that Gaines had failed to make sufficient

---

[11]  Gaines does not dispute that she had yet to complete the "plain language" training
contemplated by her supervisors at the time she made her request, but instead faults her
supervisors for "fail[ing] to arrange for her to have the necessary training" in the months that she
had been working in the Tax Forms and Publication Division.  Pls.' Stmt. ¶ 33 (citing Gardner
Dep. at 37).  However, Gaines cites to no evidence in the record that would permit a reasonable
trier of fact to infer that any delay in ensuring that Gaines received the requisite training was
unreasonable.  Meanwhile, it is undisputed that the training that Gaines required was typically
conducted in a classroom setting in Atlanta, Georgia, but that Gaines's supervisor had to make
special arrangements to have a training session held for Gaines locally at the New Carrollton
office.  Def.'s Stmt. ¶¶ 29-30; Pls.' Stmt. ¶¶ 29-30.  Gaines stopped reporting to work before the
special training session was held.  Def.'s Stmt. ¶ 42; Pls.' Stmt. ¶ 42.

estimated tax payments pertaining to gambling winnings during tax-year 2006.[12]  Def.'s Stmt. ¶

34; Pls.' Stmt. ¶ 34.  Gaines admitted to the ETC Branch that she had violated her duty to

accurately report her income, claiming that she was unaware of her legal obligation to report

gambling winnings immediately upon receipt.[13]  Def.'s Stmt. ¶ 38; Pls.' Stmt. ¶ 38.  This was not

Gaines's first incident of tax non-compliance: in 2003, Gaines received a three-day suspension

for an incident pertaining to tax-year 1999.[14]  Def.'s Stmt. ¶ 45; Pls.' Stmt. ¶ 45; Def.'s Ex. D

(Ltr. from C. Tavenner to M. Gaines dated Nov. 24, 2003).

Upon discovering the issue, the ETC Branch referred the new incident to Gaines's

supervisors for purposes of determining a suitable punishment.  Def.'s Stmt. ¶ 39; Pls.' Stmt. ¶

---

[12]  The ETC Branch flags potential issues and either refers them to the employee's manager or issues an advisory and enters the case into an automated tracking system.  Def.'s Stmt. ¶ 36; Pls.' Stmt. ¶ 36.  Employees' supervisors play no role in initiating the investigation of potential tax non-compliance issues.  Def.'s Stmt. ¶ 37; Pls.' Stmt. ¶ 37.

[13]  In responding to the Secretary's proffered factual statement, Gaines first concedes that she "admitted to the ETC that she had violated her duty to accurately report income," but then proceeds to allege that she "did not intentionally fail to pay her taxes."  Pls.' Stmt. ¶ 38 (citing Gelineau Dep at 75-76; Pls.' Ex. 61).  In support of this allegation, Gaines relies heavily upon what she identifies as Plaintiffs' Exhibit 61, but there is no Exhibit 61 accompanying Plaintiffs' opposition papers.  See LCvR 5.4(c)(2) ("A person filing a document by electronic means is responsible for insuring the accuracy of the official docket entry . . . .").  Regardless, the Court will assume that Gaines's admitted incident of tax non-compliance was not a "willful act," as the Secretary has never contended otherwise and this conclusion is consistent with testimony offered by Gaines's second-line supervisor, Gelineau.  See Gelineau Dep. at 75-76.  For purposes of resolving the pending motions, it suffices to note that Gaines concedes that she "is ultimately responsible for her income tax return."  Pls.' Stmt. ¶ 38.

[14]  In responding to the Secretary's proffered factual statement, Gaines first concedes that she received a three-day suspension in 2003 for her failure to fully pay federal taxes, but then proceeds to claim that the Secretary has "distorted" these facts.  Pls.' Stmt. ¶ 46.  However, based on Gaines's response, it is unclear how she believes the Secretary has distorted the underlying facts.  Gaines alleges that she was "actively engaged in an EEO complaint" at the time she received the suspension in 2003, but that suspension simply is not at issue in this action.

39; Gelineau Dep. at 92; Golatz Dep. at 21-22.  On July 8, 2008, Gaines's first-line supervisor,

Gardner, and her second-line supervisor, Gelineau, asked to meet with Gaines in person to

discuss the matter.[15]  Def.'s Stmt. ¶ 41; Pls.' Stmt. ¶ 41.  During that meeting, Gelineau provided

Gaines with a letter informing Gaines that the IRS was considering imposing a fourteen-day

suspension in response to the incident, but that alternative discipline was also a possibility.

Def.'s Stmt. ¶ 41; Pls.' Stmt. ¶ 41.  Two days after meeting with her supervisors, Gaines stopped

reporting to work altogether.  Def.'s Stmt. ¶ 42; Pls.' Stmt. ¶ 42.  She never returned.  Def.'s

Stmt. ¶ 42; Pls.' Stmt. ¶ 42.

On July 14, 2008, Gaines sent her fourth-line supervisor, Fayne, a letter in which she

expressed her desire to retire and to begin the disability application process.[16]  Def.'s Stmt. ¶ 43;

Pls.' Stmt. ¶ 43.  After Gaines had already stopped reporting to work, but while the fourteen-day

suspension proposal was still pending, the ETC Branch determined that Gaines had committed

yet another tax violation—namely, that she had failed to timely pay additional taxes because she

failed to accurately claim an earned-income tax credit.[17]  Def.'s Stmt. ¶ 44; Pls.' Stmt. ¶ 44.  This

---

[15]  In responding to the Secretary's proffered factual statement, Gaines first concedes that
the statement is admitted, but then proceeds to claim that the facts have been "mischaracterized."
Pls.' Stmt. ¶ 41.  In so doing, Gaines fails to explain why she believes the facts have been
mischaracterized and instead incorporates her response to an entirely different factual statement,
a response that has no obvious nexus to the factual statement at issue.  The Court will therefore
treat the Secretary's proffered factual statement as admitted.

[16]  The Secretary asserts that the IRS cannot initiate the disability application process on
an employee's behalf, see Def.'s MSJ Mem. at 9 n.2, and this assertion is left uncontested by
Gaines in her opposition.

[17]  In responding to the Secretary's proffered factual statement, Gaines first concedes that
the statement is admitted, but then proceeds to suggest that the facts have been "distorted."  Pls.'
Stmt. ¶ 44.  In so doing, Gaines incorporates her response to an entirely different factual
statement, a response that relies in relevant part upon an exhibit that is not actually appended to

violation constituted the third instance of tax non-compliance by Gaines discovered by the ETC

Branch.[18]  Def.'s Stmt. ¶ 45; Pls.' Stmt. ¶ 45.

On December 12, 2008, upon learning of this development, Gaines's supervisors

rescinded the original suspension proposal and issued a new letter proposing the same fourteen-

day suspension, albeit this time incorporating the facts relating to the new incident of tax non-

compliance.[19]  Def.'s Stmt. ¶¶ 47-48; Pls.' Stmt. ¶¶ 47-48.  Ultimately, the proposed fourteen-day

suspension was mitigated to a ten-day suspension.  Def.'s Stmt. ¶ 49; Pls.' Stmt. ¶ 49.  Gaines

was notified of the decision on April 13, 2009.  Def.'s Stmt. ¶ 49; Pls.' Stmt. ¶ 49; Gaines Dep.

Ex. 16 (Ltr. from K. Becton-Johnson to M. Gaines dated Apr. 13, 2009).

---

her opposition.  *See* Pls.' Stmt. ¶ 38 (citing Pls.' Ex. 61).  In any event, Gaines admits that she
"overstated" the earned income tax credit to which she was entitled, and merely attempts to
minimize the import of that admission by averring that she took steps to correct the infraction
upon being notified.  *Id.*  As before, the Court will assume for purposes of resolving the pending
motions that Gaines's non-compliance was not a "willful act," but the undisputed facts
nonetheless establish that she "failed to timely pay additional taxes assessed because of her
failure to accurately claim an earned-income tax credit."  Def.'s Stmt. ¶ 44; Pls.' Stmt. ¶ 44.

[18]  In responding to the Secretary's proffered factual statement, Gaines first concedes that
the statement is admitted, but then proceeds to contend that the facts have been "distorted."  Pls.'
Stmt. ¶ 45.  In so doing, Gaines fails to explain why she believes the facts have been distorted
and instead incorporates her response to an entirely different factual statement, a response that
has no obvious nexus to the factual statement at issue.  The Court will therefore treat the
Secretary's proffered factual statement as admitted.

[19]  Citing to no evidence in the record, Gaines purports to dispute that her "supervisors
had the authority to increase her penalty."  Pls.' Stmt. ¶ 48.  Regardless, it is undisputed that the
second proposal incorporated an entirely new incident of tax non-compliance but recommended
the same level of discipline as previously proposed.

6.      The Termination of Gaines's Employment

On March 3, 2009, Gaines underwent a work-capacity evaluation, after which the

examining doctor determined that she was able to return to work on a full-time basis.[20]  Def.'s

Stmt. ¶ 50; Gaines Dep. Ex. 18 (Work Capacity Evaluation dated Mar. 3, 2009).  On May 29,

2009, the DOL's OWCP notified Gaines that her medical and wage loss benefits would be

terminated effective June 7, 2009, advised her that applicable regulations required her to apply

for re-employment with the IRS immediately upon her recovery, and informed her of her right to

appeal the determination.[21]  Def.'s Stmt. ¶ 51; Pls.' Stmt. ¶ 51; Gaines Dep. Ex. 18 (Ltr. from S.

Stone to M. Gaines dated May 29, 2009).  On June 15, 2009, the IRS sent Gaines a letter

instructing her to report to work by no later than June 29, 2009.  Def.'s Stmt. ¶ 52; Pls.' Stmt. ¶

52; Gaines Dep. Ex. 19 (Ltr. from S. Becker to M. Gaines dated June 15, 2009).  In lieu of

returning to work, Gaines elected to appeal the OWCP's determination.[22]  Def.'s Stmt. ¶ 53; Pls.'

---

[20]  In responding to the Secretary's proffered factual statement, Gaines does not dispute
that she underwent a work-capacity evaluation on March 3, 2009, or that the examining doctor
determined that she was able to return to work full-time.  Pls.' Stmt. ¶ 50.  Instead, Gaines
alleges that the evaluation was insufficiently "thorough" and that the "examining doctor would
not review current medical documents . . . in order to make a correct assessment of her
condition."  *Id.* (citing Pls.' Interrog. Resps. No. 11; Pls.' Ex.  58 (Ltr. from R. Swick to S.
Becker dated July 21, 2009)).  Because the evidence cited by Gaines does not support her
extraneous factual allegations, those allegations will be disregarded.

[21]  In responding to the Secretary's proffered factual statement, Gaines concedes that the
statement is admitted, but then proceeds to allege that she "is awaiting a Hearing of her Pending
Case with the Department of Labor."  Pls.' Stmt. ¶ 51.  Gaines fails to support this extraneous
allegation with "references to the parts of the record relied on [for] support."  LCvR 7(h)(1).  In
any event, it is immaterial.

[22]  In responding to the Secretary's proffered factual statement, Gaines concedes that the
statement is admitted, but then proceeds to set forth additional factual allegations.  Pls.' Stmt. ¶
54.  Because these extraneous factual allegations are unaccompanied by "references to the parts
of the record relied on [for] support," LCvR 7(h)(1), the Court will disregard them.

Stmt. ¶ 53.  On July 21, 2009, Gaines's legal counsel, Richard L. Swick, Esq. ("Swick"),

responded to the IRS's letter by informing the IRS that Gaines was "not likely to be physically

able to return to work at the IRS" and requesting that an IRS representative "call [him] to explore

a resolution to th[e] situation."  Gaines Dep. Ex. 20 (Ltr. from R. Swick to S. Becker dated July

21, 2009) at 1.

      Shortly thereafter, Swick called Gaines's third-line supervisor, Becker.  Def.'s Stmt. ¶ 54;

Pls.' Stmt. ¶ 54.  The parties dispute what was said during this conversation, though they agree

that it occurred.  On the one hand, the Secretary contends that Swick requested that the IRS begin

the process of terminating Gaines for non-disciplinary reasons—in other words, that she be

terminated without cause.  Def.'s Stmt. ¶ 54.  On the other hand, Gaines admits that Swick and

Becker discussed two available options—a non-disciplinary termination and a disability

retirement—but denies that Swick requested that the IRS begin the process for a non-disciplinary

termination.  Pls.' Stmt. ¶ 54.  Both versions of the conversation find some support in the record.

Becker testified at her deposition that Swick informed her that Gaines would not be "coming to

work" and requested that Becker "start the termination procedures."  Dep. of Stacey Becker

("Becker Dep.") at 28.  Meanwhile, Swick has submitted a declaration in which he states that

while he and Becker "did discuss the option of a non-disciplinary termination, . . . [he] did not

suggest that Ms. Becker propose Ms. Gaines's termination."  Pls.' Ex. 33 (Decl. of Richard L.

Swick) ¶¶ 3, 5.  Furthermore, there is a point in Becker's deposition testimony where she

suggests that Swick stated during the conversation that the IRS "needed to get her retirement

going," Becker Dep. at 67, which may or may not be consistent with the remainder of her

testimony.  Viewing this conflicting evidence in the light most favorable to Gaines as the non-

movant, the Court will assume for purposes of resolving the pending motions that Swick did not

ask or otherwise propose that the IRS commence the process of terminating Gaines for non-

disciplinary reasons.

Setting aside whether Swick requested that the IRS do so, the IRS subsequently initiated

the process of removing Gaines for non-disciplinary reasons.  Def.'s Stmt. ¶ 55; Pls.' Stmt. ¶ 55.

Gaines testified that she no longer wanted to continue working at the IRS by that point in time,

and maintains that she was still unable to work.  Gaines Dep. at 207, 212.  Nonetheless, she had

not at that time filed an application for her preferred mode of separating from the IRS—namely, a

disability retirement.[23]  Def.'s Stmt. ¶¶ 56-57; Pls.' Stmt. ¶¶ 56-57.  Accordingly, the IRS

proceeded with the non-disciplinary termination process, citing as grounds Gaines's admitted

failure to report for work and inability to perform her duties since early July 2008.  Def.'s Stmt. ¶

59; Pls.' Stmt. ¶ 59.  On September 15, 2009, the IRS notified Gaines of the proposed non-

disciplinary termination, and in so doing expressly advised Gaines that the proposed "action

[would] not affect [her] entitlement to apply for disability retirement for up to one year after

separation" and "[would] not affect any entitlement to compensation for which [she] may qualify

under the Federal Employees' Compensation Act."  Gaines Dep. Ex. 22 (Ltr. from S. Becker to

M. Gaines dated Sept. 15, 2009) at 1-2; *see also* Becker Dep. at 66 (testifying that the

termination would not have any effect on Gaines's filing for a disability retirement).  Although

---

[23]  While Gaines disputes other aspects of Becker's recollection of her conversation with
Swick, Becker's testimony that she told Swick that she was uncertain why Gaines had not
applied for disability retirement and that she and IRS management would support and facilitate
such an application stands uncontradicted.  Becker Dep. at 63.  Meanwhile, when Gaines was
asked at her deposition what steps she had taken to secure a disability retirement, the only step
she was able to identify was that she had spoken to her counsel, Swick.  Gaines Dep. at 212-13.

the IRS informed Gaines of her right to respond to the proposal orally or in writing, Gaines

elected to do neither.  Gaines Dep. Ex. 22 (Ltr. from S. Becker to M. Gaines dated Sept. 15,

2009) at 2; Def.'s Stmt. ¶ 60; Pls.' Stmt. ¶ 60.  On October 16, 2009, the IRS notified Gaines that

her non-disciplinary proposal would be upheld and that she would be removed from federal

service effective October 23, 2009.  Def.'s Stmt. ¶ 61; Pls.' Stmt. ¶ 61; Gaines Dep. Ex. 23 (Ltr.

from K. Becton-Johnson to M. Gaines dated Oct. 16, 2009).

It is an employee's responsibility to initiate the disability retirement application process.

Becker Dep. at 68.  The Secretary asserts that the IRS cannot process a disability retirement

without a Form OPM SF-3112B application for disability retirement from the employee, Def.'s

MSJ Mem. at 10 n.4, and this assertion is left uncontested by Gaines in her opposition papers.

When notifying Gaines of her proposed non-disciplinary termination on September 15, 2009, the

IRS described the application process for Gaines and provided relevant contact information.

Gaines Dep. Ex. 22 (Ltr. from S. Becker to M. Gaines dated Sept. 15, 2009) at 1.  It is undisputed

that Gaines did not file an application for a disability retirement—Form OPM SF-3112B—until

October 4, 2009.  Def.'s Stmt. ¶ 57; Pls.' Stmt. ¶ 57.  Thereafter, the IRS forwarded her

application to the Office of Personnel Management ("OPM")[24] and Gaines's termination was

subsequently converted from a non-disciplinary removal to a disability retirement.  Def.'s Stmt.

¶¶ 58, 62; Pls.' Stmt. ¶ 62.  The record created by the parties does not clearly provide when the

conversion occurred.

---

[24]   The OPM, and not the IRS, is tasked with making the determination on an application
for a disability retirement.  Gaines Dep. Ex. 22 (Ltr. from S. Becker to M. Gaines dated Sept. 15,
2009) at 1.

B.      *Factual Background Relating to Plaintiff Euel Mason*

Mason began working with the IRS in 1987 as a GS-5-level Printing Analyst.  Def.'s

Stmt. ¶ 63; Pls.' Stmt. ¶ 63.  As a result of the 2006 Settlement, he was promoted to a GS-14-

level Technical Advisor position in the M&P Organization.  Def.'s Stmt. ¶ 64; Pls.' Stmt. ¶ 64.

During the relevant time period, Mason's chain-of command was as follows:

- •      First-line supervisor: Pedro Mendez ("Mendez"), from October 1, 2006, to

        April 13, 2007; fellow-plaintiff Benton, from April 15, 2007, to July 7,

        2007; Richard Freeman ("Freeman"), from July 8, 2007, to August 5,

        2007; and Paul Dangel ("Dangel"), from August 4, 2007, to September 30,

        2007;

- •      Second-line supervisor: Mitchell Farah ("Farah"); and

- •      Third-line supervisor:  Fayne, until September 2008; Becton-Johnson,

        from September 2008, to July 31, 2009.

Def.'s Stmt. ¶¶ 65-67; Pls.' Stmt. ¶¶ 65-67.

1.      Mason's Complaints as to a Series of "Incidents" With His Supervisors

Mason complains of a series of approximately fourteen "incidents" that allegedly

occurred between him and his supervisors in the approximately three-year period extending from

June 2, 2006, to July 31, 2009.[25]  *See* Pls.' MSJ Opp'n at 12-24.  Mason provides only the barest

_____

[25]  The Court shall disregard Mason's sporadic allegations that he was "stalked" or "harassed" on a "daily basis" when those allegations are unaccompanied by any meaningful factual support.  *See Ass'n of Flight Attendants-CWA v. U.S. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009) (conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment).  Absent further factual content, Mason has failed to adduce sufficient facts that would allow a reasonable trier of fact to conclude that his allegations would meaningfully contribute to a severe or pervasive hostile work

of factual content in connection with these incidents, and the Court identifies them here *seriatim*.

- **The June 2, 2006, Incident:** Mason alleges that he attended a meeting with his third-line supervisor, Fayne, to discuss and resolve his concerns about "personnel information and chain of command reporting structure." Pls.' MSJ Opp'n at 12; Pls.' Interrog. Resps. No. 3. Mason claims that his concerns were not "corrected or resolved in a timely manner." Pls.' MSJ Opp'n at 12; Pls.' Interrog. Resps. No. 3.

- **The March 7, 2007, Incidents:** Mason alleges that he received a "harassing" e-mail from his third-line supervisor, Fayne, in which Fayne indicated that "she was not going to meet with him to address his ongoing and unresolved concerns." Pls.' MSJ Opp'n at 13; Pls.' Interrog. Resps. No. 3. In addition, Mason alleges that he received "a very disturbing,

---

environment. In addition, the Court shall disregard Mason's stand-alone allegation that "[o]n or around December 18, 2002, Mr. Farah approached [him] . . . in an aggressive and demeaning manner," "demand[ing] information about a project that Ron Hazell was working on" and "rais[ing] his voice." Pls.' MSJ Opp'n at 21 (citing Dep. of Gerald Plater ("Plater Dep.") at 52-55). First, the date identified by Mason—December 18, 2002—would place the alleged incident several years before any other event allegedly comprising the hostile work environment, and yet Mason makes no attempt to explain how an event so remote in time could possibly be construed as part of the same work environment (the Court acknowledges that Mason may have misidentified the date in his opposition, but neither his opposition nor the record provides an unambiguous date that would allow the Court to conclude that the event occurred closer in time). Second, the incident is conspicuously absent from Mason's responses to the Secretary's interrogatories calling upon him to identify each and every alleged incident of harassment supporting his claims. Pls.' Interrog. Resps. Nos. 3, 5. Third, by burying the allegation in his sixty-eight page opposition memorandum instead of including it in his responsive statement of material facts, Mason failed to raise the allegation in the specific manner prescribed by the Court. *See* 6/11/09 Scheduling & Procedures Order (Civil Action No. 09-462) ¶ 6; 5/13/10 Order (Civil Action No. 09-462) at 3; Tr. of 5/13/10 Status Hr'g (Civil Action No. 09-462) at 21-22. Regardless, even if the Court were to consider Mason's allegations in this regard, it would not warrant reaching a different result with respect to the pending motions.

condescending, and harassing e-mail" from his second-line supervisor,

Farah, on the same day, in which Farah told Mason that he was "not

familiar" with the 2006 Settlement.  Pls.' MSJ Opp'n at 13; Pls.' Interrog.

Resps. No. 3.

•   **March 26, 2007, Incident:**  Mason alleges that he attended a "private

meeting" with his first-line supervisor, Mendez, and second-line

supervisor, Fayne, in which Fayne spoke to him "in a very aggressive tone

and derogatory, condescending and insensitive way" when Fayne allegedly

told Mason that "she was 'singling him out' because of his expertise and

because of his marital status of being 'single.'" Pls.' MSJ Opp'n at 14;

Pls.' Interrog. Resps. No. 3.

•   **The April 30, 2007, Incident:**  Mason alleges that he was required to

attend an "impromptu personnel meeting" called by his third-line

supervisor, Fayne, and attended by various senior-level management

officials, concerning "ongoing and unresolved personnel issues."  Pls.'

MSJ Opp'n at 15; Pls.' Interrog. Resps. No. 3.  Without further

explanation, Mason contends that he felt "singled-out" and "harassed" by

being required to attend an "inappropriate and mandated meeting."  Pls.'

MSJ Opp'n at 15; Pls.' Interrog. Resps. No. 3.

•   **The June 28, 2007, Incident:**  Mason alleges that he was copied on "a

very disturbing, condescending, and harassing" e-mail from his second-

line supervisor, Farah, in which Farah stated to co-plaintiff Benton that

20

Mason "could not act on Mr. Benton's behalf for even the one week while he was out of the office." Pls.' MSJ Opp'n at 15-16; Pls.' Interrog. Resps. No. 3. Mason contends that the e-mail was designed to "single-out and publically embarrass [him] in front [of] other management officials and coworkers." Pls.' MSJ Opp'n at 15-16; Pls.' Interrog. Resps. No. 3.

- **The December 10, 2007, Incident:** Mason alleges that he witnessed his second-line supervisor, Farah, hand co-plaintiff Benton a "sealed confidential envelope which contained a bogus management directive of reprimand" pertaining to Benton. Pls.' MSJ Opp'n at 17-18; Pls.' Interrog. Resps. No. 3.

- **The February 29, 2008, Incident:** Mason alleges that he was approached "in an aggressive, condescending, disruptive and harassing manner" at his workstation by his first-line supervisor, Mendez, and his second-line supervisor, Farah, who handed Mason "a sealed confidential envelope containing a bogus management directive of reprimand with other coworkers were [sic] present." Pls.' MSJ Opp'n at 18-19; Pls.' Interrog. Resps. No. 3.

- **The March 31, 2008, Incident:** Mason alleges that he witnessed his third-line supervisor, Fayne, approach co-plaintiff Benton "in a threatening, condescending, disruptive, abusive, hostile and harassing verbal tone and manner" by "berat[ing] Mr. Benton for not agreeing to attend an impromptu meeting about a confidential matter." Pls.' MSJ

21

Opp'n at 19-20; Pls.' Interrog. Resps. No .3

- **The June 19, 2008, Incident:**  Mason alleges that he witnessed his second-line supervisor, Farah, approach co-plaintiff Benton's workstation and "attempt [to] embarrass, degrade, and humiliate [] Benton with [sic] publically handing him . . . a confidential sealed envelope."  Pls.' Interrog. Resps. No. 3.

- **October 6, 2008, Incident:**  Mason alleges that he was approached by his second-line supervisor, Farah, "in an aggressive, condescending, disruptive and harassing manner" when Farah provided him with a "sealed confidential envelope[]" containing a letter proposing disciplinary action. Pls.' MSJ Opp'n at 20-21; Pls.' Interrog. Resps. Nos. 3, 5.

- **January 7, 2009, Incident:**  Mason alleges that he was approached by his second-line supervisor, Farah, "in an aggressive, demeaning, abusive, harassing and hostile manner, when [Farah] handed him a sealed confidential envelope containing a [letter] imposing a 3-day suspension without pay."  Pls.' MSJ Opp'n at 21-22; Pls.' Interrog. Resps. Nos. 3, 5.

- **February 4, 2009, Incident:**  Mason alleges that his second-line supervisor, Farah, "repeatedly came down to [his] work area to stalk and harass [him] at his workstation to humiliate and embarrass him in a very condescending, threatening and demeaning manner in front of co-workers."  Pls.' MSJ Opp'n at 22-23; Pls.' Interrog. Resps. Nos. 3, 5.

- **July 28, 2009, Incident:**  Mason alleges that he was approached by his

first-line supervisor, Dangel, "in an aggressive, demeaning, abusive,
harassing and hostile manner."  Pls.' MSJ Opp'n at 23; Pls.' Interrog.
Resps. No. 3.

- **July 31, 2009, Incident:**  Mason alleges that he attended a meeting with
his first-line supervisor, Dangel, during which Dangel "wanted [him] to
sign and date a memorandum stating Notice of Unsatisfactory
Performance of Duty and Failure to Respond Readily to the Directions of
your Supervisor," which he characterizes as "totally untrue, unwarranted,
and unlawful against him."  Pls.' MSJ Opp'n at 23-24; Pls.' Interrog.
Resps. No. 3.

    2.    <u>Mason's Non-Selection for the '322 Position</u>

On or about April 16, 2007, Mason applied for the position of Branch Chief of Functional
Publishing, Vacancy Announcement 40-41-AT7TG322 ("'322 Position").  Def.'s Stmt. ¶ 68;
Pls.' Stmt. ¶ 68.  Five employees, all African American, were named to the best-qualified list for
the '322 Position.  Def.'s Stmt. ¶ 69; Pls.' Stmt. ¶ 69.  In addition to Mason, included on the list
were (1) co-plaintiff Benton, (2) Freeman, (3) Vincente Tillman ("Tillman"), and (4) Cynthia
McKinney ("McKinney").  Def.'s Stmt. ¶ 69; Pls.' Stmt. ¶ 69.  Steve Manno ("Manno") was the
ranking official, Farah was the recommending official, and Fayne was the selecting official.
Def.'s Stmt. ¶¶ 70, 72; Pls.' Stmt. ¶¶ 70, 72.

As the ranking official, Manno began the process by reviewing the application packages
and written submissions that the five candidates submitted and assigning each candidate a

score.[26]  Def.'s Stmt. ¶¶ 70, 73; Pls.' Stmt. ¶¶ 70, 73.  Mason received a ranking score of 95

points.[27]  Def.'s Stmt. ¶ 74; Pls.' Stmt. ¶ 74.  Thereafter, the candidates were interviewed by a

three-person panel, which asked each candidate identical questions and rated their responses.

Def.'s Stmt. ¶ 75; Pls.' Stmt. ¶ 75.  Mason received an interview score of 22 points.  Def.'s Stmt.

¶ 76; Pls.' Stmt. ¶ 76.  The final scores for all five candidates were as follows:

| NAME | RANKING SCORE | INTERVIEW SCORE |
|---|---|---|
| Freeman (selectee) | 100 | 28 |
| Tillman | 100 | 22 |
| Mason | 95 | 22 |
| Benton | 95 | 21 |
| McKinney | 90 | 17 |

---

[26]  In responding to the Secretary's proffered factual statement, Mason concedes that the
statement is admitted, but then proceeds to set forth additional factual allegations.  Specifically,
Mason alleges that Manno "ranked his direct subordinate, Vincente Tillman, which constituted a
conflict of interest and compromised the Agency's selection process in accordance with the
Internal Revenue Manual (IRM) 6.335.1 - Merit Promotion Plan."  Pls.' Stmt. ¶ 70 (citing Dep.
of Steve Manno ("Manno Dep.") at 12).  But Mason does not identify any language in the
Internal Revenue Manual that prohibited Manno from evaluating a subordinate, and more
importantly, Mason fails to cite to evidence in the record that would permit the Court to evaluate
the validity of the claim—most notably, the Internal Revenue Manual itself.  "Judges 'are not
like pigs, hunting for truffles buried in briefs' or the record," *Potter v. District of Columbia*, 558
F.3d 542, 553 (D.C. Cir. 2009) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th
Cir.1991)), and the Court declines Mason's invitation to sift through the record in an attempt to
locate evidence in support of his claim.  Because these extraneous factual allegations are
unaccompanied by sufficiently specific "references to the parts of the record relied on [for]
support," LCvR 7(h)(1), the Court will disregard them.  In any event, Mason fails to adduce
evidence that would allow the trier of fact to conclude that any procedural error was intentional
or otherwise indicative of a retaliatory animus against him.

[27]  In responding to the Secretary's proffered factual statement, Mason concedes that the
statement is admitted, but then proceeds to allege that Manno's ranking process was "biased and
unfair."  Pls.' Stmt. ¶ 74.  Because this extraneous factual allegation is unaccompanied by
"references to the parts of the record relied on [for] support," LCvR 7(h)(1), it shall be
disregarded by the Court.  Mason adduces no evidence in support of his allegation.

*See* Def.'s Ex. M (Management Selection Program Ranking Form for R. Freeman); Def.'s Ex. N

(Management Selection Program Ranking Form for V. Tillman); Def.'s Ex. O (Management

Selection Ranking Form for D. Benton); Def.'s Ex. P (Management Selection Program Ranking

Form for C. McKinney); Def.'s Ex. Q (Management Selection Ranking Form for E. Mason).

The scores were then reviewed by Farah, who as the recommending official chose the

highest-ranking candidate—Freeman.  Def.'s Ex. L (Promotion Certificate) at 1501.  Thereafter,

the scores and Farah's recommendation were reviewed by Fayne, who as the selecting official

selected the highest-ranking candidate—Freeman—on July 8, 2007.  Def.'s Stmt. ¶¶ 78-79; Pls.'

Stmt. ¶¶ 78-79; Def.'s Ex. L (Promotion Certificate) at 1501.

The application and review materials demonstrated a "clear separation" between Freeman

and the other four candidates, including Mason.[28]  Def.'s Stmt. ¶ 80.  Both Manno, as the ranking

official, and the interview panel agreed that Freeman possessed the most extensive managerial

experience, demonstrated more relevant professional achievement than the other candidates, and

had an educational background that was superior or comparable to the other candidates.[29]  *Id.* ¶

---

[28]  Mason purports to dispute the Secretary's proffered factual statement, but his argument
is non-responsive.  *See* Pls.' Stmt. ¶ 80.  While Mason alleges that "Mr. Freeman was selected
because Ms. Fayne and Mr. Farah harbored a retaliatory animus against Mr. Mason and Mr.
Benton," Pls.' Stmt. ¶ 80, he provides no explanation or evidentiary basis that would call into
doubt the Secretary's proffered statement that, viewed objectively, "[t]he application packages
and the interview panelists' notes demonstrate a clear separation between Freeman and the rest of
the candidates," Def.'s Stmt. ¶ 80.  Accordingly, the Court will deem the Secretary's proffered
statement to be admitted.  The Court addresses Mason's generalized allegations of bias elsewhere
in this Memorandum Opinion.

[29]  Mason purports to dispute the Secretary's proffered factual statement, but his argument
is non-responsive.  *See* Pls.' Stmt. ¶ 81.  In responding, Mason incorporates his response to an
entirely different factual statement, but the incorporated response pertains to Farah and Fayne's
alleged bias, and provides no explanation or evidentiary basis to call into doubt the determination
of the interview panelists or Manno.  Accordingly, the Court will deem the Secretary's proffered

81.  At his deposition, Mason admitted that he was not the most qualified candidate for the '322

Position.  Dep. of Euel Mason ("Mason Dep.") at 206-08.  In his own view, at least two

candidates—Tillman and co-plaintiff Benton—should have been selected over him.  *Id.*

### 3.  Mason's Request for a Rotational Work Assignment

On March 28, 2008, employees in the M&P Organization received an e-mail describing

the Rotational Work Assignment Program, which was designed to "provide Printing Specialists

the opportunity to gain a broader knowledge base of the organization and its programs."  Def.'s

Stmt. ¶ 84; Pls.' Stmt. ¶ 84.  Employees were invited to select up to three program choices for a

rotational work assignment and to submit their choices to their supervisor by April 11, 2007,

along with a statement explaining why the choices would benefit the IRS.  Def.'s Ex. R (E-mail

from T. Costa to M&P Listserv dated Mar. 27, 2007) at 1.  Mason submitted his requests for a

rotational assignment on April 23, 2007, after the submission deadline had elapsed.  Def.'s Stmt.

¶ 85; Pls.' Stmt. ¶ 85.  Nonetheless, Mason's second-line supervisor, Farah, considered Mason's

request.  Def.'s Stmt. ¶ 86; Pls.' Stmt. ¶ 86.  After consulting with Mason's first-line supervisor,

co-plaintiff Benton, and his third-line supervisor, Fayne, Farah decided that Mason should

remain in his current position in order to complete an ongoing project, the VERA/VSIP Mailout

Program, and denied Mason's request on April 23, 2007.[30]  Def.'s Stmt. ¶ 86; Pls.' Stmt. ¶ 86;

---

statement to be admitted.  The Court addresses Mason's generalized allegations of bias on the
part of Farah and Fayne elsewhere in this Memorandum Opinion.

[30]  In responding to the Secretary's proffered factual statement, Mason first concedes that
the statement is admitted, but then proceeds to raise a series of extraneous factual allegations
concerning a "Special Project Team for the Publishing Workforce Program producing various
Reduction In Force (RIF) packages."  Pls.' Stmt. ¶ 86.  It is unclear how these allegations, which
are stated without any meaningful factual context, even relate to the Secretary's proffered
statement.  In any event, because these extraneous factual allegations are unaccompanied by

Def.'s Ex. R (E-mail from M. Farah to E. Mason dated Apr. 23, 2007).  Mason's first-line

supervisor, co-plaintiff Benton, had informed Farah that another important mailout was

upcoming and that Mason's participation in the project was necessary.  Def.'s Stmt. ¶ 87; Pls.'

Stmt. ¶ 87.  However, after the VERA/VSIP Mailout Program had concluded, Mason renewed

his request for a rotational assignment.  Def.'s Stmt. ¶ 89; Pls.' Stmt. ¶ 89.  Farah responded the

very next day by granting Mason's request, notifying Mason that he would be granted a rotational

work assignment to the Wage & Investment Tax Products Branch Chief's office beginning on

August 5, 2007.[31]  Def.'s Stmt. ¶ 90; Def.'s Ex. R (E-mail from M. Farah to E. Mason dated July

27, 2007).

### 4.    Mason's Request for a Transfer to the New Carrollton Office

On August 30, 2007, Mason sent an e-mail to his third-line supervisor, Fayne, requesting

that his post of duty be changed from IRS Headquarters in Washington, D.C., to the IRS's New

Carrollton office located in Lanham, Maryland.  Def.'s Stmt. ¶ 91; Pls.' Stmt. ¶ 91.  Fayne

responded to Mason's request later that day, reminding Mason of the general policy that requests

by employees in the M&P Organization for a transfer to New Carrollton office would not be

considered until January 2008 because the M&P Organization had in place a moratorium on all

relocations to the New Carrollton office affecting all employees in the organization.  Def.'s Stmt.

---

"references to the parts of the record relied on [for] support," LCvR 7(h)(1), the Court will
disregard them.

[31]  Mason purports to dispute the Secretary's proffered factual statement.  *See* Pls.' Stmt.
¶ 91.  However, his narrative response concedes that "Mr. Farah approved [his] request to [be]
reassigned to the W&I Publishing Branch," and it is unclear what part of the proffered factual
statement Mason intends to dispute.  *Id.*  In any event, because Mason's response is
unaccompanied by "references to the parts of the record relied on [for] support," LCvR 7(h)(1),
the Court will deem the Secretary's proffered factual statement to be admitted.

¶ 92; Pls.' Stmt. ¶ 92; Def.'s Ex. S (E-mail from D. Fayne to E. Mason dated Aug. 30, 2007).  At

his deposition, Mason admitted that he was already aware of the policy at the time that he made

his request.  Mason Dep. at 177-78.  He has also conceded that he is unable to identify any other

employee in the M&P Organization who requested and was granted a transfer to the New

Carrollton office during the moratorium.  Def.'s Stmt. ¶ 95; Pls.' Stmt. ¶ 95.

    5.    Mason's Request to Be Reassigned to Another Branch

On December 17, 2007, Mason requested to be transferred to another branch within the

M&P Organization.[32]  Def.'s Stmt. ¶ 96; Pls.' Stmt. ¶ 96.  On December 18, 2007, Mason's

second-line supervisor, Farah, denied the request, citing as grounds that Mason had just recently

been transferred to the Functional Publishing Branch in July 2007 and that there was no staffing

need for someone working in Mason's position in any of the other branches.[33]  Def.'s Stmt. ¶ 98;

---

[32]  Mason also alleges that another request for reassignment was denied sometime in May,
2009.  *See* Pls.' MSJ Opp'n at 23 (citing Pls.' Interrog. Resps. No. 4).  For several reasons, the
Court shall disregard the allegation.  First, by burying the allegation in his sixty-eight page
opposition memorandum instead of including it in his responsive statement of material facts,
Mason failed to raise the allegation in the specific manner prescribed by the Court.  *See* 6/11/09
Scheduling & Procedures Order (Civil Action No. 09-462) ¶ 6; 5/13/10 Order (Civil Action No.
09-462) at 3; Tr. of 5/13/10 Status Hr'g (Civil Action No. 09-462) at 21-22.  Second, it is
undisputed that Mason failed to raise any such allegation on the administrative level, Def.'s Stmt.
¶ 97; Pls.' Stmt. ¶ 97, and yet he never even attempts to explain why it could properly be
considered by the Court.  Third, Mason adduces no evidence that would suggest that the denial of
his request had anything to do with his protected activity; he offers only his conclusory allegation
that it was "a result of on-going retaliation."  Pls.' Interrog. Resps. No. 4.  Regardless, even if the
Court were to consider Mason's allegation, it would not warrant reaching a different result with
respect to the pending motions.

[33]  Mason purports to dispute the Secretary's proffered factual statement, but in so doing
he provides no explanation or evidentiary basis for calling into doubt either that he had just
recently been transferred to the Functional Publishing Branch in 2007 or that there was no
staffing need for someone working in Mason's position in any of the other branches.  *See* Pls.'
Stmt. ¶ 98.  Accordingly, the Court shall deem those matters to be admitted.  Mason's response
instead alleges that Farah otherwise harbored a generalized retaliatory animus, an argument

Def.'s Ex. U (Decl. of Paul L. Dangel) at 1112; Def.'s Ex. V (Decl. of Mitchell A. Farah) at 992.

### 6.   Mason's Request for a "Flexiplace" Assignment

On October 15, 2007, Mason met with his first-line supervisor, Dangel, during which he provided Dangel with a memorandum entitled "Requests for Family Medical Leave Act and Flexi-Place," and a seven-page, single-spaced "Informal Meeting Agenda."  Def.'s Stmt. ¶ 99; Pls.' Stmt. ¶ 99.  In the memorandum, Mason explained that he had two sisters in Memphis, Tennessee, who required his support and requested "to be approved for the Family Medical Leave Act" and "to be allow [sic] to work Flexi-place from the Memphis Service Center Campus."  Def.'s Stmt. ¶ 100; Pls.' Stmt. ¶ 100.  In the agenda, Mason expressly asked Dangel to seek approval for the requests on his behalf from "appropriate upper management officials."  Def.'s Stmt. ¶ 101; Pls.' Stmt. ¶ 101.  Pursuant to Mason's request, Dangel subsequently approached his supervisors and inquired whether Mason could work in Memphis.  Def.'s Stmt. ¶ 102; Pls.' Stmt. ¶ 102.  It is undisputed that Dangel did not discuss the nature of Mason's sisters' illness, Mason's prior protected activity, or Mason's participation in the Employee Assistance Program with his supervisors.[34]  Def.'s Stmt. ¶ 103; Pls.' Stmt. ¶ 103.

---

which the Court addresses elsewhere in the Memorandum Opinion.

[34]  In responding to the Secretary's proffered factual statement, Mason unambiguously states that he admits that "Dangel did not discuss Mason's EEO activity, participation in the Employee Assistance Program, or the nature of [Mason's] sisters' illnesses with his supervisors." Def.'s Stmt. ¶ 103; Pls.' Stmt. ¶ 103.  The Court will hold Mason to this unambiguous admission, even if it may be in tension with his responses to an interrogatory posed by the Secretary in the course of discovery.  *See* Pls.' Interrog. Resps. No. 6 (alleging that "Dangel disclosed [Mason's] confidential employee information to Mr. Farah and Denise S. Fayne," including "1) plaintiff's EEO activity at the time, 2) plaintiff seeking counseling through the Employee Assistance Program (EAP), and 3) medical issues regarding plaintiff's family members that reside out of state.").  In any event, Mason's cursory interrogatory responses fail to explain how he could possibly have personal knowledge of the conversation, and as such is an

Subsequently, Dangel notified Mason that he had spoken with Farah and Fayne about his requests.  Def.'s Stmt. ¶ 104; Pls.' Stmt. ¶ 104.  This prompted Mason to send a lengthy e-mail to his first-line supervisor, Dangel, his second-line supervisor, Farah, his third-line supervisor, Fayne, and his fifth-line, Atlanta-based supervisor, Susan Carroll, entitled, "Did not need to know requesting [sic] reassignment its [sic] a trust broken reassigned [sic] to B-tax chief or Pub. chief."  Def.'s Stmt. ¶ 105; Pls.' Stmt. ¶ 105.

### 7.    Mason's "Met" Rating on His 2007 Performance Appraisal

Following implementation of the 2006 Settlement, Mason was promoted to a GS-14-level, 1601-series Technical Advisor position.  Def.'s Stmt. ¶ 106; Pls.' Stmt. ¶ 106.  Prior to the promotion, Mason was a GS-13, non-managerial, non-bargaining-unit employee and received performance appraisals on Form 6850-NBU.  Def.'s Stmt. ¶ 107; Pls.' Stmt. ¶ 107.  Following his promotion to Technical Advisor, however, Mason was evaluated under Form 12450-B, which is typically used for management officials.[35]  Def.'s Stmt. ¶ 108; Pls.' Stmt. ¶ 108.  Form 12450-B differs from Form 6850-NBU because it contains so-called "critical performance expectations" ("CPEs"), concrete goals specifically designed for each employee being evaluated.  Def.'s Stmt. ¶ 109; Pls.' Stmt. ¶ 109.  The Form 6850-NBU does not contain these specific, employee-tailored performance expectations and instead evaluates employees using general achievement criteria

---

insufficient basis for a reasonable trier of fact to disregard the contrary evidence in the record.  *See* Dep. of Paul Dangel ("Dangel Dep.") at 51.

[35]  In responding to the Secretary's proffered factual statement, Mason first concedes that the statement is admitted, and then proceeds to raise a number of incoherent, extraneous factual allegations.  *See* Pls.' Stmt. ¶ 108 (citing Pls.' Interrog. Resps. No .7).  In support, Mason cites exclusively to his response to an interrogatory posed by the Secretary in the course of discovery, which does not support the factual allegations identified.  *See* Pls.' Interrog. Resps. No. 7.

like "customer satisfaction" and "business results."  Def.'s Stmt. ¶ 110; Pls.' Stmt. ¶ 110.  In

short, with his promotion, Mason was being evaluated based on new criteria.  Def.'s Stmt. ¶ 111;

Pls.' Stmt. ¶ 111.

The matter was complicated somewhat when Mason stated that he did not want to assume

managerial responsibilities upon his promotion.[36]  Def.'s Stmt. ¶ 112; Dep. of Denise Fayne

("Fayne Dep.") at 77-78.  Due to Mason's refusal to accept a managerial position, an entirely

new, non-managerial position was created especially for him at the GS-14 level.[37]  Def.'s Stmt. ¶

113; Fayne Dep. at 72-73, 77. Because Mason held a non-managerial GS-14-level position, there

was initially some confusion as to whether Mason should continue to be evaluated under Form

6850-NBU or should instead be evaluated under Form 12450-B.  Def.'s Ex. Z (Suppl. Decl. of

Pedro Martinez) at 1158.  Later, it was discovered that Mason should have been provided with

his CPEs when he was first promoted, and should have been switched over to the Form 12450-B

at that time.  Def.'s Stmt. ¶ 114; Pls.' Stmt. ¶ 114.  When the oversight came to light, Mason's

supervisors converted him to Form 12450-B and issued him the CPEs that would help determine

his ultimate rating on the Form 12450-B.  Def.'s Stmt. ¶ 115; Pls.' Stmt. ¶ 115.

Consistent with this account, Mason's first-line supervisor, Mendez, initially signed

Mason's review on the Form 6850-NBU on February 27, 2007, issuing Mason a rating of

---

[36]  While Mason purports to dispute the Secretary's proffered factual statement, asserting the he "was willing to take an acceptable management position," his response is unaccompanied by "references to the parts of the record relied on [for] support."  LCvR 7(h)(1).  Accordingly, the Court will deem the Secretary's proffered factual statement to be admitted.

[37]  While Mason purports to dispute the Secretary's proffered factual statement, asserting that he "was willing to take an acceptable management position," his response is unaccompanied by "references to the parts of the record relied on [for] support."  LCvR 7(h)(1).  Accordingly, the Court will deem the Secretary's proffered factual statement to be admitted.

"Outstanding"—the highest rating available—for the period from February 1, 2006, to January 31, 2007.[38]  Def.'s Stmt. ¶ 116; Def.'s Ex. Y (Non Bargaining Unit Performance Appraisal for Euel Mason) at 1740.  Mason was subsequently converted to Form 12450-B for the period from October 1, 2006, to September 30, 2007.  Def.'s Stmt. ¶ 117; Pls.' Stmt. ¶ 117.  On April 20, 2007, Mason and his first- and second-line supervisors signed a mid-year progress review in which Mason acknowledged that he had discussed the CPEs with his supervisors and was given specific examples of the behavior that would meet the standards described in the CPEs.  Def.'s Stmt. ¶ 118; Pls.' Stmt. ¶ 118.

At the end of fiscal-year 2007, Mendez furnished Mason with a summary narrative of Mason's achievements to be included in his Form 12450-B evaluation.[39]  Def.'s Stmt. ¶ 119;

---

[38]  Mason purports to dispute the Secretary's proffered factual statement, but the only evidence in the record cited by Mason in his response supports, rather than undermines, the veracity of the statement.  *See* Pls.' Stmt. ¶ 116 (citing Def.'s Ex. Y (Non Bargaining Unit Performance Appraisal for Euel Mason)).  Accordingly, the Court shall deem the Secretary's proffered factual statement to be admitted.

[39]  Mason purports to dispute the Secretary's proffered factual statement, claiming that Mendez "was not [his] first-line supervisor at the conclusion of his FY Management Official Performance Agreement."  Pls.' Stmt. ¶ 119 (citing Pls.' Interrog. Resps. No. 7).  While the evidence cited by Mason does not actually support his response, *see* Pls.' Interrog. Resps. No. 7, it is undisputed that Dangel was Mason's first-line supervisor at the conclusion of the performance period on September 30, 2007, Def.'s Stmt. ¶ 67; Pls.' Stmt. ¶ 67.  At the same time, it is undisputed that Mendez was Mason's first-line supervisor from October 1, 2006, through April 13, 2007, which comprised the majority of the performance period relevant to the appraisal.  Def.'s Stmt. ¶ 67; Pls.' Stmt. ¶ 67; Def.'s Ex. X (Management Official Performance Agreement for E. Mason) at 1681.  For the remainder of the performance period, Mason had three separate first-line supervisors—co-plaintiff Benton, Freeman, and Dangel.  Def.'s Stmt. ¶ 67; Pls.' Stmt. ¶ 67.  The Secretary asserts that neither Benton, Freeman, nor Dangel contributed to the appraisal because they each supervised Mason for less than 60 days, *see* Def.'s MSJ Mem. at 8 n.8, the minimum time required to issue a performance appraisal, and this assertion is left uncontested by Mason.  More to the point, Mason's response does not present any explanation or evidentiary basis to call into doubt the Secretary's proffered factual statement that "[a]t the end of FY 2007, Mendez furnished Mason with a Summary Narrative of Mason's achievement to be

Def.'s Ex. X (Management Official Performance Agreement for E. Mason) at 1685.  Mendez

also asked Mason to prepare a self-assessment for the year, which Mason provided.  Def.'s Stmt.

¶ 120; Pls.' Stmt. ¶ 120.  Mendez reviewed Mason's self-assessment and, based on Mason's

narrative, determined that Mason had successfully "met" his CPEs.[40]  Def.'s Stmt. ¶ 121; Pls.'

Stmt. ¶ 121.  However, Mendez at first refused to sign the evaluation because he was no longer

Mason's first-line supervisor of record at the conclusion of the performance period.  Mendez

Dep. at 107.  Instead, Mendez forwarded the evaluation to Mason's second-line supervisor,

Farah, for his review.  Def.'s Stmt. ¶ 122; Pls.' Stmt. ¶ 122.  Like Mendez, Farah determined that

Mason had successfully "met" his CPEs.[41]  Def.'s Stmt. ¶ 123; Dep. of Mitchell Farah ("Farah

Dep.") at 42-44.  The "met" rating meant that Mason "achieved or made substantial progress

toward achievement of desired results" with respect to his commitments and that he displayed

"solid, dependable performance."  Def.'s Stmt. ¶ 124; Pls.' Stmt. ¶ 124.  Mason claims that he

did not receive his appraisal until early October 2008.  Pls.' Stmt. ¶ 117 (citing Pls.' Interrog.

---

included in his evaluation."  Def.'s Stmt. ¶ 119.

[40]  In responding to the Secretary's proffered factual statement, Mason concedes that the statement is admitted, but then proceeds to raise a number of extraneous factual allegations.  *See* Pls.' Stmt. ¶ 121 (citing Pls.' Interrog. Resps. No. 7).  However, the evidence relied upon by Mason in support of his allegations does not support his position.  *See* Pls.' Interrog. Resps. No. 7.  For instance, Mason provides no competent evidence that would allow a reasonable trier of fact to conclude, as he suggests, that the handling of his appraisal was somehow inconsistent with the IRS's Performance Appraisal Policy.  *See* Pls.' Stmt. ¶ 121.

[41]  Mason purports to dispute the Secretary's proffered factual statement, but in so doing he provides no explanation or evidentiary basis for calling into doubt that Farah reviewed the evaluation and determined that Mason had successfully "met" his CPEs.  *See* Pls.' Stmt. ¶ 123.  Accordingly, the Court shall deem those matters to be admitted.  Mason's response instead alleges that Farah otherwise harbored a generalized retaliatory animus, an argument which the Court addresses elsewhere in the Memorandum Opinion.

Resps. No. 7).   However, it is undisputed that Mason's "met" rating became official on

November 26, 2007, when Farah electronically signed the evaluation and provided it to Mason

on the IRS's ePerformance system.[42]  Def.'s Stmt. ¶ 126; Pls.' Stmt. ¶ 126.  For months, Mason

refused to sign the evaluation, insisting that Mendez sign it first.  Farah Dep. at 44-51.

### 8.    Mason's "Met" Rating on His 2008 Performance Appraisal

Mason also received a "Met" rating for fiscal-year 2008.  Def.'s Stmt. ¶ 129; Pls.' Stmt. ¶

129; Def.'s Ex. CC (Management Official Performance Agreement for E. Mason).  Mason's

first-line supervisor, Dangel, compared Mason's achievements to his pre-set CPEs and

determined that Mason had satisfactorily met his goals.[43]  Def.'s Stmt. ¶ 130; Dangel Dep. at 83-

85.  According to Dangel, Mason had met his CPEs and performed adequately on all

assignments, though there were several assignments that were either late, inaccurate, or

incomplete.  Def.'s Ex. DD (Decl. of Paul L. Dangel) at 133.

### 9.    Mason's Three-Day Suspension

Mason routinely sent e-mails to his supervisors and senior IRS officials raising what he

claims were "workplace concerns."  Def.'s Stmt. ¶ 136; Pls.' Stmt. ¶ 136.  For example, on June

6, 2008, Mason sent a four-page, single-spaced e-mail about his 2007 performance appraisal to

---

[42]   The Secretary claims that "Mason's rating was the first to be signed and approved by
Mitchell Farah among the Technical Advisors in FY 2007."  Def.'s Stmt. ¶ 127.  Mason, in turn,
claims that "Doug King, Kathy Nemeth and Darryl Robinson received their ratings long before
Mr. Mason."  Pls.' Stmt. ¶ 127.  Because neither party cites to any record evidence in support of
their respective positions, the Court shall disregard both statements.

[43]   Mason purports to dispute the Secretary's proffered factual statement, but his response
merely incorporates a response to an entirely different factual statement that has no direct bearing
on the statement.  *See* Pls.' Stmt. ¶ 125.  Accordingly, the Court shall deem the Secretary's
proffered factual statement to be admitted.

his first-, second-, third-, and acting-third-line supervisors, as well as to the following senior IRS

officials: Douglas H. Shulman, IRS Commissioner; Richard E. Byrd, Commissioner of the Wage

& Investment Division; Pamela G. Watson, Deputy Commissioner of the Wage & Investment

Division; and Linda E. Stiff, Deputy Commissioner of the Small-Business/Self-Employment

Division.  Def.'s Stmt. ¶ 137; Pls.' Stmt. ¶ 137; Def.'s Ex. EE (E-mail from E. Mason to P.

Dangel dated June 6, 2008) at 1334-37.  In the e-mail, Mason insisted that the

"**PERFORMANCE APPRAISAL PROCESS** should be 'eliminated'" because "it's totally

'bias [sic], unfair, and unlawful.'"  Def.'s Ex. EE (E-mail from E. Mason to P. Dangel dated June

6, 2008) at 1335 (capitalization, emphasis, and internal quotation marks in original).

Eventually, Mason was directed to stop sending e-mails detailing his various grievances

directly to senior IRS officials.  Def.'s Stmt. ¶ 140; Pls.' Stmt. ¶ 140.  However, Mason

nonetheless continued to send the e-mails because he felt the responses he received from his

managers, the EEO apparatus, the Treasury Inspector General for Tax Administration

("TITGA"), and the Office of Civil Rights and Diversity were "unjust."  Def.'s Stmt. ¶ 140; Pls.'

Stmt. ¶ 140.  Alleging that EEO investigators "tamper" with complaints and conspire with IRS

supervisors to "cover up" wrongdoing, Mason claims that the EEO process is thoroughly

"corrupt" and "should be abolished."[44]  Def.'s Stmt. ¶ 141; Pls.' Stmt. ¶ 141.  He contends that

because he was dissatisfied with his supervisors' responses, he had a right to elevate his

complaints and to have them personally reviewed by the Secretary of the Treasury and even the

---

[44]  While these allegations may be helpful in explaining why Mason elected to
consistently send e-mails to senior IRS officials, the Court notes that neither Mason nor the other
Plaintiffs have adduced any evidence that would allow a reasonable trier of fact to conclude that
anything was amiss in the administration of the EEO apparatus or the agency grievance process.

35

President of the United States.[45]   Def.'s Stmt. ¶ 142; Pls.' Stmt. ¶ 142.

After tolerating Mason's communications for months and encouraging him to use the IRS's EEO apparatus and the agency grievance process to resolve his concerns, it became clear that Mason would not stop sending such communications.  Def.'s Stmt. ¶ 143; Pls.' Stmt. ¶ 143. Mason's supervisors then contacted the Labor Relations Branch to determine how best to handle the matter.  Def.'s Stmt. ¶ 143; Pls.' Stmt. ¶ 143.  At that point, a Labor Relations Specialist recommended to Mason's supervisors that they issue him a management directive[46] explaining that his behavior was unacceptable and describing the proper channels to use in raising workplace grievances.  Def.'s Stmt. ¶ 144; Pls.' Stmt. ¶ 144.  The Labor Relations Specialist and Mason's supervisors subsequently drafted the management directive and provided it to Mason on February 29, 2008.  Def.'s Stmt. ¶ 146; Pls.' Stmt. ¶ 146.  The directive, entitled "Directive for Resolving Issues of Personal Concern," was signed by Mason's second-line supervisor, Farah, and provided as follows:

> During the past several months, you have spent notable agency time and resources composing and e-mailing numerous and repetitive personal requests, complaints, and requests for information to a number of executives, senior managers, your manager, and me.  In the case of your request for information, you have been advised to submit you [sic] concerns through the appropriate channels; specifically, the EEO Complaint process or the Agency Grievance process, and you have done so.  I have been, and continue to be, available to discuss

---

[45]   In responding to the Secretary's proffered factual statement, Mason first concedes that the statement is admitted, but then claims that the facts have been "distorted."  Pls.' Stmt. ¶ 142. To the contrary, Mason plainly testified at his deposition that he believes it is the "personal responsibility" of the President of the United States and the Secretary of the Treasury to look into the issues raised in his e-mails.  Mason Dep. at 227, 229.

[46]   A "management directive" is merely an instruction from a supervisor to a subordinate to "do something or stop doing something."  Def.'s Stmt. ¶ 145; Pls.' Stmt. ¶ 145.

36

your concerns with you.

However, your use of the Agency e-mail system to demand that management answer your written interrogatories, to disparage and hector individual members of the Publishing Management Team, and your misuse of government time and equipment in the pursuit of such activities is inappropriate, disrupts the workplace and is unproductive.

You are therefore directed as follows:

1.      To immediately cease using work time, government equipment and government supplies to draft and distribute communications which disparage or hector members of the Publishing Leadership Team or other Agency employees;

2.      To follow the established chain of command in seeking resolution of your personal concerns, beginning with your first-level supervisor;

3.      To immediately cease sending "broadcast" communications to multiple management officials on personal matters and/or matters that should properly be initially presented to your first-line manager or pursued through available dispute resolution mechanisms, such as the EEO process or the Agency Grievance Procedure.

4.      To utilize available dispute resolution mechanisms and pursue adjustment of workplace concerns which are not resolved to your satisfaction by management.

Mason Dep. Ex. 19 (Mem. Directive for Resolving Issues of Personal Concern dated Feb. 28, 2008) at 1.  The memorandum then proceeds to outline the procedure for invoking the agency grievance system and EEO apparatus.  *Id.* at 2.  The memorandum concludes by warning Mason that his failure to abide by these instructions "may result in disciplinary action."  *Id.*

Nonetheless, Mason continued to e-mail senior IRS officials with complaints, requests for information, and demands to address his workplace grievances.[47]  Def.'s Stmt. ¶ 149.  On

---

[47] While Mason purports to dispute the Secretary's proffered factual statement, he does not actually contest that he continued to e-mail senior IRS officials with complaints, requests for

October 6, 2008, Mason's second-line supervisor, Farah, issued a letter proposing Mason's

suspension without pay for three days for (1) "fail[ing] to follow a directive from management,"

(2) "misus[ing] government equipment and government supplies," and (3) "misus[ing] work

time."  Mason Dep. Ex. 20 (Notice of Proposed Disciplinary Suspension dated Oct. 6, 2008) at 1-

6.  The letter identified (1) fourteen separate instances between May 9, 2008, and October 6,

2008, in which Mason allegedly sent e-mails raising "personal concerns" to higher management,

(2) thirteen separate instances in which he used government equipment to send communications

"disparag[ing] or hector[ing] members of the Publishing Leadership Team or other Agency

employees, and (3) two instances in which he "misused work time" to draft such

communications.  *Id.*  On January 6, 2009, after reviewing Mason's e-mails and Farah's

proposal, Mason's third-line supervisor, Becton-Johnson, approved the three-day suspension.

Def.'s Stmt. ¶ 152; Pls.' Stmt. ¶ 152.

> 10.    Mason's Resignation

On July 31, 2009, Mason's first-line supervisor, Dangel, met with Mason to apprise him

of his unsatisfactory performance.  Def.'s Stmt. ¶ 153; Pls.' Stmt. ¶ 153.  For months, Dangel had

orally notified Mason that he was not performing his duties in a timely or satisfactory manner.

Def.'s Stmt. ¶ 153; Pls.' Stmt. ¶ 153.  Dangel therefore requested that Mason meet with him to

discuss how they could improve Mason's performance.  Def.'s Stmt. ¶ 154; Pls.' Stmt. ¶ 154.

During the meeting, Dangel furnished Mason with a memorandum detailing Mason's

unsatisfactory performance, including Mason's unacceptable work product (and total lack of

---

information, and demands to address his many workplace grievances, but instead merely claims
that his e-mail communications should not be characterized as raising "personal concerns."  Pls.'
Stmt. ¶ 149.

work product) with respect to several specific projects.  Def.'s Stmt. ¶ 155; Pls.' Stmt. ¶ 155;

Def.'s Ex. FF (Notice of Unsatisfactory Performance of Duty and Failure to Respond Readily to

the Directions of Your Supervisor dated July 31, 2009) at 1-3.  The memorandum identifies

several instances of what was described as Mason's "uncooperative, unresponsive and

unproductive" behavior.  Def.'s Ex. FF (Notice of Unsatisfactory Performance of Duty and

Failure to Respond Readily to the Directions of Your Supervisor dated July 31, 2009) at 2.  The

memorandum concludes as follows:

> In summary, your work in [sic] incomplete, late, on [sic] not
> delivered at all.  Some of your written documents have problems with
> grammar, spelling and organization.
>
> Mr. Mason, I am more then [sic] willing to work with you but the
> primary responsibility for performing the duties of your position are
> [sic] yours.

*Id.* at 3.  Mason's work on the enumerated tasks was incomplete, late, or altogether absent, and

his work product was often sloppy and contained grammatical, spelling, and organizational

errors.[48]  Def.'s Stmt. ¶¶ 156-57.

In the middle of the meeting, shortly after Dangel gave Mason the memorandum, Mason

handed Dangel a pre-prepared letter of resignation.  Def.'s Stmt. ¶ 158; Pls.' Stmt. ¶ 158.  In his

---

[48]  Mason purports to dispute the Secretary's proffered factual statement, claiming that he "completed all his assignments on time and his first-line supervisor Paul L. Dangel is wrong." Pls.' Stmt. ¶ 156.  However, because Mason provides no "references to the parts of the record relied on [for] support" for his position, LCvR 7(h)(1), the Court shall deem the Secretary's proffered factual statement to be admitted.  While Mason elsewhere cites to one of his responses to the Secretary's interrogatories, that response does not provide any reason to call into doubt the Secretary's allegation that Mason's assignments were incomplete, late, or altogether absent.  *See* Pls.' Stmt. ¶¶ 156-157 (citing Pls.' Interrog. Resps. No. 7).  Instead, that interrogatory response merely sets forth Mason's conclusory allegation that his annual performance review should have been higher based on his own self-assessment of his performance.  Pls.' Interrog. Resps. No. 7.

letter of resignation, Mason wrote:

> The reason for my **resignation** is that I can no longer endure your [*i.e.*, Dangel's] inhumane treatment of me.  I cannot fathom why, knowing that my "Sister" is struggling against terminal cancer, she resides in (Memphis, Tennessee) outside of the Washington, D.C. Metropolitan Area . . . and you will <u>not</u> approve leave for me to care for her.  Your actions have placed me in a situation where I must choose between my family and my job as I must either neglect my moral duty to my "Sister" or face charges of insubordination and Absent Without Leave (AWOL) from you and those who are directing your actions.  Because of this action and your generally abusive, oppressive and underhanded way of treating me, I can no longer bear working for the Internal Revenue Service (IRS) in the "Main" IRS National Headquarters Building . . . .
>
> I deeply regret that I have been <u>forced</u> to leave my professional career job with over **"22"** years of Dedicated Service that was once a source of pride and pleasure to me, but you and your Superiors in the chain of command including up to the Commissioner of the Internal Revenue Service (IRS) have left me no choice.

Mason Dep. Ex. 1 (Ltr. from E. Mason to P. Dangel dated July 31, 2009) at 1 (emphasis and underlining in original).  Despite the contents of Mason's letter, it is undisputed that Dangel never threatened Mason with an "AWOL charge" and no one ever placed Mason on "AWOL status."  Def.'s Stmt. ¶ 160; Pls.' Stmt. ¶ 160.  Furthermore, neither Dangel nor any of Mason's other supervisors had ever denied any of Mason's requests for leave without pay.[49]  Def.'s Stmt. ¶ 161; Mason Dep. at 130-31.  Dangel had personally "approved hundreds of hours of leave without pay so that Mr. Mason could care for his sister."  Pls.' Stmt. ¶ 165.  Indeed, Dangel had just recently approved Mason's request for leave without pay for the week of August 10, 2009, so

---

[49]  Mason purports to dispute the Secretary's proffered factual statement, *see* Pls.' Stmt. ¶ 161, but because his response is unaccompanied by "references to the parts of the record relied on [for] support," LCvR 7(h)(1), the Court shall deem the Secretary's proffered statement to be admitted.  Regardless, at his deposition, Mason testified that Dangel never denied his requests for leave without pay and could not identify anyone who had.  Mason Dep. at 130-31.

that Mason could attend to his family in Memphis.  Def.'s Stmt. ¶ 162; Pls.' Stmt. ¶ 162.

Mason complains that Dangel did not also immediately approve Mason's request for leave without pay for the week of August 17, 2009.  Pls.' Stmt. ¶ 162.  However, it is undisputed that Mason had been scheduled to attend a training session during that week, which prompted Dangel to ask Mason to provide him with a compelling reason why he could not attend the training.  Def.'s Stmt. ¶ 163; Pls.' Stmt. ¶ 163; Dangel Dep. at 153.  In an e-mail dated July 29, 2009, Dangel stated:

> I am simply trying to discuss your leave request with you to determine whether I should approve it or not.  You have been scheduled for the training the week of August 17-24, 2009.  You should have known those dates since May 20, 2009.  Your request for the week of August 17-24 will be denied unless there is a very compelling reason that you must have the week off.

Mason Dep. Ex. 1 (E-mail from P. Dangel to E. Mason dated July 29, 2009) at 1.  Mason had personally requested the training program and had known that it was scheduled for the week at issue since at least May 2009.  Def.'s Stmt. ¶ 164; Pls.' Stmt. ¶ 164.  However, Mason refused to provide the requested explanation and instead tendered his resignation.  Def.'s Stmt. ¶ 166; Pls.' Stmt. ¶ 166.

### C.   *Factual Background Relating to Plaintiff Donovan Benton*

Benton began working at the IRS in 1987 as a GS-5-level Printing Analyst.  Def.'s Stmt. ¶ 167; Pls.' Stmt. ¶ 167.  During the relevant time period, Benton was a 1601-series, GS-14-level Technical Advisor in the M&P Organization and his chain-of-command was as follows:

- First-line supervisor: Mendez, from April 2005, until July 2007; and Freeman, from April 2007, until January 9, 2009;

- Second-line supervisor: Farah; and

- Third-line supervisor: Fayne, until September 2008; and Becton-Johnson, from September 2008, to January 9, 2009.

Def.'s Stmt. ¶¶ 168-71; Pls.' Stmt. ¶¶ 168-71.

    1.   <u>Benton's Complaints as to a Series of "Incidents" With His Supervisors</u>

Benton complains of a series of approximately fourteen "incidents" that allegedly occurred between him and his supervisors in the approximately one-and-a-half-year period extending from June 28, 2007, to January 9, 2009.[50] *See* Pls.' MSJ Opp'n 31-40. Benton provides only the barest factual content in connection with these incidents, and the Court identifies them here *seriatim*.

- **June 28, 2007, Incident:** Benton alleges that he received a "disturbing, condescending and harassing email" from his second-line supervisor, Farah, which "singled out" not him, but co-plaintiff Mason, by stating that "Mr. Mason could not act on Mr. Benton's behalf for one week while he was out of the office." Pls.' MSJ Opp'n at 33; Pls.' Interrog. Resps. No. 3.

- **Early October 2007, Incident:** Benton alleges that his first-line supervisor, "Mr. Freeman[,] informed [him] that Mr. Farah was inappropriately monitoring [his] time and attendance exclusively, despite there had not been any issues of abusive time and attendance use on [his]

---

[50] The Court shall disregard Benton's sporadic allegations that he was "stalked" or "harassed" on a "daily basis" when those allegations are unaccompanied by any meaningful factual support. *See Ass'n of Flight Attendants-CWA*, 564 F.3d at 465-66 (conclusory allegations offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment). Absent further factual content, Benton has failed to adduce sufficient facts that would allow a reasonable trier of fact to conclude that his allegations would meaningfully contribute to a severe or pervasive hostile work environment.

part."  Pls.' MSJ Opp'n at 34; Pls.' Interrog Resps. No. 3.

- **October 28, 2007, Incident:**  Benton alleges that his second-line supervisor, "Mr. Farah[,] humiliated [him] by approaching his workstation in a disruptive, threatening, harassing, and hostile manner."  Pls.' MSJ Opp'n at 34; Pls.' Interrog. Resps. No. 5.

- **October 29, 2007, Incidents:**  Benton claims three incidents occurred on this date.  First, he alleges that he was "approached at his open and shared workstation in an aggressive, harassing and threatening manner while other coworkers were present in the office" by Farah, and that when he asked Farah to "meet him in the hallway . . . Mr. Farah agreed."  Pls.' MSJ Opp'n at 35; Pls.' Interrog. Resps. No. 3.  Second, Benton alleges that he was "abruptly harassed, threatened, intimidated, and bullied" by Farah "at his open and public workstation (unannounced and unscheduled)" when Farah "abused his authority by . . .  threatening [] Benton to come to his (Mr. Farah) office to engage in [a] discussion, without a witness."  Pls.' MSJ Opp'n at 35; Pls.' Interrog. Resps. No. 3.  Finally, Benton alleges that he received a "very disturbing and harassing e-mail from [Fayne] . . . stating 'If you feel you have been mistreated please feel free to file a complaint and allow the third party process to settle this issue."  Pls.' MSJ Opp'n at 34-35; Pls.' Interrog. Resps. No. 3.

- **December 10, 2007, Incident:**  Benton alleges that "Mr. Farah humiliated [him] in an aggressive manner and threatening manner" when Farah

"handed [him] a sealed 'confidential' envelope containing an unwarranted management reprimand" in "full view of Mr. Mason and other coworkers who might be in the shared workspace." Pls.' MSJ Opp'n at 36; Pls.' Interrog. Resps. Nos. 3, 5.

- **December 27, 2007, Incident:** Benton alleges that his second-line supervisor, Farah, with the permission of his third-line supervisor, Fayne, "falsely imputed into the IRS' annual evaluation *ePerformance* that [he] refused to sign his mid-year evaluation." Pls.' MSJ Opp'n at 16; Pls.' Interrog. Resps. No. 3.

- **March 7, 2008, Incident:** Benton alleges that his second-line supervisor, Farah, "humiliated [him] by approaching him at his workstation in a disruptive and hostile manner when he was handed a confidential envelope." Pls.' MSJ Opp'n at 37; Pls.' Interrog. Resps. No. 5.

- **March 31, 2008, Incident:** Benton alleges that his third-line supervisor, Fayne, approached him "in a threatening, condescending, disruptive, abusive, hostile and harassing verbal tone and manner" when Fayne "berated [him] for not agreeing to attend an impromptu meeting." Pls.' MSJ Opp'n at 38; Pls.' Interrog. Resps. Nos. 3, 5.

- **June 19, 2008, Incident:** Benton alleges that his first-line supervisor, Mendez, and his second-line supervisor, Farah, approached his "open and public workstation with other witnesses present . . . to attempt [to] embarrass, degrade, and humiliate [him] with [sic] publically handing him

44

. . . a confidential sealed envelope." Pls.' MSJ Opp'n at 39; Pls.' Interrog. Resps. No. 3.

- **October 6, 2008, Incident:** Benton alleges that he was approached by his second-line supervisor, Farah, "in an aggressive, condescending, disruptive and harassing manner" when Farah handed him "a sealed confidential envelope . . . which contained a letter proposing to remove him from [the] IRS." Pls.' MSJ Opp'n at 39; Pls.' Interrog. Resps. No. 3.

- **December 18, 2008, Incident:** Benton alleges that he "attended a meeting" with his second-line supervisor, Farah, and his third-line supervisor, Fayne, with co-plaintiff Mason attending, in which he was "spoken to in a very aggressive tone that was very condescending, abusive, insensitive, derogatory and harassing" when Fayne told him "that she did not care if [he] was on his hospital bed—that she expected him to finish her assignment." Pls.' MSJ Opp'n at 39; Pls.' Interrog. Resps. No. 3.

- **January 9, 2009, Incident:** Benton alleges that he was "approached" by his second-line supervisor, Farah, "in an aggressive, demeaning, abusive, harassing and hostile manner in order to be removed from federal service with the IRS and escorted from the Main IRS Headquarters Building in front of coworkers." Pls.' MSJ Opp'n at 40; Pls.' Interrog. Resps. No. 3.

2.     <u>Benton's Non-Selection for the '044 Position</u>

On or about October 30, 2006, Benton applied for the position of Printing Officer Branch Chief, Vacancy Announcement No. 40-41-AT7TG044 ("'044 Position"). Def.'s Stmt. ¶ 172;

Pls.' Stmt. ¶ 172.  Four employees were named to the best-qualified list for the '044 Position.

Def.'s Stmt. ¶ 173; Pls.' Stmt. ¶ 173.  In addition to Benton, included on the list were (1) Dangel,

(2) Freeman, and (3) Tillman.  Def.'s Stmt. ¶ 173; Pls.' Stmt. ¶ 173.  Mendez was the ranking

official; Farah was the recommending official; and Fayne was the selecting official.[51]  Def.'s

Stmt. ¶¶ 174, 176; Pls.' Stmt. ¶¶ 174, 176; Farah Dep. at 70-71; Fayne Dep. at 88-89; Benton

Dep. at 56, 259-60.

As the ranking official, Mendez began the process by evaluating the application packages

and written submissions that the five candidates submitted and assigning each candidate a

score.[52]  Def.'s Stmt. ¶ 174; Pls.' Stmt. ¶ 174.  Benton received a ranking score of 90 points.[53]

---

[51]  Benton purports to dispute that Fayne was the selecting official, claiming that there
was an "effort to cover up" Farah's role in the decisionmaking process.  Pls.' Stmt. ¶ 176.
However, Benton admitted at his deposition that Fayne was the selecting official, *see* Dep. pf
Donovan Benton ("Benton Dep.") at 56, 259-60, and that admission is consistent with the
testimony provided by Farah and Fayne, *see* Farah Dep. at 70-71; Fayne Dep. at 88-89.  In this
case, the evidence is " so one-sided" that no reasonable trier of fact could infer, as Benton
suggests, that there was some vaguely defined "cover up" in connection with the allocation of
responsibilities in the decisionmaking process, let alone that any such efforts had a nexus to his
participation in the 2003 Litigation.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52
(1986).  Regardless, crediting Benton's allegation would only further weaken his claim given the
dearth of competent evidence to suggest that Farah harbored a retaliatory animus against him.

[52]  In responding to the Secretary's proffered factual statement, Benton first concedes that
the statement is admitted, but then proceeds to contend that Mendez's actions were "in direct
violation" of IRS policies "because Benton was his direct report."  Pls.' Stmt. ¶ 174.  But Benton
does not identify any language in any IRS policy that prohibited Mendez from evaluating a
subordinate, and more importantly, Benton fails to cite to evidence in the record that would
permit the Court to evaluate the validity of the claim—most notably, the policies themselves.
The Court declines Benton's invitation to sift through the record in an attempt to locate evidence
in support of his claim.  Because this extraneous factual allegation is unaccompanied by
"references to the parts of the record relied on [for] support," LCvR 7(h)(1), it shall be
disregarded by the Court.

[53]  In responding to the Secretary's proffered factual statement, Benton first concedes that
the statement is admitted, but then proceeds to set forth a series of disjointed, extraneous factual

Def.'s Stmt. ¶ 178; Pls.' Stmt. ¶ 178.  Thereafter, the candidates were interviewed by a three-person panel, which asked each candidate identical questions and rated their responses.  Def.'s Stmt. ¶ 179; Pls.' Stmt. ¶ 179.  Benton received an interview score of 32.5 points.  Def.'s Stmt. ¶ 180; Pls.' Stmt. ¶ 180.  The final scores of the four candidates were as follows:

| NAME | RANKING SCORE | INTERVIEW SCORE |
|---|---|---|
| *Dangel (selectee)* | 95 | 37.5 |
| *Freeman* | 95 | 31 |
| *Benton* | 90 | 32.5 |
| *Tillman* | 90 | 31 |

*See* Def.'s Ex. HH (Final Ranking Form); Def.'s Ex. MM (Interview Materials).

The Scores were then reviewed by Farah, who as the recommending official chose the highest-ranking candidate—Dangel.  Def.'s Ex. LL (Promotion Certificate).  Thereafter, the scores and Farah's recommendation were reviewed by Fayne, who as the selecting official selected the highest-ranking candidate—Dangel.  Def.'s Ex. LL (Promotion Certificate); Farah Dep. at 70-71; Fayne Dep. at 88-89; Benton Dep. at 56, 259-60.

On March 29, 2007, Benton met with his third-line supervisor, Fayne, to discuss his non-selection for the '044 Position.[54]  Def.'s Stmt. ¶ 201; Pls.' Stmt. ¶ 201.  During the meeting, Fayne offered Benton opportunities to improve his managerial and interviewing skills and

---

allegations.  Pls.' Stmt. ¶ 178.  Because those extraneous factual allegations are unaccompanied by "references to the parts of the record relied on [for] support," LCvR 7(h)(1), the Court shall disregard them.

[54]  Benton secretly recorded the conversation, but he subsequently destroyed the recording.  Def.'s Stmt. ¶¶ 201, 203; Pls.' Stmt. ¶¶ 201, 203.  Benton's admitted destruction of the recording serves as the basis for the Secretary's pending Motion for Sanctions.

offered to place Benton in a front-line management position.  Def.'s Stmt. ¶ 202; Pls.' Stmt. ¶

202; Fayne Dep. at 191, 221-23.  In Benton's view, Fayne's offer amounted to an attempt to

"bribe [him] with a promotion," claiming that Fayne conditioned these opportunities upon his

withdrawal of a complaint unrelated to his participation in the 2003 Litigation.  Pls.' Stmt. ¶ 202

(citing Benton Dep. at 179).  However, in the relied-upon deposition testimony, Benton merely

reiterated his view that he personally "interpreted" Fayne's offer as a bribe.[55]  Benton Dep. at

180.  Notably, he did not testify that Fayne expressly conditioned these opportunities on his

withdrawal of the referenced complaint:

> Q     **Did she say you couldn't have the training unless you
>       pulled your complaint?**
>
> A     She questioned me and haggard [sic] — and she drilled me
>       about that complaint, sir.  It stayed on that.  And that —
>       again, everything I've said is truthful.

Benton Dep. at 159.  At best, the cited testimony is sufficient to create a genuine dispute that

Benton and Fayne discussed the complaint, but nothing more.

Benton further contends that he received an e-mail from Fayne the following day, March

30, 2007, in which she wrote:

> I have been thinking a lot about our meeting yesterday . . . .  I am
> genuinely trying to give everyone who wants the opportunity to move
> up the chance to do that.  That does not mean that everyone gets to
> move right when they think they should.  As I said to you yesterday,
> I hope the trust level can go up enough so that people will sit down
> and talk as we did, instead of running to file grievances and
> complaints without first trying to talk about it.  I value your points
> and your presence in M&P.  Keep in mind what we talked about, and

---

[55]  Similarly, although not referenced by Benton or Mason in their responsive statement of material facts, Benton's response to the Secretary's interrogatories states, without any meaningful factual content, that he "felt he was being bribed and harassed."  Pls.' Interrog. Resps. No. 3.

> perhaps we can talk again when I return from vacation.   There's
> simply too much work for M&P to do to be bogged down in so much
> distrust.

Pls.' Interrog. Resps. No. 3.  Benton claims that he found the e-mail "very unusual and

disturbing."  *Id.*

### 3.      Benton's Non-Selection for the '322 Position

Like Mason, Benton applied for the '322 Position on or about April 16, 2007.  *See supra*

Part I.B.2.  However, Benton was ranked even lower than Mason, placing him fourth out of the

five candidates.  Def.'s Stmt. ¶¶ 187-88; Pls.' Stmt. ¶¶ 187-88.  The application and review

materials demonstrated a "clear separation" between the ultimate selectee, Freeman, and the

other four candidates, including Benton.[56]  Def.'s Stmt. ¶ 80.  The ultimate selectee, Freeman,

had the highest score of all the candidates, and the ranking official and interview panelists agreed

that Freeman's qualifications exceeded Benton's qualifications.  Def.'s Stmt. ¶ 189; Pls.' Stmt. ¶

189.

### 4.      Benton's Request for a Transfer to the New Carrollton Office

On or about August 30, 2007, Benton, like Mason, requested a transfer from IRS

Headquarters in Washington, D.C., to the IRS's New Carrollton office in Lanham, Maryland.

Def.'s Stmt. ¶ 190; Pls.' Stmt. ¶ 190.  Like Mason, he was informed by his supervisors in late

---

[56]  Benton purports to dispute the Secretary's proffered factual statement, but his
argument is non-responsive.  *See* Pls.' Stmt. ¶ 80.  While Benton alleges that "Mr. Freeman was
selected because Ms. Fayne and Mr. Farah harbored a generalized retaliatory animus against Mr.
Mason and Mr. Benton," Pls.' Stmt. ¶ 80, he provides no explanation or evidentiary basis that
would call into doubt the Secretary's proffered statement that, viewed objectively, "[t]he
application packages and the interview panelists' notes demonstrate a clear separation between
Freeman and the rest of the candidates," Def.'s Stmt. ¶ 80.  Accordingly, the Court will deem the
Secretary's proffered statement to be admitted.  The Court addresses Bention's allegations of bias
elsewhere in this Memorandum Opinion.

August and early September 2007 that there was a general policy that requests by employees in

the M&P Organization for a transfer to the New Carrollton office would not be considered until

January 2008, because the M&P Organization had in place a moratorium on all relocations to the

New Carrollton office affecting all employees in the organization.[57]  Def.'s Stmt. ¶ 190; Pls.'

Stmt. ¶ 190; Benton Dep. Ex. 9 (E-mail from R. Freeman to D. Benton dated Sept. 5, 2007) at 1.

> 5.    Benton's Request to be Reassigned to Another Branch

On or about September 5, 2007,[58] Benton requested an assignment to another branch

within the M&P Organization.  Def.'s Ex. PP (E-mail from D. Benton to R. Freeman dated Sept.

5, 2007).  Later that same day, Benton's first-line supervisor, Freeman, responded by indicating

that Benton's request would impact all four branches of the organization, Def.'s Ex. PP (E-mail

from R. Freeman to D. Benton dated Sept. 5, 2007), because it would require hiring a

replacement grade-14-level Technical Advisor in the Functional Publishing Branch to fill the

vacancy that would be created by Benton's requested transfer,[59] Def.'s Stmt. ¶ 194.

---

[57]  In responding to the Secretary's proffered factual statement, Benton first concedes that the statement is admitted, but then proceeds to raise a number of extraneous factual allegations, including that "no plausible reason, explanation, etc [sic] was given to Mr. Benton specifically" and that "Mr. Benton provide [sic] valid business reasons and family medical reasons as to why this [c]hange . . . was critical."  Pls.' Stmt. ¶ 190.  Because those extraneous factual allegations are unaccompanied by "references to the parts of the record relied on [for] support," LCvR 7(h)(1), the Court shall disregard them.

[58]  The Secretary and Benton both identify the date of Benton's request as September 12, 2007, *see* Def.'s Stmt. ¶ 192; Pls.' Stmt. ¶ 192, but e-mail correspondence suggests that the request was first made on September 5, 2007, *see* Def.'s Ex. PP (E-mail from D. Benton to R. Freeman dated Sept. 5, 2007).  However, the discrepancy is immaterial.

[59]  Benton purports to dispute the Secretary's proffered factual statement, alleging, among other things, that "[t]here were several other similar [sic] situated employee [sic] in the Media and Publications Division would could have easily been reassigned."  Pls.' Stmt. ¶ 194. However, because Benton's response is unaccompanied by "references to the parts of the record

On September 12, 2007, Benton "elevat[ed]" his request to his second-line supervisor,

Farah.  Def.'s Ex. PP (E-mail from D. Benton to M. Farah dated Sept. 12, 2007).  Later that same

day, Farah indicated that he had discussed Benton's request with Benton's third-line supervisor,

Fayne, and informed Benton that the only GS-14-level reassignment available at that time was in

Fayne's office, working in Balance Measures.[60]  Def.'s Ex. PP (E-mail from M. Farah to D.

Benton dated Sept. 12, 2007).  Farah and Fayne inquired whether Benton would be interested in

that position and offered to discuss the opportunity further.  *Id.*; Def.'s Ex. PP (E-mail from D.

Fayne to D. Benton dated Sept. 12, 2007).  Shortly thereafter, Benton declined the offer, writing

to Fayne, *"Thanks, but no thanks . . . due to the legal situation!"*  Def.'s Ex. PP (E-mail from D.

Benton to D. Fayne dated Sept. 14, 2007) (emphasis in original).[61]

6.    Benton's Requests for FMLA Leave

On September 25, 2007, Benton approached his first-line supervisor, Freeman, and

submitted an application for Family and Medical Leave Act ("FMLA") leave for the period

extending from October 10, 2007, to approximately October 10, 2008.  Def.'s Stmt. ¶ 197; Pls.'

_____

relied on [for] support," LCvR 7(h)(1), the Court shall deem the Secretary's proffered factual
statement to be admitted.

[60]  Benton tenders a litany of extraneous factual allegations in the course of responding to
the Secretary's proffered factual statements on this issue.  Pls.' Stmt. ¶¶ 195-96.  Because those
extraneous factual allegations are unaccompanied by "references to the parts of the record relied
on [for] support," LCvR 7(h)(1), the Court shall disregard them.  Furthermore, despite Benton's
assertion to the contrary, he was provided an explanation for the decision.  *See* Def.'s Ex. PP (E-
mail from R. Freeman to D. Benton dated Sept. 5, 2007); Def.'s Ex. PP (E-mail from M. Farah to
D. Benton dated Sept. 12, 2007).

[61]  While the Secretary and Benton dispute whether Freeman had the authority to deny
Benton's request for a reassignment, neither cites to any competent evidence clearly delineating
the scope of Freeman's authority in this regard.  *See* Def.'s Stmt. ¶ 193; Pls.' Stmt. ¶ 193; Def.'s
Resp. ¶ 193.  However, the dispute is immaterial.

Stmt. ¶ 197; Benton Dep. Ex 1 (Appl. for Leave under the Family and Medical Leave Act) at 1.

Freeman then contacted his supervisors, Farah and Fayne, to ascertain what sort of information

Benton would need to provide to support his application  Def.'s Stmt. ¶ 198; Pls.' Stmt. ¶ 198.

Freeman had an obligation to obtain the necessary approvals from his supervisors.  Def.'s Stmt. ¶

199; Pls.' Stmt. ¶ 199.  On October 12, 2007, after receiving the necessary approvals, Freeman

granted Benton's request, making it retroactive to Benton's requested start-date of October 10,

2007.[62]  Def.'s Stmt. ¶ 199; Pls.' Stmt. ¶ 199; Benton Dep. Ex 1 (Appl. for Leave under the

Family and Medical Leave Act) at 1.

### 7.    Benton's 2007 Performance Appraisal

Benton claims that he learned on November 26, 2007, that his second-line supervisor,

Farah, had directed his first-line supervisor, Mendez, to lower his fiscal-year 2007 performance

appraisal to a "Met."  Pls.' MSJ Opp'n at 36 (citing Pls.' Interrog. Resps. No. 7).  However, it is

undisputed that Benton was issued the highest possible rating, "Outstanding," on December 5,

2007, and in fact received a performance award.  Def.'s Stmt. ¶ 204; Pls.' Stmt. ¶ 204.  He also

claims that "he was not furnished a copy of his [appraisal] until nearly a year later in October

2008."  Pls.' Interrog. Resps. No. 7.

---

[62]  In responding to the Secretary's proffered factual statement, Benton first concedes that
the statement is admitted, but then proceeds to allege that there were "extensive delays" in
Freeman's processing of his application.  Pls.' Stmt. ¶ 199.  However, because Benton's
extraneous factual allegation is unaccompanied by "references to the parts of the record relied on
[for] support," LCvR 7(h)(1), it shall be disregarded by the Court.  Even assuming, *arguendo*,
that some delay occurred, Benton has failed to provide any explanation or adduce any evidence
that would allow a reasonable trier of fact to conclude that the delay was unreasonable.  Indeed,
Benton's relevant certifications were not executed until late September 2007, shortly before his
request was formally granted.  *See* Benton Dep. Ex. 1 (Certification of Health Care Provider) at
3.

8.      Benton's Three-Day Suspension

Like Mason, Benton routinely sent e-mails to his supervisors and senior IRS officials

raising workplace concerns and grievances.  Def.'s Stmt. ¶ 207; Pls.' Stmt. ¶ 207.  For example,

on July 9, 2007, Benton sent a three-page, single-spaced e-mail entitled, "You Refuse to Meet,

but You Plan to Discredit Me Personally & Professionally - Donovan L. Benton," to his third-

line supervisor, Fayne, as well as Carl Froehlich, Director of IRS Agency-Wide Shared Services;

Susan W. Carroll, Director of CARE; Richard J. Morgante, Commissioner of the Wage &

Investment Division; and Kevin M. Brown, Deputy Commissioner of IRS Services &

Enforcement.  Def.'s Stmt. ¶ 208; Pls.' Stmt. ¶ 208.  In the e-mail, Benton chided his third-line

supervisor, Fayne, for her purportedly "aggressive tone"[63] and alleged that the selection processes

for the '044 Position and the '322 Position were tainted by "corruption."  Def.'s Stmt. ¶ 209;

Pls.' Stmt. ¶ 209.  In other e-mails, Benton inquired of senior IRS officials, "*WHO IS LIBEL and

ACCOUNTALBLE [sic], on your watch?*" Benton Dep. Ex. 5 (E-mail from D. Benton to R. Byrd

dated Aug. 27, 2008) at 120 (emphasis and capitalization in original); charged his supervisors

with "deliberate and willful 'DEFAMATION OF [HIS] PROFESSIONAL & PERSONAL

CHARACTER," Def.'s Ex. 5 (e-mail from D. Benton to M. Farah dated Aug. 7, 2008) at 133

(capitalization in original); and characterized his business unit as an *"Oppressive and Restrictive

Tyranny!"*  Benton Dep. Ex. 18 (E-mail from D. Benton to R. Freeman dated Nov. 5, 2008) at 1

---

[63]   In the e-mail, Benton attributes the following comments to Fayne: (1) "You were not the most qualified then and I told you that your interview was not good"; (2) "You needed to practice and I would help you"; (3) "You were a manger for less than year.  You need more experience"; (4) "And now you want to meet with me again one-one-one.  No.  That cannot happen under the circumstances I value my job as much as you value yours, and I will not put it in jeopardy"; (5) "Given the legal situation we are in it is unwise for us to meet one-on-one." Benton Dep. Ex. 6 (E-mail from D. Benton to D. Fayne dated July 9, 2007) at 1-2.

(emphasis in original).

Benton often included deadlines e-mails, demanding a response "by a date certain."
Def.'s Stmt. ¶ 212; Pls.' Stmt. ¶ 212.  Benton claims that if his supervisors failed to meet his
deadlines, he had a right to "elevate" his concerns to the "next appropriate high-level
management official(s)" in his "chain of command."  Def.'s Stmt. ¶ 213; Pls.' Stmt. ¶ 213.  He
maintains that the deadlines were a "professional courtesy" and justifiable given the timing of the
responses to his communications.  Def.'s Stmt. ¶ 212; Pls.' Stmt. ¶¶ 212, 214.  Even after senior
IRS officials responded by directing Benton to pursue his complaints through the EEO apparatus,
TITGA, or with his supervisors who were familiar with his situation, Benton nonetheless
continued to send e-mails to senior IRS officials.[64]  Def.'s Stmt. ¶ 215; Dep. of Susan Carroll at
24; Dep. of Richard Byrd at 28-30, 72.

As conceded by Benton, "[a]fter tolerating Benton's abusive communications for months,
and after encouraging him to pursue his grievances through the EEO or Agency Grievance
offices, his supervisors contacted [the] Labor Relations [Branch] to determine how to proceed."
Def.'s Stmt. ¶ 216; Pls.' Stmt. ¶ 216.  At that point, a Labor Relations Specialist recommended to
Benton's supervisors that they issue him a management directive explaining that his behavior
was unacceptable and describing the proper channels to use in raising workplace grievances.
Def.'s Stmt. ¶ 217; Pls.' Stmt. ¶ 217.  The Labor Relations Specialist and Benton's supervisors
subsequently drafted the management directive and provided it to Benton on December 10, 2007.

---

[64]  While Benton purports to dispute the Secretary's proffered factual statement, his only
objection is that his communications "were work-related."  Pls.' Stmt. ¶ 215.  He does not
contest that he continued to send e-mails to senior IRS officials even after he was directed to
pursue his concerns through other channels.

Def.'s Stmt. ¶ 218; Pls.' Stmt. ¶ 218.  The directive, entitled "Directive for Resolving Issues of

Personal Concern," was signed by Benton's second-line supervisor, Farah, and provided as

follows:

> During the past several months, you have spent significant agency time and resources composing and e-mailing numerous and repetitive personal requests, complaints, and requests for information to a number of executives, senior managers, your manager, and me.  In the case of your personal request for a change in place of reporting, you have been advised that your request would be considered if you provided certain information concerning the medical necessity and a schedule of appointments, which you have failed to provide.  In the case of your request for information, you have been advised to submit you [sic] concerns through the appropriate channels; specifically, the EEO Complaint process or the Agency Grievance process, which so far you have chosen not to do.  I have attempted to discuss your concerns with you face to face and you have effectively refused to meet with me, contending that I have threatened you.
>
> Your use of the Agency e-mail system to demand that management answer your written interrogatories, to disparage and hector individual members of the Publishing Management Team, and your misuse of government time and equipment in the pursuit of such activities is inappropriate, disrupts the workplace and is unproductive.
>
> You are therefore directed as follows:
>
> 1.   To immediately cease using work time, government equipment and government supplies to draft and distribute communications which disparage or hector members of the Publishing Leadership Team or other Agency employees;
>
> 2.   To follow the established chain of command in seeking resolution of your personal concerns, beginning with your first-level supervisor;
>
> 3.   To immediately cease sending "broadcast" communications to multiple management officials on personal matters and/or matters that should properly be initially presented to your first-line manager or pursued through available dispute resolution mechanisms, such as the EEO process or the Agency Grievance Procedure.

4.      To utilize available dispute resolution mechanisms and pursue adjustment of workplace concerns which are not resolved to your satisfaction by management.

Benton Dep. Ex. 2 (Mem. Directive for Resolving Issues of Personal Concern dated Dec. 10, 2007) at 2185-86.  The memorandum then proceeds to outline the procedure for invoking the agency grievance system and EEO apparatus.  *Id.* at 2186.  The memorandum concludes by warning Benton that his failure to abide by these instructions "may result in disciplinary action." *Id.*

Nonetheless, Benton continued to e-mail senior IRS officials with complaints, requests for information, and demands to address his workplace grievances.[65]  Def.'s Stmt. ¶ 221.  On March 6, 2008, after repeatedly reminding Benton to air his grievances through the proper channels and not to disrupt the workplace, Farah issued Benton a letter proposing Benton's suspension without pay for three days.  Def.'s Stmt. ¶ 222; Pls.' Stmt. ¶ 222.  The letter identified thirteen instances in which Benton allegedly sent an e-mail to senior IRS officials in violation of the directive.  Def.'s Ex. QQ (Ltr. from M. Farah to D. Benton dated Mar. 6, 2008).  On March 31, 2008, after reviewing Benton's e-mails and Farah's proposal, Benton's third-line supervisor, Fayne, approved the three-day suspension.  Def.'s Stmt. ¶ 224; Pls.' Stmt. ¶ 224.

9.      Benton's Fourteen-Day Suspension for Tax Non-Compliance

During a routine computerized comparison of payroll and tax account records, the ETC Branch discovered that Benton had failed to timely pay his federal taxes for tax-year 2006.

---

[65]  While Benton purports to dispute the Secretary's proffered factual statement, he does not actually contest that he continued to e-mail senior IRS officials with complaints, requests for information, and demands to address his many workplace grievances, but instead merely claims that his e-mail communications should not be characterized as raising "personal concerns."  Pls.' Stmt. ¶ 221.

56

Def.'s Stmt. ¶ 225; Pls.' Stmt. ¶ 225.  This violation followed two other tax compliance violations—one in tax-year 2001 and a second in tax-year 2004—for which Benton had previously been counseled.  Def.'s Stmt. ¶ 226; Pls.' Stmt. ¶ 226.  Benton did not fully satisfy his tax liability for tax-year 2006 until August 27, 2007.[66]  Def.'s Stmt. ¶ 228; Pls.' Stmt. ¶ 228.

On January 22, 2008, the ETC Branch issued Benton a letter, inviting him to submit information to clarify his non-compliance.  Def.'s Stmt. ¶ 229; Pls.' Stmt. ¶ 229.  On February 12, 2008, Benton responded in a letter, explaining that he had been distracted by personal issues and "did not realize" that his checking account had insufficient funds.  Def.'s Stmt. ¶ 230; Pls.' Stmt. ¶ 230.  On March 5, 2008, the ETC Branch informed Benton that its investigation revealed that the violation was potentially more than a technical error and that the matter would therefore be referred to his supervisors to consider whether disciplinary action was appropriate.  Def.'s Stmt. ¶ 231; Pls.' Stmt. ¶ 231.  On or about June 19, 2008, Benton's supervisors, with Fayne as the deciding official, proposed a fourteen-day suspension, citing Benton's history of tax-non-compliance and the magnitude of the tax liability underpayment.  Def.'s Ex. RR (Alerts Case File) at 1-5; Benton Dep. Ex. 17 (Ltr. from D. Fayne to D. Benton dated Aug. 4, 2008).  Benton did not invoke his right to submit an oral or written opposition to the proposal.  Def.'s Stmt. ¶ 237; Pls.' Stmt. ¶ 237.  On August 4, 2008, Fayne approved the fourteen-day suspension.  Pls.' Stmt. ¶ 236; Pls.' Stmt. ¶ 236; Benton Dep. Ex. 17 (Ltr. from D. Fayne to D. Benton dated Aug. 4, 2008).

---

[66]  In responding to the Secretary's proffered factual statement, Benton first concedes that the statement is admitted, but then proceeds to allege that he "attempted on several occasions to resolve the mater, but the IRS continued to apply penalties and interests [sic] upon him."  Pls.' Stmt. ¶ 228.  Because this extraneous factual allegation is unaccompanied by "references to the parts of the record relied on [for] support," LCvR 7(h)(1), it shall be disregarded by the Court.

10.     Benton's Termination

Following his two suspensions, Benton continued to send e-mails to senior IRS officials

raising his many workplace concerns and grievances.[67]  Def.'s Stmt. ¶ 238.  After tolerating the

e-mails for several months and reminding Benton to abide by the management directive,

Benton's managers again contacted the Labor Relations Branch to seek guidance.[68]  Id. ¶ 239.

The Labor Relations Specialist informed Benton's supervisors that his continued conduct

constituted a third offense—the first being the three-day suspension for sending similar e-mails

and the second being the fourteen-day suspension for tax-noncompliance.[69]  Id. ¶ 240.  The Labor

Relations Specialist and Benton's second-line supervisor, Farah, subsequently drafted a letter of

proposed removal, which was issued to Benton on October 6, 2008.  Def.'s Stmt. ¶¶ 241-42; Pls.'

Stmt. ¶ 242.  The letter identifies a total of twenty-three instances in which Benton allegedly sent

e-mail correspondence to senior IRS management in violation of his supervisors' prior directives.

Benton Dep. Ex. 4 (Ltr. from M. Farah to D. Benton dated Oct. 6, 2008).  After reviewing the

evidence, Benton's third-line supervisor, Becton-Johnson, approved the proposal, and Benton's

---

[67]  While Benton purports to dispute the Secretary's proffered factual statement, he does not actually contest that he continued to e-mail senior IRS officials with e-mails raising his workplace concerns and grievances, but instead merely claims that his e-mail communications should not be characterized as raising "personal concerns."  Pls.' Stmt. ¶ 238.

[68]  While Benton purports to dispute the Secretary's proffered factual statement, he does not actually contest that his supervisors "tolerat[ed] the emails for several months and remind[ed] him to abide by the management directive," Def.'s Stmt. ¶ 239, but instead merely claims that his e-mail communications should not be characterized as raising "personal concerns," Pls.' Stmt. ¶ 239.

[69]  While Benton purports to dispute the Secretary's proffered factual statement, he does not actually contest that the Labor Relations Specialist informed his supervisors that his continued conduct constituted his third offense, but instead merely claims that his e-mail communications should not be characterized as raising "personal concerns."  Pls.' Stmt. ¶ 240.

removal became effective on January 9, 2009.  Def.'s Stmt. ¶ 243; Pls.' Stmt. ¶ 243.

## II.  LEGAL STANDARDS

### A.      *Motions for Summary Judgment Generally*

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and [that it] . . . is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The mere existence of some factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a "material" fact, and therefore "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Liberty Lobby*, 477 U.S. at 255.  Nor may summary judgment be avoided based on just any disagreement as to the relevant facts; rather, the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant.  *Id.*

In order to establish that a fact is or is not genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute.  FED. R. CIV. P. 56(c)(1).  Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment.  *Ass'n of Flight Attendants-CWA*, 564 F.3d at 465-66.  Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact undisputed."  FED. R. CIV. P. 56(e).

When presented with a motion for summary judgment, the district court may not make

credibility determinations or weigh the evidence, but instead must analyze the evidence in the

light most favorable to the non-movant, with all justifiable inferences drawn in its favor. *Liberty*

*Lobby*, 477 U.S. at 255.  If material facts are genuinely in dispute, or undisputed material facts

are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate.

*Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009).  In the end, the district court's task is to

determine "whether the evidence presents a sufficient disagreement to require submission to [the

trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Liberty*

*Lobby*, 477 U.S. at 251-52.  In this regard, the non-movant must "do more than simply show that

there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); "[i]f the evidence is merely colorable, or is not

sufficiently probative, summary judgment may be granted," *Liberty Lobby*, 477 U.S. at 249-50

(internal citations omitted).  Stated differently, the mere existence of a "scintilla of evidence" in

support of the non-movant's position will not suffice; there must be enough evidence on which

the trier of fact could reasonably find for the non-movant. *Talavera v. Shah*, 638 F.3d 303, 308

(D.C. Cir. 2011) (quoting *Anderson*, 477 U.S. at 252).

   B.  *Motions for Summary Judgment in Actions for Employment Discrimination or*
       *Retaliation*

   In recognition of the difficulty in uncovering clear evidence of discriminatory or

retaliatory intent, the district court should approach summary judgment in an action for

employment discrimination or retaliation with "special caution." *Aka v. Wash. Hosp. Ctr.*, 116

F.3d 876, 879-80 (D.C. Cir. 1997), *vacated on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998)

(*en banc*).  Even so, the plaintiff is not relieved of his burden to support his allegations with

competent evidence. *Brown v. Mills*, 674 F. Supp. 2d 182, 188 (D.D.C. 2009).  As in any

context, where the plaintiff will bear the burden of proof at trial on a dispositive issue, at the summary judgment stage, he bears the burden of production to designate specific facts showing that there is a genuine dispute requiring trial. *Ricci v. DeStefano*, __ U.S. __, 129 S. Ct. 2658, 2677 (2009). Absent this burden, the plaintiff could effectively defeat the "central purpose" of the summary judgment device—namely, "to weed out those cases insufficiently meritorious to warrant . . . trial"—simply by way of offering conclusory allegations, speculation, and argument. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

      C.    *Local Procedures for Motions for Summary Judgment*

      The United States District Court for the District of Columbia has supplemented Rule 56 of the Federal Rules of Civil Procedure with Local Civil Rule 7(h)(1), which requires that each party submitting a motion for summary judgment attach a statement of material facts for which that party contends there is no genuine dispute. In turn, the party opposing the motion must submit a responsive statement enumerating all material facts that the party contends are genuinely disputed. *See* LCvR 7(h)(1). Both the movant's initial statement and the non-movant's responsive statement must be based on "references to the parts of the record relied on to support the statement." *Id.*; *see also* FED. R. CIV. P. 56(c)(1) & (3) (requiring parties to "cit[e] to particular parts of materials in the record" and providing that "[t]he court need consider only the cited materials."). This well-reasoned rule "places the burden on the parties and their counsel, who are most familiar with the litigation and the record, to crystallize for the district court the material facts and relevant portions of the record." *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 151 (D.C. Cir. 1996). The parties in these actions have been cautioned on several occasions that this Court strictly adheres to the dictates of Local

Civil Rule 7(h)(1) when resolving motions for summary judgment.  *See* 6/11/09 Scheduling &

Procedures Order (Civil Action No. 09-462) ¶ 6; 5/13/10 Order (Civil Action No. 09-462) at 3;

Tr. of 5/13/10 Status Hr'g (Civil Action No. 09-462) at 21-22.

## III.  DISCUSSION

A.     *Discussion Relating to Plaintiff Mable Gaines*

Gaines is pursuing four claims under Title VII, each of which is based on the contention

that she was retaliated against, in one way or another, for her participation in the 2003 litigation.

Fourth Am. Compl. (Civil Action No. 09-462) ¶¶ 25-26; Compl. (Civil Action No. 10-683) ¶¶

12-13; Pls.' MSJ Opp'n at 45.  First, Gaines claims that she was subjected to a hostile work

environment.  *See* Fourth Am. Compl. (Civil Action No. 09-462) ¶ 25; Pls.' MSJ Opp'n at 45-51,

56-59.  Second, Gaines claims that her requests for a "flexiplace" assignment and related

accommodations were improperly denied.  *See* Pls.' MSJ Opp'n at 52, 66-67.  Third, Gaines

claims that she was improperly suspended without pay for ten days.  *See* Fourth Am. Compl.

(Civil Action No. 09-462) ¶ 25; Pls.' MSJ Opp'n at 52-54.  Fourth, Gaines claims that she was

improperly subjected to a non-disciplinary termination.  *See* Compl. (Civil Action No. 10-683) ¶¶

12-13; Pls.' MSJ Opp'n at 54-55, 67.  The Court addresses each claim in turn.

1.     The Secretary is Entitled to Summary Judgment on Gaines's Hostile Work
Environment Claim

Gaines claims that she was subjected to a hostile work environment in retaliation for her

participation in the 2003 Litigation.  *See* Fourth Am. Compl. (Civil Action No. 09-462) ¶ 25;

Pls.' MSJ Opp'n at 45-51, 56-59.  "In this [C]ircuit, a hostile work environment can amount to

retaliation under Title VII."  *Hussain v. Nicholson*, 435 F.3d 359, 366 (D.C. Cir.) (citing

*Singletary v. District of Columbia*, 351 F.3d 519, 526 (D.C. Cir. 2003)), *cert. denied*, 549 U.S.

993 (2006).  A workplace becomes "hostile" for purposes of Title VII only if the allegedly

offensive conduct "permeate[s] [the workplace] with 'discriminatory [or retaliatory] intimidation,

ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment.'"  *Harris v. Forklift Sys., Inc.*, 510 U.S.

17, 21-22 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 & 67 (1986)).  The

inquiry has an objective component and a subjective component: the environment must be one

that a reasonable person in the plaintiff's position would find hostile or abusive, and the plaintiff

must actually perceive the environment to be hostile or abusive.  *Id.*  In determining whether a

hostile work environment exists, the district court must take into account "the totality of the

circumstances, including the frequency of the discriminatory conduct, its severity, its

offensiveness, and whether it interferes with an employee's work performance."  *Baloch v.

Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (citing *Faragher v. City of Boca Raton*, 524

U.S. 775, 787-88 (1998)).

a.      Gaines's Opposition Is Fundamentally Infirm

Gaines's opposition in support of her hostile work environment claim leaves much to be

desired.  Whereas the Secretary's opening memorandum provides an exhaustive account of the

factual and legal bases that he claims support dismissal of Gaines's hostile work environment

claim, addressing in turn each of the various component-acts that Gaines has identified as

comprising part of the alleged hostile work environment, *see* Def.'s MSJ Mem. at 3-11, 40-49,

Gaines offers no meaningful factual or legal analysis in support of her claim—none.  She begins

by reciting the skeletal allegations concerning her claim *seriatim*, *see* Pls.' MSJ Opp'n at 46-51,

proceeds to restate the legal standard governing hostile work environment claims generally, *see*

*id.* at 56-59, and then concludes by asserting that simply because she has "testified that [she was] subjected to severe hostility on an almost daily basis," then "there is an issue of fact regarding whether [she] suffered from a hostile work environment," *id.* at 57.  In so doing, Gaines ignores virtually every factual and legal argument raised by the Secretary.  With few exceptions, the only factual support for her allegations is her narrative response to an interrogatory posed by the Secretary in discovery asking her to identify each act relevant to the alleged hostile work environment.  *See* Pls.' Interrog. Resps. No. 11.  Inexplicably, the argument section of her opposition does not even specifically mention her, but instead focuses on Plaintiffs as a whole despite the stark difference in their claims.  In the final analysis, Gaines's opposition reduces to little more than legal boilerplate, and amounts to an impermissible attempt to shift the burden to the Secretary and this Court to sift through the record to ascertain the viability of her claim.

> b.      Gaines Improperly Attempts to Incorporate Discrete Employment Acts Into a Single Hostile Work Environment Claim

In setting forth the factual background that she considers relevant to her hostile work environment claim, Gaines identifies the following component-acts:[70] (1) the physical altercation she had with a co-worker on December 21, 2004; (2) the failure of her supervisors to solicit leave donations on her behalf in early 2005; (3) her receipt of a letter on August 25, 2005, directing her to return to work; (4) her supervisors' "insensitive" and "unprofessional" telephone calls while

---

[70]   Despite substantial overlap, the parties' descriptions and groupings of the component-acts do not perfectly align, and for purposes of clarity and convenience the Court may describe and group the component-acts in a manner slightly different from that of the parties.  In addition, the Court shall disregard Gaines's sporadic references to "ongoing retaliation, disparate treatment and harassment practices" that are stated in a conclusory fashion and unaccompanied by any meaningful factual detail or record support.  *See Ass'n of Flight Attendants-CWA*, 564 F.3d at 465-66 (conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment).

she was on leave until her return to work in June 2007; (5) her supervisors' failure to provide

"complete reporting instructions" upon her return to work on June 4, 2007; (6) her supervisors'

instruction that she participate in an office-wide "clean building initiative"; (7) her temporary

assignment to a workshop before she commenced her permanent responsibilities; (8) her

supervisors' failure to provide her with adequate coaching; (9) her "isolation" from other

employees; (10) the denial of her requests for a "flexiplace" assignment and related

accommodations in March 2008; (11) her supervisors' failure to solicit leave donations on her

behalf in May 2008; (12) the failure to allow her to have a union representative present at a

meeting concerning potential disciplinary action on July 8, 2008; (13) her ten-day suspension for

tax non-compliance on April 13, 2009; and (14) her non-disciplinary termination on October 23,

2009.[71]  *See* Pls.' MSJ Opp'n at 46-51.

    Unfortunately, Gaines has compiled a list of discrete employment actions that she

attempts to bring under the umbrella of a hostile work environment claim.  Regardless of the

possible strategic advantages that might flow from such an approach, it is well-established that

"this jurisdiction frowns on plaintiffs who attempt to bootstrap their alleged discrete acts of

retaliation into a broader hostile work environment claim."  *Baloch v. Norton*, 517 F. Supp. 2d

---

[71]  Somewhat strangely, Gaines does not identify her non-disciplinary termination as part of her hostile work environment.  *See* Pls.' MSJ Opp'n at 46-51.  Perhaps Gaines recognized that her termination constituted the sort of discrete act of retaliation that is inappropriate to incorporate into a broader hostile work environment claim.  *See infra* Part III.A.1.b.  Or perhaps she recognized that the pleading in which she asserts her hostile work environment claim has not been amended since she was terminated.  *See* Fourth Am. Compl. (Civil Action No. 09-462).  Nonetheless, in an abundance of caution, the Court will assume that Gaines intended to include her termination as one of the component-acts allegedly comprising the hostile work environment.  Even proceeding with this assumption, the Secretary is entitled to summary judgment on the claim.

345, 364 (D.D.C. 2007), *aff'd sub nom. Baloch v. Kempthorne*, 550 F.3d 1191 (D.C. Cir. 2008);

*accord Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 108 (D.D.C. 2005), *aff'd*, 222 F. App'x 5 (D.C.

Cir. 2007), *cert. denied*, 552 U.S. 1243 (2008); *Lester v. Natsios*, 290 F. Supp. 2d 11, 33 (D.D.C.

2003).  The reason is simple: hostile work environments are by definition different because

"[t]heir very nature involves repeated conduct."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S.

101, 115 (2002).

Consistent with the distinction between the two theories, courts are often hesitant to allow

plaintiffs to bring suit under a hostile work environment theory based upon nothing more than an

amalgamation of loosely related discrete acts.  There is no bright line rule for determining when a

variety of component-acts may be considered collectively; instead, "courts must exercise their

judgment carefully and on a case-by-case basis."[72] *Baloch*, 517 F. Supp. 2d at 363.  In exercising

that judgment, courts must consider the extent to which the alleged actions are related in time

and type; if certain actions are so remote in time or different in kind that a reasonable trier of fact

could not find them to be part of the same work environment, then those actions should not be

considered.  *See Vickers v. Powell*, 493 F.3d 186, 199-200 (D.C. Cir. 2007); *Verges v. Shelby

Cnty. Sheriff's Office*, 721 F. Supp. 2d 730, 746 (W.D. Tenn. 2010).  That does not mean that it

will always be necessary for the component-acts comprising a hostile work environment to be

identical or to take the same form; however, there must be a "common thread" among them.  *Cf.

Norman v. Gannett Co., Inc.*, 852 F. Supp. 46, 50 (D.D.C. 1994); *Harris v. City of Fresno*, 625 F.

---

[72]  While the general hesitancy to allow "bootstrapping" is often stated in broad terms, there is no *per se* rule prohibiting a plaintiff from seeking relief in connection with a particular employment action under the premise that it is actionable both on its own and as part of a broader hostile work environment.  On some occasions, it may be entirely appropriate for an incident to double as an independently actionable act and as a component-act of a hostile work environment.

Supp. 2d 983, 1024 (E.D. Cal. 2009).  In short, there must be some coherence to the claim.

In this case, the Secretary argues in his opening memorandum that Gaines is improperly attempting to "bootstrap" discrete acts of retaliation in the guise of a hostile work environment claim.  *See* Def.'s MSJ Mem. at 41.  In opposition, Gaines offers no response to this argument, electing instead to recite legal boilerplate concerning hostile work environment claims generally and then faulting the Secretary for "ignor[ing] the totality of the circumstances."  Pls.' MSJ Opp'n at 58.  In so doing, Gaines provides no meaningful analysis of her hostile work environment claim and fails to explain how the various component-acts identified congeal into a coherent hostile work environment.  *See* Pls.' MSJ Opp'n at 56-59.  In this Circuit, "it is well understood . . . that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."  *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) (citation omitted), *aff'd*, 98 F. App'x 8 (D.C. Cir. 2004); *accord Lewis v. District of Columbia*, No. 10-5275, 2011 WL 321711, at *1 (D.C. Cir. Feb. 2, 2011).  Because Gaines has failed to provide any rejoinder to the Secretary's argument that her hostile work environment claim is not predicated on "one unlawful employment practice," Def.'s MSJ Mem. at 41 (internal quotation marks omitted), the Court shall, in an exercise of its discretion, treat the argument as conceded.

Even if the Court were inclined to reach the merits of the argument, the result would be the same.  Depending on how they are framed, Gaines has identified somewhere in the neighborhood of ten to fifteen component-acts.  But regardless of how they are framed, those acts are spread out over nearly five years; involve conduct ranging from a physical altercation to what

are at best minor inconveniences common to any workplace; implicate a broad set of actors ranging from former co-workers to fourth-line supervisors, some of whom worked at different locations than Gaines; and only a handful are alleged to have occurred while Gaines was actually working at the IRS.[73]  Where, as here, a plaintiff adopts a "kitchen sink" approach to crafting a hostile work environment claim, and when that approach is challenged, it is incumbent upon her to come forward with some explanation as to how her claim actually *works* under a hostile work environment theory.  In this case, Gaines has made no attempt—none—to crystallize for the Court how these disparate acts could be seen by a trier of fact as sufficiently related to coalesce into a single hostile work environment.  When viewed in their totality, as Gaines presses this Court to view them, the Court can only conclude that these acts are so different in kind and remote in time that they cannot possibly comprise part of the same hostile work environment.  Based on the record created by the parties, the Court concludes that the Secretary is entitled to summary judgment in his favor on Gaines's hostile work environment claim on this basis alone.

---

[73]  On this last point, the Secretary argues that some of the component-acts identified by Gaines in support of her hostile work environment claim are irrelevant because they occurred while she was on extended leave and therefore absent from the workplace.  *See* Def.'s MSJ Mem. at 42-44.  Beginning from the premise that "there was no work environment to speak of," the Secretary reasons these acts could not "by definition . . . have rendered Gaines's work environment hostile."  *Id.* at 42.  Stated in such sweeping terms, the Secretary's argument runs up against the principle that there is no "*per se* rule against considering incidents alleged to have occurred while an employee was physically absent from the workplace."  *Greer v. Paulson*, 505 F.3d 1306, 1314 (D.C. Cir. 2007).  The Secretary's argument may or may not have merit when applied to the particulars of this case, but because the Secretary has not attempted to do so, the Court declines to reach the argument.

> c.    Gaines Fails To Adduce Sufficient Evidence That Would Permit a
>       Reasonable Trier of Fact to Conclude That the Component-Acts
>       Were Taken in Retaliation for Her Protected Activity

There is another ground for granting summary judgment in the Secretary's favor on

Gaines's hostile work environment claim: to the extent there is a common thread among the

component-acts identified by Gaines, it is that there is no evidence to suggest that any one was

taken in retaliation for her participation in the 2003 Litigation.  Critically, Title VII only prohibits

discrimination against an employee taken "because" the employee has engaged in protected

activity.  42 U.S.C. § 2000e-3(a).  Consistent with this statutory mandate, "the plaintiff must

establish a causal connection between the harassment and her protected activity to succeed on the

claim."  *Lewis v. District of Columbia*, 653 F. Supp. 2d 64, 81 (D.D.C. 2009) (citing *Nichols v.

Truscott*, 424 F. Supp. 2d 124, 141 (D.D.C. 2006))*.*  There is an evidentiary component to this

principle: evidence that bears no connection to the plaintiff's protected status cannot support a

hostile work environment claim.  *Harris v. Wackenhut Servs., Inc.*, 419 F. App'x 1, 2 (D.C. Cir.

2011) (*per curiam*) (citing, *inter alia*, *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d

426, 440 (2d Cir. 1999)).  Therefore, courts should exclude from consideration employment

actions that "lack a linkage" to discrimination or retaliation.  *Bryant v. Brownlee*, 265 F. Supp.

2d 52, 63 (D.D.C. 2003) (quoting *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002)); *accord

Baloch*, 517 F. Supp. 2d at 363.

Here, *all* of the component-acts that Gaines relies upon in support of her hostile work

environment claim are facially neutral.  Of course, this alone is not necessarily fatal to her claim:

facially neutral incidents may, in appropriate circumstances, be considered as part of the "totality

of the circumstances" supporting a plaintiff's hostile work environment claim.  However, this is

appropriate only if a trier of fact could reasonably conclude that they were, in fact, based on the

plaintiff's participation in protected activity. *Alfano*, 294 F.3d at 378. In other words, the

plaintiff must first demonstrate that there is a factual basis for inferring that the incidents were

motivated by a retaliatory animus. In this case, Gaines's has completely failed to meet that

burden: not one of the component-acts is accompanied by any indicia of retaliatory animus of any

kind, let alone a retaliatory animus specifically directed towards her participation in the 2003

litigation. Furthermore, where the Secretary has proffered a non-retaliatory reason for a specific

act, Gaines has "failed to offer any contradictory evidence to rebut the [Secretary's] neutral

reason." *Graham v. Holder*, 657 F. Supp. 2d 210, 217 (D.D.C. 2009). Viewing the record as a

whole, no trier of fact could reasonably conclude that the acts complained of by Gaines were

motivated by a retaliatory animus.[74]

    First, Gaines alleges that she was involved in a physical altercation with a co-worker on

---

[74] The Court underscores that Gaines *never* argues in connection with her hostile work environment claim that an inference of retaliation may be made based on temporal proximity, either on its own or in connection with other circumstantial evidence. *See* Pls.' MSJ Opp'n at 56-59. As such, the argument is deemed to be waived. Even if Gaines had made such an argument, there would be two fundamental infirmities with such an approach. First, the temporal gap is frequently of such a magnitude that it is insufficient to permit a fact-finder to infer retaliation as a matter of law. *See, e.g.*, *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (*per curiam*); *Taylor v. Solis*, 571 F.3d 1313, 1322 (D.C. Cir. 2009). This is especially true where, as here, the uncontested record shows that the relevant decisionmakers had no contemporaneous knowledge of Gaines's participation in the 2003 litigation. *See Talavera*, 638 F.3d at 313 (faulting the plaintiff for failing to show that the relevant decisionmaker "had knowledge of her protected activity."); *Jones v. Bernanke*, 557 F.3d 670, 679 (D.C. Cir. 2009) (same). Second, in this Circuit, "positive evidence beyond mere [temporal] proximity" is ordinarily necessary to undermine an employer's proffered explanation for its conduct. *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007). Where the Secretary has proffered an explanation for a particular component-act, Gaines had failed to adduce sufficient evidence from which a trier of fact could reasonably conclude that the act had any nexus to her protected activity. The Court shall provide examples of these two infirmities in the discussion that follows.

December 21, 2004.  However, Gaines concedes that the only reason the co-worker struck her

was because she refused to attend a breakfast outing earlier that morning.  *See* Def.'s Stmt. ¶ 6;

Pls.' Stmt. ¶¶ 5-6; Pls.' MSJ Opp'n at 47; Gaines Dep. at 106.  There is no evidence to suggest

that the altercation had any nexus to Gaines's participation in the 2003 litigation and therefore it

cannot support her hostile work environment claim.

      Second, Gaines alleges that her supervisors failed to solicit leave donations on her behalf

in early 2005 while she was on leave.  Unfortunately, Gaines states the allegation in such a

conclusory manner that it unclear exactly what she contends transpired or when:

> Ms. Gaines's manager, John Wood, did not carry out his managerial
> responsibility to solicit leave donations on her behalf.  Wood's
> intentional and inappropriate action taken against Ms. Gaines,
> shutting her out from participating in the leave bank program was
> hostile in nature and directed toward Ms. Gaines as a result of her
> protected activity.

Pls.' MSJ Opp'n at 48 (citing Pls.' Interrog. Resps. No. 11).  This sort of cursory allegation may

suffice in a complaint, but it is patently insufficient to create a genuine dispute necessitating trial.

As an initial matter, Gaines offers no response to the Secretary's argument that her "supervisors

had no responsibility to solicit leave donations on her behalf."  Def.'s MSJ Mem. at 42.  In an

exercise of its discretion, the Court shall treat the argument as conceded.  More importantly,

however, Gaines offers no facts from which a trier of fact could infer that the action was taken in

retaliation for her participation in the 2003 Litigation.  *See Hussain*, 435 F.3d at 365 (concluding

that the district court properly disregarded "conclusory allegations" of discriminatory animus in

the plaintiff's own affidavit); *Robinson v. Duncan*, 775 F. Supp. 2d 143, 2011 WL 1319084, at

*7 (D.D.C. Apr. 7, 2011) (faulting the plaintiff for "present[ing] nothing aside from conclusory

allegations from which a reasonable jury could conclude that [the decisionmaker] acted with

discriminatory or retaliatory animus."). On this record, no reasonable trier of fact could conclude that John Wood's alleged failure to solicit leave donations on Gaines's behalf in early 2005 had any nexus to Gaines's participation in the 2003 litigation. Therefore, it cannot support her hostile work environment claim.[75]

Third, Gaines alleges that a letter was sent to her on August 25, 2005, directing her to return to work on September 6, 2005. The undisputed sequence of events that led to the issuance of the letter precludes a trier of fact from drawing an inference of retaliation. It is undisputed that Gaines was examined by a board-certified orthopedic surgeon on June 9, 2005, and it is undisputed that the surgeon concluded that Gaines was able to return to work full-time so long as she was not required to lift more than ten pounds. Def.'s Stmt. ¶ 10; Pls.' Stmt. ¶ 10. Based on that examination, the DOL's OWCP—not the IRS—determined that Gaines was fit to return to work based on the stated lifting limitation and notified the IRS of that determination on August 19, 2005. Def.'s Stmt. ¶ 11; Pls.' Stmt. ¶ 11. That in turn prompted the IRS to send Gaines a letter less than a week later offering her a position as a Tax Analyst, acknowledging her lifting limitation, and instructing her to report to work on September 6, 2005. Def.'s Stmt. ¶ 12; Pls.'

---

[75] There is a further reason why the allegation cannot support Gaines's hostile work environment claim—specifically, Gaines fails to respond to the Secretary's argument that "leave *was* solicited on Gaines's behalf." Def.'s MSJ Mem. at 33 (emphasis altered). Indeed, it is undisputed that "a memorandum soliciting donations was distributed on her behalf." Def.'s Stmt. ¶ 9; Pls.' Stmt. ¶ 9; Gaines Dep. Ex. 4 (Mem. to M. Gaines dated Mar. 9, 2005). Due entirely to Gaines's failure to situate her allegations in time and her failure to respond to the Secretary's arguments, the Court cannot say with any precision how close in time the memorandum was circulated after Gaines's application to participate in the Leave Bank Program was approved. Nonetheless, the Court can surmise from the record that it was at most within a few months. Under these circumstances, no reasonable trier of fact could conclude that the alleged failure, even if it occurred, was sufficiently material to meaningfully contribute to a severe or pervasive hostile working environment.

Stmt. ¶ 12; Gaines Dep. Ex. 7 (Ltr. to M. Gaines dated Aug. 25, 2005) at 1.  At her deposition, Gaines admitted that her supervisors at the IRS did not initiate the request that she return to work, played no role in the OWCP's decision, and were obligated to follow the OWCP's recommendation.  Gaines Dep. at 152, 155-56.  More to the point, she adduces no evidence that would suggest that the letter or the surrounding circumstances were in any way motivated by a desire to retaliate against her for her prior protected activity.  Indeed, Gaines conceded at her deposition that she cannot even explain the basis for her belief that the letter was retaliatory.  Gaines Dep. at 153.  Simply put, there is no evidence to suggest that the letter had any nexus to Gaines's participation in the 2003 Litigation and therefore it cannot support her hostile work environment claim.[76]

Fourth, Gaines alleges that while she was out on leave, her fourth-line supervisor, Fayne, "occasionally spoke with [her] on the phone concerning her return to the workplace, [indicated] that she would start with a clean slate, and [stated] that when she [did] return to the workplace, she [would] have to hit the ground rolling."  Pls.' MSJ Opp'n at 49 (citing Pls.' Interrog Resps. No. 11).  Without further factual elaboration, Gaines claims that the statements attributed to Fayne reflected a "condescending and demeaning attitude" and were "insensitive and totally unprofessional."  *Id.* (citing  Pls.' Interrog Resps. No. 11).  However, it is far from clear how the statements attributed to Fayne, which taken at face value appear to be words of encouragement

---

[76]  There is a further reason why the allegation cannot support Gaines's hostile work environment claim.  It is undisputed that even though Gaines failed to respond to the letter or to report to work on the designated date, she was never disciplined for failing to report to work.  Def.'s Stmt. ¶¶ 13-14; Pls.' Stmt. ¶¶ 13-14.  In other words, the letter had no material consequences for Gaines's employment.  Under these circumstances, no reasonable trier of fact could conclude that the letter was sufficiently material to meaningfully contribute to a severe or pervasive hostile working environment.

and reassurance from a supervisor to an employee, could be construed as condescending, demeaning, insensitive, or unprofessional.  Regardless, and more to the point, Gaines adduces no evidence that would allow a trier of fact to reasonably conclude that these statements were motivated by a retaliatory animus.  By Gaines's own account, Fayne was merely "over-talking" her, "telling [her] what was going to be going on when [she] returned to work" and preventing Gaines from "get[ting] a word in edgewise."  Gaines Dep. at 122.  There is no evidence to suggest that the statements had any nexus to Gaines's participation in the 2003 Litigation and therefore they cannot support her hostile work environment claim.[77]

Fifth, Gaines alleges that her third-line supervisor, Becker, failed to provide her with "complete reporting instructions" upon her return to work on June 4, 2007.  At her deposition, Gaines admitted that she did not view the act as hostile, merely "inappropriate."  Gaines Dep. at 226.  Gaines adduces no evidence that would allow a reasonable trier of fact to conclude that Becker's alleged failure to provide her with "complete reporting instructions" had any connection to her prior protected activity.  In the absence of competent evidence to suggest that the alleged failure had any nexus to Gaines's participation in the 2003 Litigation, it cannot support her hostile work environment claim.[78]

---

[77]   There is a further reason why the allegation cannot support Gaines's hostile work environment claim.  At her deposition, Gaines testified that she personally found Fayne's alleged statements at most "[k]ind of" condescending, but not demeaning.  Gaines Dep. at 123.  No reasonable trier of fact could conclude that the statements attributed to Fayne were objectively hostile.  Title VII is not a "general civility code," *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998), and this sort of complaint falls considerably short of what is required to meaningfully contribute to a severe or pervasive hostile working environment.

[78]   There is a further reason why the allegation cannot support Gaines's hostile work environment claim.  According to Gaines, the upshot of Becker's purported failure to provide complete reporting instructions was that she was required to wait a total of two hours at a

Sixth, Gaines alleges that during an office tour upon her return to work on June 4, 2007, her second-line supervisor, Gelineau, instructed her to participate in a "clean building initiative." According to Gaines, Gelineau instructed her to clean and organize the area surrounding her workplace, an instruction that Gaines admits applied to everyone in the office.  Gaines Dep. at 227-33, 235; Gelineau Dep. at 89.  It is undisputed that Gelineau explained that the entire office was conducting a week-long "clean building initiative," in connection with which all employees were encouraged to cull their files of excess paperwork, organize their workspace, and remove any extraneous boxes or office supplies.  Def.'s Stmt. ¶ 23; Pls.' Stmt. ¶ 23.  There is no indication that Gaines was singled out for special treatment.  Furthermore, Gaines offers no response to the Secretary's argument that Gelineau "had no knowledge of Gaines's EEO activity at the time."  Def.'s MSJ Mem. at 46 (citing Gelineau Dep. at 83).  In an exercise of its discretion, the Court shall treat the argument as conceded.[79]  In any event, the argument is supported by the record.  At bottom, Gaines points to no evidence that would allow a reasonable trier of fact to conclude that Gelineau's instruction had any connection whatsoever to her

---

security station until her second-line supervisor, Gelineau, arrived to escort her into the premises. *See* Pls.' MSJ Opp'n at 49.  This sort of minor inconvenience cannot meaningfully contribute to a severe or pervasive hostile working environment.

[79]  The Court recognizes that *the employer's* knowledge of an employee's protected activity may suffice to infer knowledge on the part of the relevant decisionmaker when it is coupled with temporal proximity.  *See Jones*, 557 F.3d at 679.  However, in this case, the incident occurred approximately one year and two months after Gaines last participated in protected activity in connection with the 2003 Litigation by participating in the 2006 Settlement. *See* Stip. & Compromise Settlement & Dismissal With Prejudice ¶ 4, *Mason v. Snow*, Civil Action No. 03-1730 (CKK) (D.D.C. May 1, 2006).  Courts have routinely held that a temporal gap of this magnitude is insufficient to permit the trier of fact to infer a retaliatory animus.  *See, e.g.*, *Breeden*, 532 U.S. at 273; *Taylor*, 571 F.3d at 1322.  Nor has Gaines pointed to any other circumstantial evidence that would permit a reasonable trier of fact to infer knowledge on Gelineau's part.

participation in the 2003 Litigation.  Therefore, the incident cannot support her hostile work environment claim.[80]

Seventh, Gaines alleges that upon her return to work on June 4, 2007, she was temporarily assigned to a workshop before she began work on her permanent responsibilities.[81] Once again, Gaines offers no response to the Secretary's argument that Gelineau, who was responsible for assigning Gaines to the workshop, "had no knowledge of Gaines's EEO activity at the time."  Def.'s MSJ Mem. at 46 (citing Gelineau Dep. at 83).  In an exercise of its discretion, the Court shall treat the argument as conceded.  In any event, the argument is supported by the record.  More broadly, Gaines adduces no evidence that would permit a reasonable trier of fact to conclude that the assignment had any connection with her prior protected activity.  There is no evidence to suggest that the assignment had any nexus to Gaines's participation in the 2003 Litigation and therefore it cannot support her hostile work environment

---

[80]   There is an additional reason why the incident cannot support Gaines's hostile work environment claim.  Gaines admits that she did not actually participate in cleaning or organizing the area surrounding her workplace, and concedes that she was never instructed to do so again by Gelineau or anyone else.  Gaines Dep. at 233.  Under these circumstances, no reasonable trier of fact could conclude that Gelineau's instructions that Gaines participate in an office-wide "clean building initiative" were sufficiently material to meaningfully contribute to a severe or pervasive hostile working environment.

[81]   On a related note, Gaines also alleges, in passing and with no meaningful explication, that the workshop assignment required her to coordinate with a co-worker who "rarely returned" her communications.  To the extent Gaines intended to suggest that the co-worker's conduct supports her hostile work environment claim, she adduces no evidence that would permit a reasonable trier of fact to conclude that the co-worker's alleged failure to promptly respond to her communications had any nexus to her protected activity.  In any event, no reasonable trier of fact could conclude that such conduct would be sufficiently material to meaningfully contribute to a severe or pervasive hostile working environment.

claim.[82]

Eighth, Gaines claims that sometime shortly after her return to work on June 4, 2007, her first-line supervisor, Gardner, "failed to assign [her] a coach to train her in completing work assignments." Pls.' MSJ Opp'n at 51. For various reasons, no reasonable trier of fact could infer that the alleged failure to assign Gaines a coach was retaliatory. As an initial matter, Gaines fails to respond to the Secretary's argument that Gardner "had no knowledge of her participation in the 2003 lawsuit or her EEO activity." Def.'s MSJ Mem. at 47 n.15 (citing Gardner Dep. at 60, 69-70). In an exercise of its discretion, the Court shall treat the argument as conceded. In any event, the argument is supported by the record. Furthermore, the uncontested evidence in the record establishes that Gardner made arrangements to provide Gaines with training to get her acclimated to her position. *See* Def.'s Stmt. ¶ 30; Pls.' Stmt. ¶ 30; Gaines Dep. at 235, 239; Gardner Dep. at 17, 35. While Gaines alleges that she further requested that she be assigned a senior analyst as an "on-the-job" coach, she admits that Gardner in fact asked a senior analyst to serve as her coach and that the senior analyst "refused to do so." Pls.' MSJ Opp'n at 51. Gaines adduces no evidence that would permit a reasonable trier of fact to conclude that Gardner's efforts, or the senior analyst's refusal, had any connection to her prior protected activity. True, Gaines alleges that "other new analysts" were provided a senior analyst as an on-the-job coach. Pls.' Stmt. ¶ 27 (citing Gaines Dep. at 235-40). The actual testimony relied upon for this allegation only suggests that a single employee, Nuss, was coached by a senior analyst for an unspecified duration at some point after Gaines started in her new position. Gaines Dep. at 237.

---

[82] In any event, no reasonable trier of fact could conclude that a temporary assignment of this kind was sufficiently material to meaningfully contribute to a severe or pervasive hostile working environment.

Gaines makes no attempt to show that she was similarly situated to Nuss in all material respects or to provide any meaningful explanation as to how the coaching that Nuss allegedly received differed from the training opportunities she received.[83]   In the absence of evidence that she and Nuss were similarly situated, "an inference of falsity or [retaliation] is not reasonable." *Montgomery v. Chao*, 546 F.3d 703, 707 (D.C. Cir. 2008) (quoting *Waterhouse v. District of Columbia*, 298 F.3d 989, 995 (D.C. Cir. 2002)).   No trier of fact, if presented with this record, could reasonably conclude that the alleged shortcomings in the training and coaching provided to Gaines, if there even were any, had any connection to her prior protected activity.   At bottom, there is no evidence to suggest that these decisions had any nexus to Gaines's participation in the 2003 Litigation and therefore they cannot support her hostile work environment claim.

Ninth, Gaines vaguely alleges that she was "intentionally isolated from [her] group by non-association."  Pls.' MSJ Opp'n at 51.  Unfortunately, the allegation is stated in such conclusory and unilluminating terms that it is difficult to glean from Gaines's submissions exactly what is the basis of her complaint.  Equally troubling, the sum total of evidence identified by Gaines in support of this allegation is the following statement from her responses to the Secretary's interrogatories:

> Gaines sat at her desk for weeks completing online training courses because she was not assigned appropriate section work.  She met with Mr. Gardner . . . .   Ms. Gaines then asked if she could be assigned section work like everyone else, and Mr. Gardner said that he would see what he could do to assist her in her request.

---

[83]   Gaines testified that she personally viewed a senior analyst in her office as her "go-to person when [she] had a question," and the person to whom she would speak "to help [her] complete her tasks."  Gaines Dep. at 236, 239.  She makes no attempt to explain to the Court how this relationship differs from an "on-the-job" coach.

Pls.' Interrog. Resps. No. 11.  Gaines does not even attempt to explain how this could possibly

serve as evidence of retaliation.  By her own account, she was required to complete certain

training "since she was new to the section," and when she approached her supervisor to request

an assignment he said "he would see what he could do to assist her in her request."   Pls.' MSJ

Opp'n at 51.  No reasonable trier of fact could draw an inference of retaliation from this sequence

of events, especially where, as here, the uncontested evidence in the record shows that the

relevant supervisor, Gardner, had no knowledge of Gaines's prior protected activity at the time.

There is no evidence to suggest that Gaines was "intentionally isolated" and, even if she was, that

it had any nexus to Gaines's participation in the 2003 Litigation.  Therefore, it cannot support her

hostile work environment claim.

Tenth, Gaines contends that her requests for a "flexiplace" assignment and related

accommodations were improperly denied in March 2008.  For the reasons set forth elsewhere,

*see infra* Part III.A.2, no reasonable trier of fact could conclude that Gaines's requests were

denied in retaliation for her prior protected activity.  Therefore, they cannot serve as evidence in

support of her hostile work environment claim.

Eleventh, Gaines alleges that her first-line supervisor, Gardner, failed to solicit leave

donations on her behalf in May 2008.  The totality of the evidence cited for this allegation is as

follows: "In May 2008 Gardner failed to solicit requests for donated leave . . . on behalf of

plaintiff Gaines, after he agreed to do so."  Pls.' Interrog Resps. No. 11.  Gaines provides no

meaningful factual support for her allegation.  Meanwhile, the record shows that Gaines was

approved to participate in the Leave Transfer Program.  Def.'s Stmt. ¶ 32; Pls.' Stmt. ¶ 32.

However, Gardner admitted he "dropped the ball" and forgot to send out notice of Gaines's

approval for the Leave Transfer Program to other employees for them to make contributions of donated leave on her behalf.  Gardner Dep. at 41-42.  The Secretary concedes as much, and argues that Gardner had no knowledge of Gaines's protected activity at the time, that there is no evidence that Gardner's lapse was related to Gaines's protected activity, and that, regardless, Gardner had no responsibility to solicit donations on Gaines's behalf.  *See* Def.'s MSJ Mem. at 42-43.  In opposition, Gaines offers no response to these arguments.  In an exercise of its discretion, the Court shall treat them as conceded.  More to the point, however, Gaines has adduced no evidence that would allow a reasonable trier of fact to conclude that Gardner's failure to solicit donations on her behalf had any connection with her participation in the 2003 Litigation.  Therefore, it cannot serve as evidence in support of her hostile work environment claim.

Twelfth, Gaines alleges that her first-line supervisor, Gardner, and her second-line supervisor, Gelineau, denied her the right to have a union representative present during a meeting concerning potential disciplinary action.[84]  In its opening memorandum, the Secretary argues that "[e]ven assuming the accuracy of [the] allegation, no fact supports [Gaines's] argument that the absence of a union representative at a single meeting created a hostile work environment that pervaded the workplace with ridicule, discrimination, or insult."[85]  Def.'s MSJ Mem. at 48 n.16.

---

[84]  While it is far from clear from her disjointed submissions, Gaines appears to contend that this was in violation of the relevant bargaining agreement.  *See* Pls.' MSJ Opp'n at 46. However, she fails to cite to any evidence in the record in support of this allegation, and states it in such a conclusory manner that the Court has no basis to assess its validity.  In any event, she still fails to adduce any evidence that would permit a trier of fact to reasonably conclude that the denial, assuming it even occurred, had any connection to her prior protected activity.

[85]  Although the Secretary appears willing to concede the point in connection with the pending motions, the Court observes that the evidence cited by Gaines in support of the

In opposition, Gaines offers no response to the argument and, in an exercise of its discretion, the Court will treat the argument as conceded.  More to the point, Gaines once again adduces no evidence that would permit a reasonable trier of fact to conclude that these events had any relationship to her prior protected activity.  The mere fact that something undesirable might have occurred is insufficient to support a claim for retaliation; Gaines must show "a causal connection between the harassment and her protected activity."  *Lewis*, 653 F. Supp. at 81.  Because she has failed to do so, the alleged incident cannot support her hostile work environment claim.

Thirteenth, Gaines claims that her ten-day suspension for tax non-compliance was imposed in retaliation for her prior protected activity.  For the reasons set forth elsewhere, *see infra* Part III.A.3, no reasonable trier of fact could conclude that the suspension was imposed for her prior protected activity.  Therefore, it cannot serve as evidence in support of her hostile work environment claim.

Fourteenth, and finally, Gaines contends that her non-disciplinary termination on October 23, 2009, was taken in retaliation for her prior protected activity.  For the reasons set forth elsewhere, *see infra* Part III.A.4, no reasonable trier of fact could conclude that Gaines was terminated for her prior protected activity.  Therefore, it cannot serve as evidence in support of her hostile work environment claim.

---

proposition that Gardner and Gelineau refused to allow her to have a union representative present during the meeting—namely, Gardner and Gelineau's deposition testimony—does not actually support the proposition.  *See* Pls.' MSJ Opp'n at 51 (citing Gardner Dep. at 66-67; Gelineau Dep. at 76-77).  The cited testimony is at best contradictory.  Gardner testified that Gaines *was* offered the opportunity to have a union representative present, but testified that he recalled Gelineau extending the offer.  Gardner Dep. at 67.  Meanwhile, Gelineau testified that it was standard practice to inform employees that they could have a union representative present, but did not testify that she recalled doing so.  Gelineau Dep. at 76-77.

In the final analysis, of the myriad component-acts identified by Gaines as supporting her hostile work environment claim, Gaines has failed to point to any evidence to suggest that any one was taken in retaliation for her participation in the 2003 Litigation. Viewing the record as a whole, no trier of fact could reasonably conclude that the acts complained of by Gaines were motivated by a retaliatory animus. Having failed to designate specific facts showing that there is a genuine dispute requiring trial, *see Ricci*, 129 S. Ct. at 2677, Gaines's claim must fail on this separate independent basis. Accordingly, the Court will enter summary judgment in the Secretary's favor on Gaines's hostile work environment claim.

> 2.    The Secretary Is Entitled to Summary Judgment on Gaines's Claim Based on the Denial of Her Requests for a "Flexiplace" Assignment and Related Accommodations

Gaines claims that her requests for a "flexiplace" assignment and related accommodations were denied in retaliation for her participation in the 2003 Litigation.[86]  *See* Pls.' MSJ Opp'n at 52, 66-67. In this Circuit, once the employer has proffered a legitimate, non-retaliatory reason for a challenged employment action, the "central question" becomes whether "the employee [has] produced sufficient evidence for a reasonable jury to find that the employer's asserted [non-retaliatory] reason was not the actual reason and that the employer intentionally [retaliated] against the employee." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008); *see Jones*, 557 F.3d at 678 (noting that "these principles apply equally to retaliation claims.").

---

[86]  The Court actually doubts that a discrete claim for retaliation based upon the denial of Gaines's requests for a "flexiplace" assignment and related accommodations could be said to be within the scope of the operative pleadings. *See* Fourth Am. Compl. (Civil Action No. 09-462) ¶¶ 19, 25-26; Compl. (Civil Action No. 10-683) ¶¶ 12-13. However, because the Secretary has not pressed the issue, and because the claim fails in any event, the Court shall assume, without deciding, that Gaines may pursue such a claim here.

Generally speaking, a claim should proceed to the jury if the plaintiff is able to point to evidence from which a jury could reasonably find that the employer's stated reasons for the challenged employment action were pretextual. *Calhoun v. Johnson*, 632 F.3d 1259, 1261 (D.C. Cir. 2011); *see also Pardo-Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010) (providing that evidence of pretext is generally, but not always, sufficient to survive summary judgment).[87]  The plaintiff cannot rely on her view that the employer's actions "were imprudent or unfair; an employer may make an employment decision for a good reason, a bad reason, or no reason at all so long as" the decision is not made in reprisal for the plaintiff's protected activity. *Santa Cruz v. Snow*, 402 F. Supp. 2d 113, 125 (D.D.C. 2005) (internal quotation marks omitted).

In this case, Gaines submitted an application for a "flexiplace" assignment and related accommodations in March 2008, requesting that she be allowed to work at home full-time following a surgical procedure that she planned to undergo at the end of the month.  Def.'s Stmt. ¶ 31; Pls.' Stmt. ¶ 31.  However, Gaines's supervisors informed her that they were unable to accommodate her requests because she was yet to complete the requisite "plain language" review training.  Def.'s Stmt. ¶ 33; Pls.' Stmt. ¶ 33; Gardner Dep at 28, 35, Gelineau Dep. at 26-27.  Gardner told Gaines that he would be able to "better justify" her working from home following the completion of her training.  Gardner Dep. at 28, 35.  Here, Gaines's entire defense of her claim consists of a single paragraph.  *See* Pls.' MSJ Opp'n at 66-67.  She tenders only two arguments as to why she believes the trier of fact could find the Secretary's proffered justification

---

[87]  Gaines does not claim to have—nor has she—presented any "direct evidence" of retaliation. *See generally Manuel v. Potter*, 685 F. Supp. 2d 46, 60 n.11 (D.D.C. 2010) ("'[D]irect evidence' is that which, if believed by the fact-finder, establishes the fact in question without any need for an inference, including statements or documents showing a discriminatory or retaliatory animus on their face.").

to be pretextual.  *See* Pls.' MSJ Opp'n at 66-67.  Neither argument has any merit.

First, Gaines asserts that the Secretary's proffered justification for denying her requests is nothing more than a "post hoc rationale" raised for the first time in this litigation.  Pls.' MSJ Opp'n at 67.  This argument is easily dispensed with, as it is flatly contradicted by the record. Gardner, in the course of denying Gaines's requests on or about July 11, 2008, included the following contemporaneous explanation for the decision:

> Training is essential to conduct the clarity reviews [for which Gaines is responsible].  * * *  We have tried to schedule training for [Gaines] to get acclimate[d] . . . to the notice review process and procedures. To work from home at this time would not be productive.

Gaines Dep. Ex 25 (Reasonable Accommodation Req.) at 2.  On this record, no reasonable trier of fact could conclude that the Secretary's proffered justification is a "post hoc rationale" raised for the first time in this litigation.

Second, Gaines claims that her supervisors granted a "flexiplace" request by a co-worker, Nuss, two months after Nuss began working in her position.  Pls.' MSJ Opp'n at 66-67.  The argument fails at the outset because Gaines never attempts to establish that she and Nuss were similarly situated in all material respects.  *See McFadden v. Ballard Spahr Andrews & Ingersoll, LLP*, 611 F.3d 1, 4 (D.C. Cir. 2010) (allegation that other employees received accommodations not offered to the plaintiff did "not provide the slightest reason to doubt" the defendant's proffered explanation where the plaintiff had failed to show that she was similarly situated to the alleged comparators).  Likewise, Gaines's passing suggestion that "all nine of [her] coworkers were on flexiplace," Pls.' MSJ Opp'n at 66 (citing Gardner Dep. at 71), goes nowhere because she does not even identify these co-workers by name, let alone attempt to establish that they were all similarly situated.  Gaines had failed to satisfy her threshold burden of showing that she and

84

any of the alleged comparators were similarly situated.[88]  On this record, no reasonable trier of

fact could conclude that Gaines was the subject of disparate treatment.

    The two arguments tendered by Gaines are without merit, and this alone suffices to grant

summary judgment in the Secretary's favor.  Nonetheless, the Court pauses to observe that no

reasonable trier of fact, viewing the record as a whole, could conclude that the Secretary's

proffered justification for denying Gaines's requests was not the actual reason and that Secretary

intentionally retaliated against Gaines for her participation in the 2003 Litigation.  In this regard,

Gaines fails to respond to two arguments tendered by the Secretary that undermine any possible

inference of retaliation in this instance.  First, Gaines offers no rejoinder to the Secretary's

argument that the temporal gap between the denial of her requests and her prior protected activity

is too great to support an inference of retaliation, *see* Def.'s MSJ Mem. at 47, and, in an exercise

of its discretion, the Court shall treat the argument as conceded.  In any event, approximately two

years had elapsed since Gaines had last engaged in protected activity in connection with the 2003

Litigation, precluding any potential inference of retaliation based on temporal proximity.

Second, Gaines offers no response to the Secretary's argument that "Gardner had no knowledge

of the 2003 Lawsuit or of her prior EEO activity when he denied the requests."  *Id.* (citing

Gardner Dep. at 61, 69-70), and in an exercise of its discretion, the Court shall treat the argument

_____

    [88]  The Court also notes that Gaines failed to raise this factual issue in the manner
specifically prescribed by the Court.  By the terms of this Court's prior orders, in responding to
the Secretary's statement of material facts, Gaines was required to set forth any additional facts
that she considered germane to the pending motions at the end of her responsive statement, a
procedure that was designed to afford the Secretary a meaningful opportunity to address whether
any additional proffered facts were or were not genuinely in dispute.  *See* 6/11/09 Scheduling &
Procedures Order (Civil Action No. 09-462) ¶ 6; 5/13/10 Order (Civil Action No. 09-462) at 3;
Tr. of 5/13/10 Status Hr'g (Civil Action No. 09-462) at 21-22.  By burying this factual issue in a
sixty-eight page opposition memorandum, Gaines deprived the Secretary of this opportunity.

as conceded.  In any event, the argument is supported by the record.

More to the point, Gaines simply has adduced no evidence that would allow a reasonable

trier of fact to conclude that the denial of her requests had any nexus to her prior protected

activity.  Indeed, she concedes that she was "new to that area," that she had never performed

"plain language" review of publications and notices in her career, and that she needed "plain

language" review training.  Def.'s Stmt. ¶ 28; Pls.' Stmt. ¶ 28; Gaines Dep. at 236.  These

admissions, and the Secretary's proffered explanation, are consistent with the record, which

shows that Gaines's supervisors made arrangements for her to obtain the requisite training.

Def.'s Stmt. ¶ 30; Pls.' Stmt. ¶ 30; Gardner Dep. at 17, 35; Gaines Dep. at 235, 239.  On this

record, no reasonable trier of fact could conclude that the Secretary's proffered explanation is

pretextual.  The Secretary is entitled to summary judgment on Gaines's claim based on the denial

of her requests for a "flexiplace" assignment and related accommodations.

> **3.**    **The Secretary Is Entitled to Summary Judgment on Gaines's Claim Based**
>           **On Her Ten-Day Suspension Without Pay**

Gaines also claims that she was improperly suspended without pay for ten days in

retaliation for her participation in the 2003 Litigation.  *See* Fourth Am. Compl. (Civil Action No.

09-462) ¶ 25; Pls.' MSJ Opp'n at 52-54.  The issue first emerged on January 24, 2008, when the

ETC Branch within the IRS performed a routine computerized comparison of payroll and tax

account records and determined that Gaines had failed to make sufficient estimated tax payments

pertaining to gambling winnings during tax-year 2006.  Def.'s Stmt. ¶ 34; Pls.' Stmt. ¶ 34.  It is

undisputed that the ETC Branch discovered the issue independently and that Gaines's

supervisors had no role in initiating the investigation.  Def.'s Stmt. ¶ 37; Pls.' Stmt. ¶ 37.

Subsequently, the matter was referred to Gaines's supervisors for purposes of determining a

suitable punishment; they in turn informed Gaines on July 8, 2008, that they were considering a fourteen-day suspension without pay, but advised Gaines that alternative discipline was also a possibility.  Def.'s Stmt. ¶¶ 39, 41; Pls.' Stmt. ¶¶ 39, 41.

Upon being notified of the proposed discipline, Gaines stopped reporting to work altogether and never returned.  Def.'s Stmt. ¶ 42; Pls.' Stmt. ¶ 42.  Thereafter, and while the fourteen-day suspension proposal was still pending, the ETC Branch discovered that Gaines had committed yet another tax violation—namely, that she had failed to timely pay additional taxes because she failed to accurately claim an earned-income tax credit.  Def.'s Stmt. ¶ 44; Pls.' Stmt. ¶ 44.  On December 12, 2008, upon learning of this development, Gaines's supervisors rescinded the original suspension proposal and issued a new letter proposing the same fourteen-day suspension, albeit this time incorporating the facts relating to the new incident of tax non-compliance.  Def.'s Stmt. ¶¶ 47-48; Pls.' Stmt. ¶¶ 47-48.  Ultimately, the proposed fourteen-day suspension was mitigated to a ten-day suspension, and Gaines was notified of the final decision on April 13, 2009.  Def.'s Stmt. ¶ 49; Pls.' Stmt. ¶ 49.

The Secretary is entitled to summary judgment on this claim.  As a threshold matter, Gaines has completely failed to interpose a meaningful defense in support of her claim.  Whereas the Secretary argues at great length in his opening memorandum that Gaines "presents no evidence connecting her protected activity to the suspension," Def.'s MSJ Mem. at 49, the argument section of Gaines's opposition does not even address the claim, let alone provide a response to the Secretary's detailed factual and legal arguments, *see* Pls.' MSJ Opp'n at 55-67. Among other things, Gaines (a) does not dispute that the challenged employment action came over two years after she last participated in protected activity in connection with the 2003

Litigation, a time lag that precludes an inference of retaliation based on temporal proximity, and (b) fails to provide any evidence contradicting the Secretary's assertion that the supervisors responsible for the proposed suspension did not have contemporaneous knowledge of her protected activity. *See* Def.'s MSJ Mem. at 51 (citing Gelineau Dep. at 82-83; Gardner Dep. at 61, 69; Becker Dep. at 61). True, the introductory paragraphs to Gaines's opposition include a passing statement that "[t]he ten day suspension of Ms. Gaines for paying taxes on her gambling winnings when she filed her return rather than when she won the money was unjustified and retaliatory." *Id.* at 5. However, such an argument hardly warrants serious attention; courts need not resolve arguments raised in a cursory manner and with only the most bare-bones arguments in support. *See Wash. Legal Clinic for the Homeless v. Barry*, 107 F.3d 32, 39 (D.C. Cir. 1997). Because Gaines has failed to respond to the arguments raised by the Secretary in support of dismissal, the Court shall, in an exercise of its discretion, treat those arguments as conceded. On this basis alone, the Secretary is entitled to summary judgment on the claim.

However, even if the Court were inclined to reach the merits of the claim, Gaines has failed to produce sufficient evidence to permit a reasonable trier of fact to conclude that the Secretary's proffered reason for the suspension "was not the actual reason" and that the Secretary instead intentionally retaliated against Gaines. *Brady*, 520 F.3d at 494. Even setting aside the magnitude of the temporal gap between Gaines's protected activity and the challenged suspension and the absence of any evidence that the responsible decisionmakers had any knowledge of that protected activity, Gaines *admits* that she engaged in the underlying conduct cited as grounds for the proposed suspension. Def.'s Stmt. ¶¶ 38, 44; Pls.' Stmt. ¶¶ 38, 44; Pls.' MSJ Opp'n at 53. *Cf. Waterhouse*, 298 F.3d at 995 (where plaintiff "did not contravene—and in

fact admitted—many of the deficiencies the defendants cited concerning her performance, she

failed to establish that her employer's proffered reason was unworthy of credence.") (internal

quotation marks, notations, and citations omitted).  Furthermore, despite her innuendo to the

contrary, these incidents constituted her second and third tax non-compliance violations, Def.'s

Stmt. ¶ 45; Pls.' Stmt. ¶ 45, Def.'s Ex. D (Ltr. from C. Tavenner to M. Gaines dated Nov. 24,

2003), and both the proposed and actual suspension fell within the range of recommended

disciplinary action, *see* Def.'s Ex. SS (IRS Guide to Penalty Determinations) at 12.  More

broadly, Gaines fails to adduce any evidence that would allow a reasonable trier of fact to

conclude that her suspension had any nexus to her participation in the 2003 Litigation.  On this

record, no reasonable trier of fact could find in Gaines's favor.  Accordingly, the Secretary is

entitled to summary judgment on the claim.

### 4.      The Secretary Is Entitled To Summary Judgment on Gaines's Claim Based On Her Non-Disciplinary Termination

Finally, Gaines claims that she was subjected to a non-disciplinary termination in

retaliation for her participation in the 2003 Litigation.  *See* Compl. (Civil Action No. 10-683) ¶¶

12-13; Pls.' MSJ Opp'n at 54-55, 67.  Gaines stopped reporting to work altogether on July 10,

2008, two days after her supervisors advised her that they were considering suspending her for

fourteen days for tax non-compliance, claiming that she was totally incapacitated and unable to

work.  Def.'s Stmt. ¶ 42; Pls.' Stmt. ¶ 42.  On March 3, 2009, Gaines underwent a work-capacity

evaluation, after which the examining doctor determined that she was able to work on a full-time

basis.  Def.'s Stmt. ¶ 50; Gaines Dep. Ex 18 (Work Capacity Evaluation dated Mar. 3, 2009).  On

July 21, 2009, Gaines's legal counsel, Swick, responded to this development by informing the

IRS in a letter that Gaines was "not likely to be physically able to return to work at the IRS" and

requested that an IRS representative "call [him] to explore a resolution to th[e] situation."
Gaines Dep. Ex. 20 (Ltr. from R. Swick to S. Becker dated July 21, 2009) at 1.   Shortly
thereafter, Swick called Gaines's third-line supervisor, Becker, and the two discussed the
available options, including Gaines's non-disciplinary termination.   Pls.' Ex. 33 (Decl. of
Richard L. Swick) ¶¶ 3, 5.   Thereafter, the IRS initiated the process of removing Gaines for non-
disciplinary reasons, citing as grounds Gaines's admitted failure to report for work and inability
to perform her duties since July 10, 2008.   Def.'s Stmt. ¶¶ 55, 59; Pls.' Stmt. ¶¶ 55, 59.   On
September 15, 2009, the IRS notified Gaines of the proposed non-disciplinary termination, and
advised Gaines that the proposed action would not affect her ability to apply for a disability
retirement.   Gaines Dep. Ex. 22 (Ltr from S. Becker to M. Gaines dated Sept. 15, 2009) at 1-2.
Gaines elected not to respond to the proposal, and on October 16, 2009, the IRS notified Gaines
that her non-disciplinary proposal would be upheld and that she would be removed from federal
service effective October 23, 2009.   Def.'s Stmt. ¶¶ 60-61; Pls.' Stmt. ¶¶ 60-61; Gaines Dep. Ex.
23 (Ltr. from K. Becton-Johnson to M. Gaines dated Oct. 16, 2009).   Subsequently, after Gaines
filed an application for disability retirement, her termination was converted from a non-
disciplinary removal to a disability retirement.   Def.'s Stmt. ¶¶ 57-58, 62; Pls.' Stmt. ¶¶ 57, 62.

The Secretary is entitled to summary judgment.   Once again, Gaines has completely failed
to interpose a meaningful defense in support of her claim.   Her opposition consists of a single
paragraph and asserts but one argument—specifically, Gaines contends that summary judgment
must be denied simply because there is a factual dispute as to whether Becker, in communicating
with Swick about the status of Gaines employment, actually understood Swick to have requested
that the IRS commence the process for Gaines's non-disciplinary removal.   *See* Pls.' MSJ Opp'n

at 67. As set forth in greater detail above, *see supra* Part I.A.6, the parties dispute exactly what was said during the conversation, and the Court will assume for purposes of resolving the pending motions that Swick did not actually propose that the IRS commence the process of terminating Gaines for non-disciplinary reasons.  However, it is a far cry from saying that there is a genuine dispute as to what was said during the course of the conversation to saying that a trier of fact could reasonably conclude that the Secretary's proffered justification for Gaines's non-disciplinary termination is pretextual.

In proposing Gaines's termination, Gaines's supervisors identified the basis for the proposal in the following manner:

> The proposed adverse action is based on the following reasons:
>
> Reason I: You are unable to perform the duties of your position.
>
> > Specification 1:  Due to your medical condition, you have been unable to carry out the duties as a Tax Analyst since July 10, 2008.  All information available indicates you are unlikely to return to work in the foreseeable future.
>
> Reason II: You are unavailable to perform the duties of your position.
>
> > Specification 1: You have not reported to duty since July 10, 2008.

Gaines Dep. Ex. 22 (Ltr from S. Becker to M. Gaines dated Sept. 15, 2009) at 1.  Significantly, these assertions are indisputably true.  By the time her termination became final, Gaines had not reported to work for over a year and three months; she testified that she no longer wanted to continue working at the IRS and maintained that she was unable to work despite a contrary determination by a board-certified physician.  Gaines Dep. at 207, 212.  Moreover, her legal counsel made it clear that Gaines was "not likely to be physically able to return to work at the

IRS."  Gaines Dep. Ex. 20 (Ltr. from R. Swick to S. Becker dated July 21, 2009) at 1.  The mere

fact that there might be some disagreement as to what Swick said to Becker during a single

phone conversation does not change the fact that the two proffered bases for Gaines's

termination—namely that she was "unable" and "unavailable" to perform the duties of her

position—are conceded to be true.  On this record, no reasonable trier of fact could conclude that

the Secretary's proffered justification was pretextual based solely on the factual dispute as to

what was said during the conversation between Swick and Becker.

Furthermore, Gaines fails to respond to the Secretary's argument that no inference of

retaliation can arise from the temporal proximity between the challenged employment action and

her protected activity because "Gaines had not engaged in protected activity for years prior to the

proposed removal."  Def.'s MSJ Mem. at 53.  Similarly, Gaines offers no rejoinder to the

Secretary's argument that Becker, as the supervisor responsible for the proposed termination,

"did not know that Gaines had participated in the 2003 Lawsuit at the time she proposed the

removal."  Def.'s MSJ Mem. at 53 (citing Becker Dep. at 61-62).  In an exercise of its discretion,

the Court shall treat both arguments as conceded.  In ay event, both arguments are supported by

the record.  More to the point, Gaines adduces no evidence that would permit a reasonable trier

of fact to conclude that her termination had any nexus to her participation in the 2003 Litigation.

Accordingly, the Secretary is entitled to summary judgment on this claim as well.

* * *

In sum, Gaines has failed to adduce sufficient evidence to permit a reasonable trier of fact

to find in her favor on any of her claims.  Therefore, the Court shall enter summary judgment in

the Secretary's favor and dismiss Gaines's claims from this action.

**B.**     *Discussion Relating to Plaintiff Euel Mason*

Mason is pursuing four claims under Title VII, each of which is based on the contention that he was retaliated against, in one way or another, for his participation in the 2003 Litigation.[89] Fourth Am. Compl. (Civil Action No. 09-462) ¶¶ 1, 14-15, 21; Compl. (Civil Action No. 10-184) ¶¶ 1, 10-12; Pls.' MSJ Opp'n at 2, 6-7, 59.  First, Mason claims that he was subjected to a hostile work environment.[90]  Fourth Am. Compl. (Civil Action No. 09-462) ¶¶ 1, 14; Compl.

---

[89]  At one point in his opposition, Mason appears to suggest that he engaged in protected activity by sending various e-mails to his superiors and senior IRS management complaining about his treatment in the workplace. *See* Pls.' MSJ Opp'n at 62-64.  While Mason may have sent these e-mails, and while they may or may not constitute "protected activity" under Title VII on their own, Mason has had no less than five opportunities to set forth his claims in his pleadings, and those pleadings are unambiguous that the protected activity upon which he brings suit is his participation in the 2003 Litigation.  *See, e.g.*, Fourth Am. Compl. (Civil Action No. 09-462) ¶ 21 ("Defendant . . . has discriminated against Mr. Mason in retaliation for his prior protected civil rights activity, *specifically his participation in the successful litigation of Civil Action No. 03-1730 . . . .*") (emphasis added); Compl. (Civil Action No. 10-184) ¶ 12 ("Defendant . . . has discriminated against Mr. Mason in retaliation for his prior protected civil rights activity, *specifically, his participation in the successful litigation of Civil Action No. 03-1730 . . . .*") (emphasis added).  "It is axiomatic that a complaint may not be amended by the briefs in opposition to a [dispositive] motion,'" *Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Serv.*, 297 F. Supp. 2d 165, 170 (D.D.C. 2003) (quoting *Coleman v. Pension Benefit Guar. Corp.*, 94 F. Supp. 2d 18, 24 n. 8 (D.D.C.2000)), and Mason's belated attempt to depart from his pleadings is patently impermissible and is rejected by the Court. *Cf. Middlebrooks v. Goodwin Corp.*, 722 F. Supp. 2d 82, 89 (D.D.C. 2010) (noting that identifying the protected activity at issue is a pleading requirement), *aff'd*, No. 10-7089, 2011 WL 3207857 (D.C. Cir. July 6, 2011); *Hyson v. Architect of Capitol*, __ F. Supp. 2d __, 2011 WL 3489128, at *11 n.16 (D.D.C. Aug. 10, 2011) (refusing to consider allegations of protected activity "bear[ing] no resemblance" to the protected activity cited on the administrative level).  Regardless, for the reasons set forth below, even considering Mason's allegations, the same result would obtain.

[90]  The Secretary argues that Mason failed to plead a hostile work environment claim.  *See* Def.'s MSJ Reply at 2.  To the contrary, Mason expressly alleged that he was subjected to a "hostile work environment" and he catalogued a series of alleged incidents in support.  *See* Fourth Am. Compl. (Civil Action No. 09-462) ¶¶ 1, 14; Compl. (Civil Action No. 10-184) ¶ 1, 12.  This sufficed to provide the Secretary with fair notice that Mason intended to pursue a hostile work environment claim.  *See Steele v. Schafer*, 535 F.3d 689, 694 (D.C. Cir. 2008).  In fact, the Secretary's counsel represented to the Court prior to filing the pending motions that he

(Civil Action No. 10-184) ¶ 1, 12; Pls.' MSJ Opp'n at 12-24, 56-59.  Second, Mason claims that

his non-selection for the '322 Position was unlawful.  Fourth Am. Compl. (Civil Action No. 09-

462) ¶ 21; Pls.' MSJ Opp'n at 9-12, 59-62.  Third, Mason claims that his three-day suspension

was unlawful.  Fourth Am. Compl. (Civil Action No. 09-462) ¶ 21; Pls.' MSJ Opp'n at 25-27,

62-64.  Finally, Mason claims that he was constructively discharged.  Compl. (Civil Action No.

10-184) ¶¶ 12; Pls.' MSJ Opp'n at 12-24, 65-66.  The Court addresses each claim in turn.[91]

1.      The Secretary Is Entitled to Summary Judgment on Mason's Hostile Work
        Environment Claim

Mason claims that he was subjected to a hostile work environment for his participation in

the 2003 Litigation.  Fourth Am. Compl. (Civil Action No. 09-462) ¶¶ 1, 14; Compl. (Civil

Action No. 10-184) ¶ 1, 12; Pls.' MSJ Opp'n at 12-24, 56-59.  For at least three independent

reasons, Mason's hostile work environment claim must fail.

a.      Mason's Opposition Is Fundamentally Infirm

Mason's opposition in support of his hostile work environment claim leaves much to be

desired.  In his opening memorandum, the Secretary explains at great length why he believes the

component-acts identified by Mason as comprising his hostile work environment claim are non-

---

understood "[a]ll of the plaintiffs [to] have raised parallel claims of . . . hostile work
environment."  Tr. of 5/13/10 Status Hr'g (Civil Action No. 09-462) at 19.

[91]  These are the only four putative claims that Mason has actually identified and defended
in his opposition to the pending motions.  *See* Pls.' MSJ Opp'n at 56-66.  In his opening
memorandum, the Secretary offers an exhaustive and compelling argument as to why a litany of
allegations raised by Mason in his complaints and in the course of discovery are not
independently actionable.  *See* Def.'s MSJ Mem. at 56-70.  In opposition, Mason neither claims
that his allegations in this regard are independently actionable nor provides a response to the
Secretary's argument.  Therefore, in an exercise of its discretion, the Court shall treat the
Secretary's argument as conceded by Mason.

actionable, either because they are insufficiently adverse or because there is no evidence that they

had any connection to Mason's participation in protected activity.  *See* Def.'s MSJ Mem. at 54-

71.  Nonetheless, Mason offers no meaningful factual or legal analysis in support of his

claim—none.  Instead, he begins by reciting the skeletal allegations concerning his claim

*seriatim*, *see* Pls.' MSJ Opp'n at 12-24, proceeds to restate the legal standard governing hostile

work environment claims generally, *see id.* at 56-59, and then concludes by asserting that simply

because he has "testified that [he was] subjected to severe hostility on an almost daily basis,"

then "there is an issue of fact regarding whether [he] suffered from a hostile work environment,"

*id.* at 57.  In so doing, Mason ignores virtually every argument raised by the Secretary.  For

example, he offers no rejoinder to the Secretary's argument that he "adduces no evidence to

refute the IRS's legitimate, nonretaliatory explanation[s]" for his allegations that he was

addressed in an "inappropriate tone or manner," Def.'s MSJ Mem. at 57, or that his allegations of

workplace harassment are "quotidian workplace interactions . . . that do not entitle him to a jury

trial," *id.* at 58.  Inexplicably, Mason's argument section mentions him only once, and instead

focuses on Plaintiffs as a whole despite the stark differences in their claims.  In the final analysis,

Mason's opposition reduces to little more than legal boilerplate, and amounts to an

impermissible attempt to shift the burden to the Secretary and this Court to sift through the

record to ascertain the viability of his claim.

Moreover, with few exceptions, the only factual support for his allegations is his narrative

responses to interrogatories posed by the Secretary in discovery asking him to identify each act

relevant to his claim.  *See* Pls.' Interrog. Resps. No. 3, 5, 7.  However, Mason failed to raise these

factual matters in the manner specifically prescribed by the Court.  By the terms of this Court's

prior orders, in responding to the Secretary's statement of material facts, Mason was required to

set forth any additional facts that he considered germane to the pending motions at the end of his

responsive statement, a procedure that was designed to afford the Secretary a meaningful

opportunity to address whether any additional proffered facts were or were not genuinely in

dispute. *See* 6/11/09 Scheduling & Procedures Order (Civil Action No. 09-462) ¶ 6; 5/13/10

Order (Civil Action No. 09-462) at 3; Tr. of 5/13/10 Status Hr'g (Civil Action No. 09-462) at 21-

22. By burying his allegations in his sixty-eight page opposition memorandum or in response to

the Secretary's proffered factual statements that he *admits*, Mason deprived the Secretary of this

opportunity. The Court considers it well within its discretion to disregard, and does disregard,

the allegations on this basis alone. However, even considering Mason's allegations, his hostile

work environment claim must fail.

> b.     Mason Improperly Attempts to Incorporate Discrete Employment
>         Acts Into a Single Hostile Work Environment Claim

In setting forth the factual background that he considers relevant to his hostile work

environment claim, Mason identifies somewhere in the neighborhood of twenty-six component-

acts extending over an approximately three-year period.[92] *See* Pls.' MSJ Opp'n at 12-24. Like

Gaines, Mason has adopted a "kitchen sink" approach to his hostile work environment claim,

compiling a laundry list of employment actions and lumping them together under the umbrella of

a hostile work environment theory. He makes no attempt to show that the alleged actions are

related in time or type such that would allow a reasonable trier of fact to conclude that they

---

[92] The parties' descriptions and groupings of the component-acts do not perfectly align, and for the purposes of clarity and convenience, the Court may describe and group the component-acts in a manner slightly different than have the parties.

congeal into a coherent hostile work environment.  Indeed, Mason provides no meaningful factual or legal analysis of his hostile work environment claim at all.  Meanwhile, several of the component-acts identified by Mason in support of his claim appear, on their face, to be the sort of discrete employment actions that are not readily incorporated into a hostile work environment claim, including, but not limited to, the following: the denial of his request for a rotational work assignment on April 23, 2007, *see supra* Part I.B.3; the denial of his request for a transfer to the New Carrollton office on August 30, 2007, *see supra* Part I.B.4; the denial of his request to be reassigned to another branch on December 17, 2007, *see supra* Part I.B.5; the denial of his request for leave without pay to attend to his family in Memphis, Tennessee, on or about July 31, 2009, *see supra* Part I.B.10; and his purportedly "involuntary" resignation on July 31, 2009, *see supra* Part I.B.10.  Nonetheless, Mason makes no effort to crystallize for the Court how these disparate acts could be seen by a trier of fact as sufficiently related to coalesce into a single hostile work environment.  While there is a consistent theme of "stalking" in Mason's allegations, *see supra* Part I.B.1,[93] these particular acts are so different in kind and remote in time from the remainder of Mason's allegations that the Court can see no basis to conclude that they comprise part of the same hostile work environment, and certainly Mason has identified none.

---

[93]  As set forth below, Mason has failed to adduce sufficient evidence to allow a reasonable trier of fact to conclude that his allegations of "stalking" had any connection to his participation in protected activity or were sufficiently material to meaningfully contribute to a severe or pervasive hostile work environment.  *See infra* Part III.B.1.c.

c.      Mason Fails to Adduce Sufficient Evidence that Would Permit a
Reasonable Trier of Fact to Conclude that the Component-Acts
Were Taken in Retaliation for His Protected Activity

Furthermore, Mason has failed to discharge his burden to adduce sufficient evidence to

"establish a causal connection between the [alleged] harassment and [his] protected activity."

*Lewis*, 653 F. Supp. 2d at 141.  Without exception, Mason has stated the alleged component-acts

in such summary and cursory form that they lack any indicia of retaliatory animus of any kind, let

alone a retaliatory animus specifically directed towards his participation in the 2003 Litigation.

Just as importantly, where the Secretary has proffered a non-retaliatory reason for a specific act,

Mason offers no contradictory evidence that would allow a reasonable trier of fact to conclude

that the proffered reason was pretextual.  *See Graham*, 657 F. Supp. 2d at 217.  Viewing the

record as a whole, no trier of fact could reasonably conclude that the acts complained of were

motivated by a retaliatory animus.[94]

First, with respect to the series of approximately fourteen "incidents" that allegedly

occurred between Mason and his supervisors in the three-year period extending from June 2,

2006, to July 31, 2009, Mason has provided only the barest of factual content in connection with

these incidents.  *See supra* Part I.B.1.  Mason makes no meaningful attempt to establish that

these incidents had any connection with his protected activity, let alone his participation in the

---

[94]  Furthermore, the vast majority, if not all, of the component-acts identified by Mason
are so trivial that no reasonable trier of fact could conclude that they would meaningfully
contribute to a severe or pervasive hostile work environment.  Simply by way of example, Mason
repeatedly alleges that he was either handed, or witnessed another employee being handed,
"confidential" or "sealed" envelopes.  Setting aside that such actions are devoid of indicia of
retaliatory animus, Mason fails to explain how they could possibly be viewed as sufficiently
hostile or abusive to meaningfully contribute to a hostile work environment claim.  This defect
carries throughout Mason's opposition.

2003 Litigation.  Indeed, his allegations inevitably reduce to the bare and unilluminating allegation that he personally found his supervisors' actions to be "aggressive," "condescending," "disruptive," and "harassing."[95]  While cursory allegations of this kind may suffice in a complaint, they are patently insufficient to create a genuine dispute necessitating trial.  *See Ass'n of Flight Attendants-CWA*, 564 F.3d at 465-66 (conclusory allegations offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment).  At this stage of the proceedings, Mason bears the burden of production to designate specific facts showing that there is a genuine dispute requiring trial, *Ricci*, 129 S. Ct. at 2677, and he has simply failed to discharge that burden.  Therefore, these allegations cannot support his hostile work environment claim.

Second, with respect to the denial of Mason's request for a rotational work assignment on April 23, 2007, it is undisputed that Mason's request was first denied because his second-line supervisor, Farah, determined that Mason was then needed in his current position to complete an ongoing project.  Def.'s Stmt. ¶ 86; Pls.' Stmt. ¶ 86.  Indeed, Mason's first-line supervisor, co-plaintiff Benton, is admitted to have informed Farah that Mason's participation in the project was necessary.  Def.'s Stmt. ¶ 87; Pls.' Stmt. ¶ 87.  Consistent with this account, once Mason had completed the project, his request for a rotational work assignment was granted the very next day.  Def.'s Stmt. ¶ 90; Def.'s Ex. R (E-mail from M. Farah to E. Mason dated July 27, 2007).  Mason has failed to adduce any evidence that would allow a reasonable trier of fact to conclude that the initial denial was in any way retaliatory.  Therefore, it cannot support his hostile work

---

[95]  When Mason does provide some minimal context to his allegations, the context that he provides undermines, rather than supports, his contention that the "incidents" were retaliatory.

environment claim.

Third, with respect to Mason's request for a transfer to the New Carrollton office, it is undisputed that his third-line supervisor, Fayne, denied his request based on a general policy that such transfers would not be considered because there was a moratorium on all relocations to the New Carrollton office.  Def.'s Stmt. ¶ 92; Pls.' Stmt. ¶ 92.  Indeed, Mason admitted at his deposition that he was aware of the policy at the time he made his request.  Mason Dep. at 177-78.  He has also conceded that he is unable to identify any other M&P employee who requested and was granted a transfer to the New Carrollton office during the moratorium.[96]  Def.'s Stmt. ¶ 95; Pls.' Stmt. ¶ 95.  Mason has failed to adduce any evidence that would allow a reasonable trier of fact to conclude that the denial of his request was in any way retaliatory.  Therefore, it cannot support his hostile work environment claim.

Fourth, with respect to Mason's contention that his request to be reassigned to another branch in the M&P Organization, Mason has adduced no evidence to contradict the Secretary's proffered justification that his supervisors concluded that reassignment was inappropriate at that time because Mason had just recently transferred to his branch and there was no staffing need for someone working at his position in any of the other branches.  Def.'s Stmt. ¶ 98; Def.'s Ex. U (Decl. of Paul L. Dangel) at 1112; Def.'s Ex. V (Decl. of Mitchell A. Farah) at 992.  More broadly, he fails to adduce any evidence that would allow a reasonable trier of fact to conclude

---

[96]  Mason contends that Fayne approved a transfer for one employee, Angela Rolphs ("Rolphs") to work overseas in Rome, Italy.  *See* Pls.' Stmt. ¶ 18.  However, the argument goes nowhere because Mason makes no attempt to establish that he was similarly situated to Rolphs in all material respects and, indeed, he conceded at his deposition that Rolphs was managed by different supervisors.  Mason Dep. at 134-35.  More to the point, Mason alleges that Rolphs was granted a transfer to work overseas; he does not contend that she ever asked, or was granted, leave to transfer to the IRS's New Carrollton office.  Mason Dep. at 135.

that the denial was made in retaliation for his participation in prior protected activity.  Therefore, it cannot support his hostile work environment claim.

Fifth, with respect to Mason's allegation that his first-line supervisor, Dangel, disclosed information concerning his request for FMLA leave, it is undisputed that Dangel did not actually discuss the nature of Mason's sisters' illness, Mason's prior protected activity, or Mason's participation in the Employee Assistance Program with his supervisors.  Def.'s Stmt. ¶ 103; Pls.' Stmt. ¶ 103.  In any event, it is undisputed that Mason expressly asked Dangel to seek approval for his FMLA request on his behalf from "appropriate upper management officials."  Def.'s Stmt. ¶ 101; Pls.' Stmt. ¶ 101.  More broadly, Mason fails to adduce any evidence that would allow a reasonable trier of fact to conclude that Dangel's actions had any connection with Mason's participation in prior protected activity.  Therefore, they cannot support Mason's hostile work environment claim.

Sixth, with respect to Mason's 2007 and 2008 performance appraisals, Mason "offers no evidence of pretext nor does he refute his supervisors' legitimate, nonretaliatory explanation for the rating[s]" he received.  Def.'s MSJ Mem. at 68.  Despite Mason's conclusory allegations to the contrary, he points to no evidence that would allow a reasonable trier of fact to conclude that his rating was lower than it should have been or that his appraisals were unreasonably delayed. *See supra* Part I.B.7-8.  Therefore, they cannot support his hostile work environment claim.

Seventh, Mason cannot rely on his meeting with his first-line supervisor, Dangel, concerning Mason's performance, occurring just prior to Mason's resignation from the IRS.  It is undisputed that Dangel met with Mason to apprise him of his unsatisfactory performance and to discuss how they could improve Mason's performance.  Def.'s Stmt. ¶¶ 153-54; Pls.' Stmt. ¶¶

153-54.  For months, Dangel had orally notified Mason that he was not performing his duties in a

timely or satisfactory manner, Def.'s Stmt. ¶ 153; Pls.' Stmt. ¶ 153, and the record establishes

that Dangel had documented legitimate concerns with the timing and adequacy of Mason's

performance.  *See supra* Part I.B.10.  Mason fails to adduce any evidence that would permit a

reasonable trier of fact to conclude that the meeting, or Dangel's concerns, had any connection to

his prior protected activity.  Therefore, they cannot support his hostile work environment claim.

Finally, Mason cannot rely upon his non-selection for the '322 Position, his three-day

suspension for sending "broadcast" communications to senior IRS management, or the

circumstances allegedly leading to his resignation.  For the reasons set forth below, no reasonable

trier of fact could conclude that these actions were taken in retaliation for Mason's participation

in protected activity.  *See infra* Part III.B.2-4.

In the final analysis, Mason has failed to point to sufficient evidence to allow a reasonable

trier of fact to conclude that the component-acts identified as supporting his hostile work

environment claim were taken in retaliation for his prior protected activity.  Viewing the record

as a whole, no trier of fact could conclude that Mason was subjected to an objectively severe or

pervasive retaliatory hostile working environment.  Accordingly, the Court will enter summary

judgment in the Secretary's favor on Mason's hostile work environment claim.

> 2.  The Secretary Is Entitled to Summary Judgment on Mason's Claim Based
>     on His Non-Selection for the '322 Position

Mason claims that his non-selection for the '322 Position on or about April 16, 2007, was

in retaliation for his participation in the 2003 Litigation.  Fourth Am. Compl. (Civil Action No.

09-462) ¶ 21; Pls.' MSJ Opp'n at 9-12, 59-62.  In his opposition, Mason tenders a total of three

arguments as to why a trier of fact could find in his favor on his claim.[97]  First, he claims that he was "better qualified" than the ultimate selectee.  *See* Pls.' MSJ Opp'n at 9.  Second, he claims that the ultimate selectee was "preselected."  *Id.* at 10.  Third, and finally, he claims that the recommending official and the selecting official both demonstrated a generalized retaliatory mind-set.[98]  *Id.* at 10-11, 60-61.  The Court addresses each argument in turn.

<blockquote>

a.      Mason Has Failed to Show that He Was "Significantly" Better Qualified than the Ultimate Selectee

</blockquote>

Mason claims that he was "better qualified than the selectee," listing his assessment of his own qualifications and asserting that he "performed quite well."  Pls.' MSJ Opp'n at 9.  Like any employee, Mason understandably has his own views about his performance.  However, it is axiomatic that a "[p]laintiff cannot establish pretext simply based on [his] own subjective assessment of [his] own performance."  *Waterhouse v. District of Columbia*, 124 F. Supp. 2d 1, 7 (D.D.C. 2000) (internal quotation marks omitted), *aff'd*, 298 F.3d 989 (D.C. Cir. 2002).  Where, as here, a plaintiff attempts to use his comparative qualifications to show that the employer's proffered qualifications-based explanation is pretextual, he must adduce sufficient evidence to allow a trier of fact to conclude that he was "significantly better qualified" than the ultimate selectee.  *See Colbert v. Tapella*, __ F.3d __, 2011 WL 2417131, at *3 (D.C. Cir. June 17, 2011);

---

[97]  Strictly speaking, Mason does not even identify all three arguments in the argument section of his opposition, and instead sets forth what appear to be additional arguments in describing factual background of his claim.  *See* Pls.' MSJ Opp'n at 9-12, 59-62.  Out of an abundance of caution, the Court shall consider all three arguments.

[98]  Mason also contends, in cursory fashion and without competent evidentiary support, that the ranking official, Manno, had a "conflict of interest" that "compromised" the selection procedures.  Pls.' MSJ Opp'n at 11.  As set forth elsewhere in this Memorandum Opinion, the contention is without merit.  *See supra* Part I.B.2.

*Adeyemi v. District of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir.), *cert. denied*, __ U.S. __, 129 S. Ct. 606 (2008).  A qualifications gap alone cannot support an inference that the employer's qualifications-based justification is pretextual; the gap must be "great enough to be inherently indicative of discrimination [or retaliation]."  *Adeyemi*, 525 F.3d at 1227; *see also Porter v. Shah*, 606 F.3d 809, 816 (D.C. Cir. 2010) (referring to a "stark superiority of credentials").  In this case, Mason has failed to come forward with affirmative evidence that would allow a reasonable trier of fact to conclude that he was significantly or markedly more qualified than the ultimate selectee—Freeman.  Indeed, he has provided no meaningful comparative analysis of his qualifications relative to Freeman at all.  *See* Pls.' MSJ Opp'n at 9-12, 59-62.  Without such a showing, his argument must fail.

> b.      Mason Has Failed to Show that the Ultimate Selectee Was "Preselected" or that the Alleged Preselection Was Retaliatory

Second, Mason alleges that the ultimate selectee for the '322 Position was "pre-selected" because he had been chosen to serve in the position previously on a temporary basis.  Pls.' MSJ Opp'n at 10 (citing Dep. of Richard Freeman ("Freeman Dep.") at 18-19).  As an initial matter, by burying the allegation in his sixty-eight page opposition memorandum instead of including it in his responsive statement of material facts, Mason failed to raise the allegation in the specific manner prescribed by the Court.  *See* 6/11/09 Scheduling & Procedures Order (Civil Action No. 09-462) ¶ 6; 5/13/10 Order (Civil Action No. 09-462) at 3; Tr. of 5/13/10 Status Hr'g (Civil Action No. 09-462) at 21-22.  In any event, the evidence cited by Mason in support of his allegation is insufficient to allow a reasonable trier of fact to infer that Freeman was in fact "preselected."  *See* Freeman Dep. at 18-19.  Furthermore, Mason ignores the fact that there is nothing *per se* improper about "preselection," at least from the standpoint of Title VII.  Rather,

for evidence of preselection to be relevant, there must be some indicia of retaliation attaching to

the preselection.  *See Pearsall v. Holder*, 610 F. Supp. 2d 87, 100 n.12 (D.D.C. 2009); *Nyunt v.*

*Tomlinson*, 543 F. Supp. 2d 25, 39 (D.D.C. 2008), *aff'd*, 598 F.3d 445 (D.C. Cir. 2009).  Because

Mason never even bothers to explain how the mere fact that Freeman had been chosen to serve in

the position on a temporary basis is indicative of retaliation, the argument must fail.

> c.     Mason Has Failed to Show that the Recommending and Selecting
> Officials Harbored a Generalized Retaliatory Animus

Third, Mason contends that the recommending official for the '322 Position, Farah, and

the selecting official, Fayne, have displayed a generalized retaliatory attitude.[99]  *See* Pls.' MSJ

Opp'n at 60-61.  This is a recurring refrain in both Mason and Benton's opposition to the

pending motions, but it is without merit.  For purposes of economy, the Court shall simply

address the contention here, but notes that its discussion applies to each instance in which the

contention has been raised by Mason and Benton.

Beginning first with Farah, Mason and Benton each claim that a trier of fact could infer a

generalized retaliatory animus on Farah's part based on three alleged "incidents" between Farah

and another IRS employee who participated in the 2003 Litigation—namely, Gerald Plater

("Plater").  Notably, Mason and Benton do not claim, nor could they, that the incidents have any

direct relationship to them or the employment actions they challenge in these actions.  Instead,

they essentially claim that the three incidents are so egregious that a trier of fact could infer that

Farah had a "retaliatory, abusive and oppressive mind-set."  Pls.' MSJ Opp'n at 61.  But Mason

---

[99]  Mason and Benton also contend, in cursory fashion, that the interview panelists "were
biased and unfair," Pls.' MSJ Opp'n at 11, but they cite to no competent evidence in support of
that conclusory assertion.

and Benton's allegations are devoid of factual content, rendering it impossible for this Court or the trier of fact to situate the alleged incidents in any meaningful context, let alone conclude that Farah's behavior had any nexus to Plater's or anyone else's participation in protected activity. Just as importantly, a review of the evidentiary support cited by Mason and Benton reveals that they have radically misconstrued the nature of the alleged "incidents" and, by extension, misstate the inferences that could reasonably be drawn from those incidents.[100]

Mason and Benton first contend, in cursory fashion and without further explication, that Farah "openly threatened to 'get'" Plater.  Pls.' MSJ Opp'n at 61 (citing Plater Dep. at 44-45). But in this regard, Plater merely testified as follows:

> **Q**  **Did Mr. Farah tell you, quote, "They've been trying to get you for a long time but I'm going to get you by the book?"**
>
> A  He did say that and I told him I appreciate him trying to do that by the book.

Plater Dep. at 44.  Mason and Benton provide no context for the comment—none.  They do not state when it occurred or under what circumstances, and they make no attempt to connect it with Plater's or anyone else's participation in protected activity.  Absent further factual content, there is no basis upon which a reasonable trier of fact could conclude that this "incident" had any nexus to Plater's participation in the 2003 Litigation, let alone under circumstances that would allow Mason and Benton to use it as evidence in support of their discrete claims in these actions. In short, it is insufficient to support Mason and Benton's allegation that Farah harbored a

---

[100]  According to the Secretary, Plater also testified that Farah was never hostile to him and never attempted to harm his career.  *See* Def.'s MSJ Reply at 10 (citing Plater Dep. at 48). However, the cited testimony is not included in the excerpts provided to the Court, and therefore the Court has no basis on which to assess the Secretary's position.

generalized retaliatory mind-set.

Mason and Benton next contend, in a single sentence unaccompanied by any meaningful explanation, that Farah was "unprofessional and demeaning" towards Plater.  Pls.' MSJ Opp'n at 61 (citing Plater Dep. at 50-52).  But the testimony relied upon by Mason and Benton for this allegation reveals simply that Plater attended a single meeting on his supervisor's behalf, but that Farah told him that he could leave when his supervisor called in to participate.  *See* Plater Dep. at 51.  While Plater testified that he found the incident "kind of demeaning," "inappropriate," and "embarrassing," *id.*, he did not testify that he considered it to be hostile or abusive.  More to the point, there is no evidence upon which a reasonable trier of fact could conclude that the incident had any nexus to Plater's participation in the 2003 Litigation.  As such, it is likewise insufficient to support Mason and Benton's allegation that Farah harbored a generalized retaliatory mind-set.

Finally, Mason and Benton claim that Farah commented to Plater that he viewed the work of a particular business unit dominated by African Americans as "mule work."  Pls.' MSJ Opp'n at 61 (citing Plater Dep. at 45-46).  However, Mason and Benton conveniently ignore the fact that both Plater and Farah *denied* that Farah ever used such potentially loaded language.  *See* Plater Dep. at 44; Farah Dep. at 156.  According to Plater, Farah probably used the term "grunt work."  Plater Dep. at 46.  Regardless, Plater unambiguously testified that he did not interpret the term to be directed towards African American employees, but instead saw it as a statement about "the type of work that was being done" by entry-level employees in a particular business unit.  *Id.* at 45-47.  Just as importantly, Mason and Benton make no attempt to connect the alleged incident to Plater's participation in protected activity; in particular, they do not even bother to explain how allegedly discriminatory comments may be indicative of a generalized *retaliatory* animus.

107

In short, the incident is insufficient to support Mason and Benton's allegation that Farah harbored a generalized retaliatory mind-set.

Simply put, Mason and Benton have failed to adduce sufficient evidence that would allow a trier of fact to reasonably conclude that Farah held any sort of retaliatory animus towards Plater, let alone an animus that could be imputed to support their claims in these actions. Similarly, they have failed to make any effort to show that Plater's experience is "closely related . . . to [their] theory of the case." *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008).

The same holds true with respect to Fayne.  Mason and Benton, citing three alleged "incidents," claim that a trier of fact could infer that Fayne exhibited a "hostility towards the EEO process and those who participate in it."  Pls.' MSJ Opp'n at 60.  However, whether considered together or independently, the three incidents are insufficient to permit a reasonable trier of fact to conclude that Fayne harbored a generalized retaliatory animus.[101]

First, Mason and Benton claim that a presentation that Fayne made with another IRS employee as part of a federal dispute resolution seminar in August 2001, two years before they had even commenced the 2003 Litigation, is evidence of her retaliatory animus.  *See id.* (citing Pls.' Ex. 14 (The New Cost of Discrimination: How Agreeing to Settle a Discrimination Complaint Could Cost Your Job) at 1).  Neither Mason nor Benton ever attempt to explain how the contents of the seminar are indicative of a retaliatory animus, apparently believing that the title itself is sufficient to support their allegation.  They are mistaken; an inference of retaliation

---

[101]  Two of these alleged incidents involve Benton; Mason does not claim that the incidents have any direct relationship to him or the employment actions he challenges in this action.

cannot arise from such flimsy innuendo.  Meanwhile, the contents of the materials pertaining to

the seminar contradict the suggestion that Fayne and her co-presenter were inclined to

discriminate or retaliate—the materials merely set forth the legal background and procedure

relevant to the processing of complaints.  *See* Pls.' Ex. 14 (The New Cost of Discrimination:

How Agreeing to Settle a Discrimination Complaint Could Cost Your Job) at 1-18.

Second, Mason and Benton claim that Fayne "attempted to bribe Mr. Benton to withdraw

his EEO complaint by promising him promotional consideration for doing so."  Pls.' MSJ Opp'n

at 60 (citing Benton Dep. at 179).  It is undisputed that, when Benton met with Fayne to discuss

his non-selection for the '044 Position, Fayne offered Benton opportunities to improve his

managerial and interviewing skills and offered to place him in a front-line managerial position.

Def.'s Stmt. ¶¶ 201-02; Pls.' Stmt. ¶¶ 201-02; Fayne Dep. at 191, 221-23.  In Benton's view,

Fayne's offer amounted to an attempt to "bribe [him] with a promotion."  Pls.' Stmt. ¶ 202

(citing Benton Dep. at 179).   However, in the single page of deposition testimony specifically

cited by Mason and Benton in support of their allegations, Benton merely reiterated his view that

he personally "interpreted" Fayne's offer as a bribe.[102]  Benton Dep. at 180.  Notably, he did not

testify that Fayne expressly conditioned these opportunities on his withdrawal of the referenced

complaint:

> **Q**     **Did she say you couldn't have the training unless you**
> **pulled your complaint?**
>
> A     She questioned me and haggard [sic] — and she drilled me
>        about that complaint, sir.  It stayed on that.  And that —

---

[102]  Similarly, although not referenced by Benton in his responsive statement of material facts, Benton's response to the Secretary's interrogatories states, without any meaningful factual content, that he "felt he was being bribed and harassed."  Pls.' Interrog. Resps. No. 3.

again, everything I've said is truthful.

Benton Dep. at 159.  At best, the cited testimony is sufficient to create a genuine dispute that

Benton and Fayne discussed the complaint, but nothing more.  It does not provide a basis for a

trier of fact to reasonably conclude that Fayne harbored a generalized "hostility towards the EEO

process and those who participate in it."  Pls.' MSJ Opp'n at 60.  Indeed, if anything, Benton's

testimony would tend to suggest that Fayne was responsive to Benton's concerns and sought to

provide him with the training and opportunities to advance further in the IRS.

Third, Mason and Benton rely upon an e-mail from Fayne to Benton, in which Fayne

wrote, again on the heels of Benton's non-selection for the '044 Position:

> I have been thinking a lot about our meeting yesterday . . . .  I am
> genuinely trying to give everyone who wants the opportunity to move
> up the chance to do that.  That does not mean that everyone gets to
> move right when they think they should.  As I said to you yesterday,
> I hope the trust level can go up enough so that people will sit down
> and talk as we did, instead of running to file grievances and
> complaints without first trying to talk about it.  I value your points
> and your presence in M&P.  Keep in mind what we talked about, and
> perhaps we can talk again when I return from vacation.  There's
> simply too much work for M&P to do to be bogged down in so much
> distrust.

Pls.' Interrog. Resps. No. 3.  Simply put, the Court is left wondering why Benton considers this

e-mail "very unusual and disturbing."  *Id.*  If anything, the e-mail would also tend to suggest that

Fayne was open to discussing and responding to Benton's workplace concerns.  The mere fact

that Fayne suggested that Benton attempt to raise his concerns with her prior to taking more

formal action is not indicative of a retaliatory animus; indeed, it is entirely appropriate for

supervisors to encourage the informal reporting and discussion of workplace concerns in the first

instance.  Viewed in context, the e-mail is, on its face, a routine and unremarkable attempt by a

supervisor to encourage a higher level of trust with an employee.  Mason and Benton adduce no

evidence that would permit a reasonable trier of fact to conclude that the e-mail is evidence that

Fayne harbored a generalized "hostility towards the EEO process and those who participate in it."

Pls.' MSJ Opp'n at 60.

> d.     Mason Has Otherwise Failed to Adduce Sufficient Evidence to
>         Allow a Trier of Fact to Conclude that His Non-Selection for the
>         '322 Position Was Pretextual

While the foregoing discussion suffices to grant summary judgment on Mason's claim

based on his non-selection for the '322 Position, the Court nonetheless pauses to observe that,

viewing the record a whole, no reasonable trier of fact could conclude that the Secretary's

proffered qualifications-based justification for Mason's non-selection was pretextual.  It is

undisputed that the application and review materials demonstrated a "clear separation" between

the ultimate selectee, Freeman, and the other four candidates, and both Manno, as the ranking

official, and the interview panel agreed that Freeman had the most extensive managerial

experience, demonstrated more relevant personal achievement than the other candidates, and had

an educational background that was superior or comparable to other candidates.  *See supra* Part

I.B.2.  Indeed, Mason admitted at his deposition that he was not the most qualified candidate for

the position.  Mason Dep. at 206-08.  In his own view, at least two candidates should have been

selected over him.  *Id.*  Ultimately, "[s]hort of finding that the employer's stated reason was

indeed a pretext . . . the court must respect the employer's unfettered decision to choose among

qualified candidates." *Fischbach v. D.C. Dep't of Corrections*, 86 F.3d 1180, 1189 (D.C. Cir.

1996).  On this record, no reasonable trier of fact could conclude that the Secretary's proffered

justification for Mason's non-selection was pretextual.  Accordingly, the Secretary is entitled to

summary judgment on the claim.

<div style="margin-left: 2em;">

3.     The Secretary Is Entitled to Summary Judgment on Mason's Claim Based on His Three-Day Suspension

</div>

Mason claims that his three-day suspension, which was proposed on October 6, 2008, and upheld on January 6, 2009, was imposed in retaliation for his participation in the 2003 Litigation. Fourth Am. Compl. (Civil Action No. 09-462) ¶ 21; Pls.' MSJ Opp'n at 25-27, 62-64.  However, Mason has failed to adduce sufficient evidence for a reasonable trier of fact to conclude that the Secretary's proffered justification for the suspension was not the actual reason and that the Secretary intentionally retaliated against him.  *See Brady*, 520 F.3d at 494.

While the claim is heavily contested, the essential facts are undisputed.  Mason routinely sent prolix e-mails to senior IRS officials, including officials as high as the IRS Commissioner, raising what he claims were "workplace concerns."  *See supra* Part I.B.9.  Even though he was told to stop sending such e-mails to senior IRS management and was instead encouraged to use the IRS's EEO apparatus and the agency grievance process, Mason nonetheless continued to send the e-mails.  *See id.* After the communications continued for months, it became clear that Mason would not stop sending such communications, prompting Mason's supervisors to issue him a non-disciplinary directive on February 29, 2008.  *See id.*  In the written directive, Mason was put on notice that his "use of the Agency e-mail system . . . and [his] misuse of government time and equipment in pursuit of such activities [was] inappropriate, disrupt[ed] the workplace and [was] unproductive."  Mason Dep. Ex. 19 (Mem. Directive for Resolving Issues of Personal Concern dated Feb. 28, 2008) at 1.  Among other things, he was directed to "cease sending 'broadcast' communications to multiple management officials on personal matters and/or matters that should properly be initially presented to [his] first-line manager or pursued through available dispute

resolution mechanisms, such as the EEO process or the Agency Grievance Procedure." *Id.* He was expressly directed to "utilize available dispute resolution mechanisms and pursue adjustment of workplace concerns which [were] not resolved to his satisfaction by management," and was reminded that his supervisor "continue[d] to be[] available to discuss [his] concerns." *Id.*

Despite this directive, Mason continued to e-mail senior IRS officials with complaints, requests for information, and demands to address his workplace grievances, *see supra* Part I.B.9, prompting his second-line supervisor, Farah, to propose his suspension without pay for three days for (1) "fail[ing] to follow a directive from management," (2) "misus[ing] government equipment and government supplies," and (3) mis[using] work time," Mason Dep. Ex. 20 (Notice of Proposed Disciplinary Suspension dated Oct. 6, 2008) at 1-6. The proposal letter identified (1) fourteen separate instances between May 9, 2008, and October 6, 2008, in which Mason allegedly sent inappropriate communications to senior IRS management, (2) thirteen separate instances in which he used government equipment to send such communications, and (3) two instances in which he "misused work time" to draft such communications. *Id.* The three-day suspension was approved on January 9, 2009. Def.'s Stmt. ¶ 152; Pls.' Stmt. ¶ 152.

Mason appears to be laboring under the misapprehension that this sequence of events somehow constitutes direct evidence of retaliation. *See* Pls.' MSJ Opp'n at 63. It is nothing of the sort. Mason had adduced no evidence demonstrating that he was ever discouraged from raising his myriad allegations of discrimination or retaliation in the workplace. Indeed, all the competent evidence in the record establishes that Mason was repeatedly encouraged to raise whatever concerns he might have through the agency's EEO apparatus or the agency grievance process. Def.'s Stmt. ¶ 143; Pls.' Stmt. ¶ 143; Mason Dep. Ex. 19 (Mem. Directive for

Resolving Issues of Personal Concern dated Feb. 28, 2008) at 1.  In other words, he was merely

directed to raise his concerns through "the appropriate channels," Mason Dep. Ex. 19 (Mem.

Directive for Resolving Issues of Personal Concern dated Feb. 28, 2008) at 1, and there was

nothing inappropriate about such an instruction.  *Cf. Rollins v. State of Fla. Dep't of Law*

*Enforcement*, 868 F.2d 397, 399 (11th Cir. 1989) (employer did not act improperly where its

actions were based on "the manner in which [the plaintiff] complained of discrimination, not on

the fact that she complained," as the plaintiff "habitually bypassed the chain of command by

bringing her complaints of discriminatory employment practices directly [to senior

management]"); *Rattigan v. Holder*, 604 F. Supp. 2d 33, 49 (D.D.C. 2009) ("Title VII's anti-

retaliation provision 'was not intended to immunize insubordinate, disruptive, or nonproductive

behavior at work.'") (quoting *Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir.

1981)).

Nor can Mason create a genuine dispute requiring trial merely by repeating his personal

view that his e-mails to senior IRS management raised "workplace" and not "personal" concerns

and therefore did not violate the letter of the written management directive.  Pls.' MSJ Opp'n at

25-26.  Such an argument seeks to impose an unreasonably technical reading upon the written

management directive; the record establishes that Mason was repeatedly warned that the kind of

e-mails he was sending to senior IRS management was inappropriate and advised that his

concerns should be raised through other channels.  On this record, no reasonable trier of fact

could reach any conclusion but that Mason continued to send communications to senior IRS

officials knowing that his conduct was in contravention of the instructions of his superiors.[103]   In

any event, Mason's argument is not merely premised upon an unreasonably technical reading of

the written directive, it is premised upon a selective reading of the directive.   Despite Mason's

apparent belief to the contrary, the directive was not confined to communications of a "personal

concern"; rather, Mason was expressly instructed to stop using agency resources to distribute

communications "disparag[ing] or hector[ing]" employees and to cease sending "broadcast"

communications raising "matters that should properly be initially presented to [his] first-line

manager or pursued through available dispute resolution mechanisms, such as the EEO process

or the Agency Grievance Procedure."   Mason Dep. Ex. 19 (Mem. Directive for Resolving Issues

of Personal Concern dated Feb. 28, 2008) at 1.   And yet Mason offers no explanation as to why a

trier of fact could conclude he complied with these instructions.

   More to the point, the Court understands that Mason may personally disagree with his

supervisors' interpretation of the directive, but that alone is hardly sufficient to warrant an

inference of retaliation.   Where, as here, "the employer's stated belief about the underlying facts

is reasonable in light of the evidence, . . . there ordinarily is no basis for permitting a jury to

conclude that the employer is lying about the underlying facts."   *Brady*, 520 F.3d at 495 (citing,

---

   [103]   Contrary to Mason's innuendo, his supervisors did not testify to the contrary.   Becton-
Johnson testified that an employee should first raise a workplace issue with his or her first-line
supervisor, except where an employee is uncomfortable, in which case he or she has the option of
raising the issue through dispute resolution procedures.   Becton-Johnson Dep. at 25-27.   She also
testified that, although an employee has the right to "elevate" an issue, she plainly stated that
there is a limit: by her account, whereas an employee "has the right to take it up the chain of
command once, maybe twice," it is "inappropriate for an employee to continually heckle . . .
upper management on the same issue."   *Id.* at 27-28.   Similarly, Freeman merely testified that an
employee would be justified in elevating his concerns to his second- and third-line supervisors,
but not to senior IRS management.   Freeman Dep. at 55-57.

*inter alia*, *George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005)).  The question is *not* whether Mason in fact contravened the letter of the management directive, but rather whether his supervisors "honestly and reasonably believed" that he did.  *Id.* at 496 (emphasis omitted).  In this case, it is undisputed that Mason was repeatedly directed to cease sending communications raising his concerns to senior IRS management and to use agency resources in doing so, but he nonetheless continued on his prior course of conduct unabated.  On this record, no reasonable trier of fact could conclude that the Secretary's proffered justification for Mason's three-day suspension was pretextual.

Finally, Mason's suggestion that the penalty imposed by his supervisors exceeded the "maximum allowable penalty" is without merit.  Pls.' MSJ Opp'n at 26, 63 (citing Def.'s Ex. SS (IRS Guide to Penalty Determinations).  The record evidences that Mason was repeatedly warned that his conduct was unacceptable and yet he continued to serially send communications prepared with agency resources to senior IRS management.  Indeed, the suspension proposal identifies no less than fourteen instances between May 9, 2008, and October 6, 2008, in which Mason sent communications in contravention of the directive.  Mason Dep. Ex. 20 (Notice of Proposed Disciplinary Suspension dated Oct. 6, 2008) at 1-6.  Therefore, there is no basis to Mason's argument that he was suspended for a "first offense."  Pls.' MSJ Opp'n at 63.

In the final analysis, Mason has failed to adduce sufficient evidence for a reasonable trier of fact to conclude that the Secretary's proffered justification for the suspension was not the actual reason and that the Secretary intentionally retaliated against him.  *See Brady*, 520 F.3d at 494.  Accordingly, the Secretary is entitled to summary judgment on the claim.

116

4.    The Secretary Is Entitled to Summary Judgment on Mason's Constructive Discharge Claim

Finally, Mason claims that he was constructively discharged in retaliation for engaging in protected activity. *See* Compl. (Civil Action No. 10-184) ¶¶ 12; Pls.' MSJ Opp'n at 12-24, 65-66. It is undisputed that Mason resigned his employment with the IRS on July 31, 2009. Def.'s Stmt. ¶ 153; Pls.' Stmt. ¶ 153. In this Circuit, resignations are presumed to be voluntary. *Aliotta v. Bair*, 614 F.3d 556, 566 (D.C. Cir. 2010). However, "[i]n certain cases, the doctrine of constructive discharge enables an employee to overcome the presumption of voluntariness and demonstrate [that he] suffered an adverse employment action by showing the resignation . . . was, in fact, not voluntary." *Id.* To meet that burden, the plaintiff "must show that the [allegedly] abusive working environment became so intolerable that [his] resignation qualified as a fitting response." *Penn. State Police v. Suders*, 542 U.S. 129, 134 (2004). In this case, Mason has failed to adduce sufficient evidence to meet his burden for at least two independent reasons.

First, and most importantly, because Mason has failed to make the lesser showing that he was subjected to a severe and pervasive hostile work environment, *see supra* Part III.B.1, it necessarily follows that his constructive discharge claim, which requires a more robust showing and rests on the same nucleus of factual allegations, must fail as well. *Sewell v. Hugler*, No. 08-5079, 2009 WL 585660, at *1 (D.D.C. Feb. 25, 2009) (*per curiam*).

Second, to prevail on a constructive discharge claim, a plaintiff must point to "the existence of certain 'aggravating factors,'" *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1558 (D.C. Cir. 1997) (quoting *Clark v. Marsh*, 665 F.2d 1168, 1173 (D.C. Cir. 1981))—*i.e.*, "those aspects of a discriminatory [or retaliatory] work environment that, by making the workplace so disagreeable, prevent the reasonable employee from seeking remediation on the

117

job," *Veitch v. England*, 471 F.3d 124, 130 (D.C. Cir. 2006) (citing *Mungin*, 116 F.3d at 1558),

*cert. denied*, 552 U.S. 809 (2007).  Here, Mason characterizes the "aggravating factor" that

allegedly triggered his resignation as follows:

> Mr. Mason was denied leave to visit and care for his terminally [ill]
> sister who has cancer.   Rather than accepting Mr. Mason's
> explanation that his absence was necessary due to a personal and
> confidential matters [sic], his first-line supervisor, Paul L. Dangel,
> pressed him for specific details regarding his sister [sic] medical
> condition . . . .  This refusal forced Mr. Mason to choose between
> caring for his family and continuing to work in a hostile work
> environment.

Pls.' MSJ Opp'n at 66.  Similarly, in his letter of resignation, Mason wrote:

> Your actions have placed me in a situation where I must choose
> between my family and my job as I must either neglect my moral duty
> to my "Sister" or face charges of insubordination and Absent Without
> Leave (AWOL) from you and those who are directing your actions.

Mason Dep. Ex. 1 (Ltr. from E. Mason to P. Dangel dated July 31, 2009) at 1 (emphasis and

underlining in original).

     To the extent this may even be characterized as an "aggravating factor," it is unsupported

by the record.  Despite the allegations in Mason's letter, it is undisputed that Dangel never

threatened Mason with an "AWOL charge" and no one ever placed Mason on "AWOL status."

Def.'s Stmt. ¶ 160; Pls.' Stmt. ¶ 160.  More to the point, neither Dangel nor any of Mason's other

supervisors ever denied Mason's requests for leave without pay.  Def.'s Stmt. ¶ 161; Mason Dep.

at 130-31.  Indeed, according to Mason, Dangel had personally "approved hundreds of hours of

leave without pay so that [he] could care for his sister."  Pls.' Stmt. ¶ 165.  Most notably, Dangel

had just recently approved Mason's request for leave for the week of August 10, 2009, so that

Mason could attend to his sister.  Def.'s Stmt. ¶ 162; Pls.' Stmt. ¶ 162.

The gravamen of Mason's complaint is that Dangel did not automatically grant his specific, successive request for leave for the week of August 17, 2009.  However, it is undisputed that Mason was scheduled to attend a training session during that week, that he personally requested the training, that he was aware of the date for months, and that he had already been approved to take leave the prior week.  Def.'s Stmt. ¶¶ 163-64; Pls.' Stmt. ¶¶ 163-64.  When Dangel simply asked Mason to provide him with a sufficiently compelling reason why he could not attend the training session, Mason refused to provide the requested explanation and instead tendered his resignation.[104]  Def.'s Stmt. ¶¶ 163, 166; Pls.' Stmt. ¶¶ 163, 166.  Simply put, no reasonable trier of fact could conclude that a supervisor's mere request for an explanation to justify a successive leave request in the face of conflicting work responsibilities constitutes the sort of "aggravating factor" that could compel a reasonable person to resign their employment.  Accordingly, the Secretary is entitled to summary judgment on this claim as well.

* * *

In sum, Mason has failed to adduce sufficient evidence to permit a reasonable trier of fact to find in his favor on any of his claims.  Therefore, the Court shall enter summary judgment in the Secretary's favor and dismiss Mason's claims from this action.

C.    *Discussion Relating to Plaintiff Donovan Benton*

Benton is pursuing six claims under Title VII, each of which is based on the contention

---

[104]  Despite Mason's stated need to care for a family member in Memphis, Tennessee, he found time to attend Freeman's deposition in Washington, D.C., during the week in question.  At his own deposition, Mason indicated that attending the deposition was "more important" than being present in Memphis.  Mason Dep. at 127.

that he was retaliated against, in one way or another, for his participation in the 2003 Litigation.[105]

Fourth Am. Compl. (Civil Action No. 09-462) ¶¶ 1, 23; Pls.' MSJ Opp'n at 2, 6-7.  First, Benton

claims that he was subjected to a hostile work environment.[106]  *See* Fourth Am. Compl. (Civil

Action No. 09-462) ¶¶ 1, 17; Pls.' MSJ Opp'n at 31-40, 56-59.  Second, Benton contends that his

non-selection for the '044 Position was unlawful.  *See* Fourth Am. Compl. (Civil Action No. 09-

462) ¶ 17; Pls.' MSJ Opp'n at 59-62.  Third, Benton claims that his non-selection for the '322

Position was unlawful.  *See* Fourth Am. Compl. (Civil Action No. 09-462) ¶ 17; Pls.' MSJ Opp'n

---

[105]  Like Mason, at one point in his opposition, Benton appears to suggest that he engaged in protected activity by sending various e-mails to his superiors and senior IRS management complaining about his treatment in the workplace.  *See* Pls.' MSJ Opp'n at 62-64.  While Benton may have sent these e-mails, and while they may or may not constitute "protected activity" under Title VII on their own, Benton has had no less than four opportunities to set forth his claims in his pleadings, and those pleadings are unambiguous that the protected activity upon which he brings suit is his participation in the 2003 Litigation.  *See* Fourth Am. Compl. (Civil Action No. 09-462) ¶ 23 ("Defendant . . . has discriminated against Mr. Benton in retaliation for his prior protected civil rights activity, *specifically his participation in the successful litigation of Civil Action No. 03-1730 . . . .*") (emphasis added).  "It is axiomatic that a complaint may not be amended by the briefs in opposition to a [dispositive] motion,'" *Arbitraje Casa de Cambio*, 297 F. Supp. 2d at 170, and Benton's belated attempt to depart from his pleadings is patently impermissible and is rejected by the Court. *Cf. Middlebrooks*, 722 F. Supp. 2d at 89 (noting that identifying the protected activity at issue is a pleading requirement); *Hyson*, 2011 WL 3489128, at *11 n.16 (refusing to consider allegations of protected activity "bear[ing] no resemblance" to the protected activity cited on the administrative level).  Regardless, for the reasons set forth below, even considering Benton's allegations, the same result would obtain.

[106]  The Secretary argues that Benton failed to plead a hostile work environment claim. *See* Def.'s MSJ Reply at 2.  Unlike Gaines and Mason, Benton does not use the term "hostile work environment" in describing his claims in the operative complaint, though he does allege that he was the victim of "hostile" and "harassing" treatment.  *See* Fourth Am. Compl. (Civil Action No. 09-462) ¶¶ 1, 17.  For purposes of resolving the pending motions, the Court shall assume, without deciding, that these allegations sufficed to provide the Secretary of fair notice that Benton intended to pursue a hostile work environment claim.  *See Steele*, 535 F.3d at 694. This assumption is particularly appropriate in this case because the Secretary's counsel represented to the Court prior to filing the pending motions that he understood "[a]ll of the plaintiffs [to] have raised parallel claims of . . . hostile work environment."  Tr. of 5/13/10 Status Hr'g (Civil Action No. 09-462) at 19.

at 59-62.  Fourth, Benton claims that his three-day suspension was unlawful.  *See* Fourth Am. Compl. (Civil Action No. 09-462) ¶ 17; Pls.' MSJ Opp'n at 62-64.  Fifth, Benton claims that his fourteen-day suspension was unlawful.  *See* Fourth Am. Compl. (Civil Action No. 09-462) ¶ 17; Pls.' MSJ Opp'n at 64-65.  Sixth, Benton claims that his termination was unlawful.  *See* Fourth Am. Compl. (Civil Action No. 09-462) ¶ 17; Pls.' MSJ Opp'n at 62-64.  The Court addresses each claim in turn.[107]

1.      The Secretary Is Entitled to Summary Judgment on Benton's Hostile Work Environment Claim

Benton claims that he was subjected to a hostile work environment in retaliation for his participation in the 2003 Litigation.  *See* Fourth Am. Compl. (Civil Action No. 09-462) ¶¶ 1, 17; Pls.' MSJ Opp'n at 31-40, 56-59.  For at least three independent reasons, the claim must fail.

a.      Benton's Opposition is Fundamentally Infirm

As was the case with Gaines's and Mason's submissions, Benton's opposition in support of his hostile work environment claim leaves much to be desired.  In his opening memorandum, the Secretary explains in considerable detail why he believes that the component-acts identified by Benton as comprising his hostile work environment claim are non-actionable, either because they are insufficiently adverse or because there is no evidence that they had any connection to Benton's participation in protected activity.  *See* Def.'s MSJ Mem. at 73-81.  Nonetheless, Benton offers no

---

[107]   These are the only six putative claims that Benton has actually identified and defended in his opposition to the pending motions.  *See* Pls.' MSJ Opp'n at 56-66.  In his opening memorandum, the Secretary offers an exhaustive and compelling argument as to why a litany of allegations raised by Benton in his complaint and in the course of discovery are not independently actionable.  *See* Def.'s MSJ Mem. at 73-84.  In opposition, Benton neither claims that his allegations in this regard are independently actionable nor provides a response to the Secretary's argument.  Therefore, in an exercise of its discretion, the Court shall treat the Secretary's argument as conceded by Plaintiff.

meaningful factual or legal analysis in support of his claim—none.  Instead, he begins by reciting

the skeletal allegations in support of his claim *seriatim*, *see* Pls.' MSJ Opp'n at 31-40, proceeds to

restate the legal standard governing hostile work environment claims generally, *see id.* at 56-59,

and then concludes by asserting simply that because he has "testified that [he was] subjected to

severe hostility on an almost daily basis," then "there is an issue of fact regarding whether [he]

suffered from a hostile work environment," *id.* at 57.  In so doing, Benton ignores virtually every

argument raised by the Secretary.  Inexplicably, Benton's argument section of his opposition does

not even mention him, and instead focuses on Plaintiffs as a whole despite the stark differences in

their claims.  In the final analysis, Benton's opposition reduces to little more than legal

boilerplate, and amounts to an impermissible attempt to shift the burden to the Secretary and this

Court to sift through the record to ascertain the viability of his claim.

    Moreover, with few exceptions, the only factual support for his allegations is his narrative

responses to interrogatories posed by the Secretary in discovery asking him to identify each act

relevant to his claim.  *See* Pls.' Interrog. Resps. No. 3, 5, 7.  However, Benton failed to raise these

factual matters in the manner specifically prescribed by the Court.  By the terms of this Court's

prior orders, in responding to the Secretary's statement of material facts, Benton was required to

set forth any additional facts that he considered germane to the pending motions at the end of his

responsive statement, a procedure that was designed to afford the Secretary a meaningful

opportunity to address whether any additional proffered facts were or were not genuinely in

dispute.  *See* 6/11/09 Scheduling & Procedures Order (Civil Action No. 09-462) ¶ 6; 5/13/10

Order (Civil Action No. 09-462) at 3; Tr. of 5/13/10 Status Hr'g (Civil Action No. 09-462) at 21-

22.  By burying his allegations in his sixty-eight page opposition memorandum or in response to

the Secretary's proffered factual statements that he *admits*, Benton deprived the Secretary of this opportunity. The Court considers it well within its discretion to disregard, and does disregard, the allegations on this basis alone. However, even considering Benton's allegations, his hostile work environment claim must fail.

b.   Benton Improperly Attempts to Incorporate Discrete Employment Acts Into a Single Hostile Work Environment Claim

In setting forth the factual background that he considers relevant to his hostile work environment claim, Benton identifies somewhere in the neighborhood of twenty-five component-acts.[108] *See* Pls.' MSJ Opp'n at 31-40. Like Gaines and Mason, Benton has adopted a "kitchen sink" approach to his hostile work environment claim, compiling a laundry list of employment actions and lumping them together under the umbrella of a hostile work environment theory. He makes no attempt to show that the alleged actions are related in time or type such that would allow a reasonable trier of fact to conclude that they congeal into a coherent hostile work environment. Indeed, Benton provides no meaningful factual or legal analysis of his hostile work environment claim at all. Meanwhile, several of the component-acts identified by Benton in support of his claim appear, on their face, to be the sort of discrete employment actions that are not readily incorporated into a hostile work environment claim, including, but not limited to, the following: the denial of his request for a transfer to the New Carrollton office, *see supra* Part I.C.4; the denial of his request to be reassigned to another branch, *see supra* Part I.C.5; and the handling of his requests for FMLA leave, *see supra* Part I.C.6. Nonetheless, Benton makes no

---

[108] The parties' descriptions and groupings of the component-acts do not perfectly align, and for the purposes of clarity and convenience, the Court may describe and group the component-acts in a manner slightly different than have the parties.

effort to crystallize for the Court how these disparate acts could be seen by a trier of fact as

sufficiently related to coalesce into a single hostile work environment.  While there is a consistent

theme of "stalking" in Benton's allegations, *see supra* Part I.C.1,[109] these particular acts are so

different in kind and remote in time from the remainder of Benton's allegations that the Court can

see no basis to conclude that they comprise part of the same hostile work environment, and

certainly Benton has identified none.

> c.     Benton Fails to Adduce Sufficient Evidence that Would Permit a
>        Reasonable Trier of Fact to Conclude that the Component-Acts
>        Were Taken in Retaliation for His Protected Activity

Furthermore, Benton has failed to discharge his burden to adduce sufficient evidence to

"establish a causal connection between the [alleged] harassment and [his] protected activity."

*Lewis*, 653 F. Supp. 2d at 141.  Without exception, Benton has stated the alleged component-acts

in such summary and cursory form that they lack any indicia of retaliatory animus of any kind, let

alone a retaliatory animus specifically directed towards his participation in the 2003 Litigation.

Just as importantly, where the Secretary has proffered a non-retaliatory reason for a specific act,

Benton offers no contradictory evidence that would allow a reasonable trier of fact to conclude

that the proffered reason was pretextual.  *See Graham*, 657 F. Supp. 2d at 217.  Viewing the

record as a whole, no trier of fact could reasonably conclude that the acts complained of were

motivated by a retaliatory animus.[110]

---

[109]  As set forth below, Benton has failed to adduce sufficient evidence to allow a
reasonable trier of fact to conclude that his allegations of "stalking" had any connection to his
participation in protected activity or were sufficiently material to meaningfully contribute to a
severe or pervasive hostile work environment.  *See infra* Part III.C.1.c.

[110]  Furthermore, the vast majority, if not all, of the component-acts identified by Benton
are so trivial that no reasonable trier of fact could conclude that they would meaningfully

First, with respect to the series of approximately fourteen "incidents" that allegedly occurred between Benton and his supervisors in the approximately one-and-a-half-year period extending from June 28, 2007, to January 9, 2009, Benton has provided only the barest of factual content in connection with these incidents. *See supra* Part I.C.1. Benton makes no meaningful attempt to establish that these incidents had any connection to his protected activity, let alone his participation in the 2003 Litigation. Indeed, his allegations inevitably reduce to the bare and unilluminating assertion that he personally found his supervisors' actions to be "aggressive," "condescending," "disruptive," and "harassing."[111] While cursory allegations of this kind may suffice in a complaint, they are patently insufficient to create a genuine dispute necessitating trial. *See Ass'n of Flight Attendants-CWA*, 564 F.3d at 465-66 (conclusory allegations offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment). At this stage of the proceedings, Benton bears the burden of production to designate specific facts showing that there is a genuine dispute requiring trial, *Ricci*, 129 S. Ct. at 2677, and he has simply failed to discharge that burden. Therefore, these allegations cannot support his hostile work environment claim.

Second, with respect to his allegations concerning his interactions with his third-line supervisor, Fayne, following his non-selection for the '044 Position, Benton has failed to point to

---

contribute to a severe or pervasive hostile work environment. Simply by way of example, Benton repeatedly alleges that he was either handed, or witnessed another employee being handed, "confidential" or "sealed" envelopes. Setting aside that such actions are devoid of indicia of retaliatory animus, Benton fails to explain how they could possibly be viewed as sufficiently hostile or abusive to meaningfully contribute to a hostile work environment claim. This defect carries throughout Benton's opposition.

[111] When Benton does provide some minimal context to his allegations, the context that he provides undermines, rather than supports, his contention that the "incidents" were retaliatory.

competent evidence from which a reasonable trier of fact could conclude that these interactions

had any connection to his protected activity.  *See supra* Parts I.C.2 and III.B.2.c.  Therefore, his

allegations in this regard cannot support his hostile work environment claim.

Third, with respect to Benton's request for a transfer to the New Carrollton office, it is

undisputed that his third-line supervisor, Fayne, denied his request based on a general policy that

such transfers would not be considered because there was a moratorium on all relocations to the

New Carrollton office.  Def.'s Stmt. ¶ 190; Pls.' Stmt. ¶ 190.  Benton, like Mason, contends that a

trier of fact could draw an inference of retaliation from the fact that another employee, Rolphs,

was granted a request to transfer, but it is undisputed that Rolphs was granted a request to transfer

to Rome, Italy, not the New Carrollton office.  *See supra* Part III.B.1.c.  In any event, Benton

makes no attempt to establish that he was similarly situated to Rolphs in all material respects.

More broadly, Benton has failed to adduce any evidence that would allow a reasonable trier of fact

to conclude that the denial of his request was in any way retaliatory.  Therefore, it cannot support

his hostile work environment claim.

Fourth, with respect to Benton's contention that his request to be reassigned to another

branch in the M&P Organization, Benton has adduced no evidence to contradict the Secretary's

proffered justification that granting his request would impact all four branches of the organization

because it would require hiring a replacement to fill the vacancy that would be created by

Benton's requested transfer.  *See supra* Part I.C.5.  Moreover, Benton's supervisors in fact offered

Benton a reassignment to Fayne's office, working in Balance Measures, further undermining any

potential inference of retaliation.  *See id.*  More broadly, Benton has failed to adduce any evidence

that would allow a reasonable trier of fact to conclude that the denial of his request was in any

way retaliatory.  Therefore, it cannot support his hostile work environment claim.

Fifth, with respect to Benton's requests for FMLA leave, the record establishes that his first-line supervisor, Freeman, in fact granted Benton's requests.  *See supra* Part I.C.7.  Benton has failed to present any evidence that would allow a reasonable trier of fact to conclude that the delay in granting the request, if any, was unreasonable.  *See id.*  Nor has he adduced any evidence suggesting that Freeman acted improperly in obtaining the necessary approvals from his supervisors.  *See id.*  More generally, Benton has failed to adduce any evidence that would suggest that the handling of his FMLA requests had any nexus to his protected activity.  Therefore, it cannot support his hostile work environment claim.

Sixth, with respect to Benton's 2007 performance appraisal, it is undisputed that Benton received the highest rating possible, and in fact received a performance award.  *See supra* Part I.C.7.  He has failed to adduce any evidence to suggest that there was an unreasonable delay in the issuance of his performance appraisal or, more importantly, that any such delay had any connection to his participation in protected activity.  On this record, no reasonable trier of fact could conclude that the actions of Benton's supervisors were retaliatory.  Therefore, these allegations cannot support his hostile work environment claim.

Finally, in support of his hostile work environment claim, Benton cannot rely upon his non-selection for the '044 Position, his non-selection for the '322 Position, his three-day suspension, his fourteen-day suspension, or his termination.  For the reasons set forth below, no reasonable trier of fact could conclude that these actions were taken in retaliation for Benton's participation in protected activity.  *See infra* Part III.C.2-6.

 In the final analysis, Benton has failed to point to sufficient evidence to allow a

reasonable trier of fact to conclude that the component-acts identified as supporting his hostile

work environment claim were taken in retaliation for his prior protected activity.  Viewing the

record as a whole, no trier of fact could conclude that Benton was subjected to an objectively

severe or pervasive hostile work environment.  Accordingly, the Court will enter summary

judgment in the Secretary's favor on Benton's hostile work environment claim.

> 2.      The Secretary Is Entitled to Summary Judgment on Benton's Claim Based on His Non-Selection for the '044 Position

Benton contends that his non-selection for the '044 Position was in retaliation for his

participation in the 2003 Litigation.  *See* Fourth Am. Compl. (Civil Action No. 09-462) ¶ 17; Pls.'

MSJ Opp'n at 59-62.  Benton's arguments as to why a trier of fact could infer that his non-

selection was retaliatory are without merit.  First, Benton's contention that he had "superior

qualifications" lacks merit because he has failed to adduce sufficient evidence to allow a

reasonable trier of fact to conclude that he was "significantly better qualified" than the ultimate

selectee—Dangel.  *Adeyemi*, 525 F.3d at 1227.  Indeed, he fails to provide any meaningful

comparative analysis of his qualifications to the other candidates at all.  Second, Benton's

contention that Dangel was "apparently" pre-selected because Dangel began moving his

belongings before the selection had been announced, Pls.' MSJ Opp'n at 28, is purely speculative.

In any event, Benton ignores the fact that there is nothing *per se* improper about "preselection,"

and he has failed to point to some indicia of retaliation attaching to Dangel's alleged preselection

for the position.  *See Nyunt*, 543 F. Supp. 2d at 39.  Third, Benton has failed to show that either

the recommending official or the selecting official harbored a retaliatory animus against him.  *See*

*supra* Part III.B.2.c.  Fourth, Benton's contention that the interview panelists were "biased and

unfair" are unsupported by competent evidence and, more importantly, are unaccompanied by

evidence that would allow a reasonable trier of fact to conclude that any shortcomings in their

analysis of the candidate field had any connection to Benton's participation in the 2003 Litigation.

Fifth, and finally, Benton's contention that there was "an effort to cover up" Farah's role in the

decisionmaking process is not supported by the record and, even if true, would undermine rather

than strengthen his case given the dearth of competent evidence to suggest that Farah harbored a

generalized retaliatory animus.  *See supra* Part I.C.2.  More broadly, Benton offers insufficient

evidence to permit a reasonable trier of fact to conclude that the Secretary's decision was

pretextual.  It is undisputed that Benton's supervisors selected the highest rated candidate; Benton

was ranked third in a field of four.  *See id.*  Absent indicia of retaliation, this Court "must respect

[the Secretary's] unfettered discretion to choose among qualified candidates."  *Fischbach*, 86 F.3d

at 1189.  On this record, no reasonable trier of fact could conclude that the Secretary's proffered

justification for Benton's non-selection was pretextual.  Accordingly, the Secretary is entitled to

summary judgment on this claim.

        3.        The Secretary Is Entitled to Summary Judgment on Benton's Claim Based on His Non-Selection for the '322 Position

Like Mason, Benton claims that his non-selection for the '322 Position in or about April

2007 was unlawful.  *See* Fourth Am. Compl. (Civil Action No. 09-462) ¶ 17; Pls.' MSJ Opp'n at

59-62.  Also like Mason, Benton fails to adduce sufficient evidence to allow a reasonable trier of

fact to conclude that his non-selection for the '322 Position was in retaliation for his participation

in protected activity.  Indeed, Benton's arguments in support of his claim are coterminous with

those tendered by Mason, *see* Pls.' MSJ Opp'n at 59-62, and are unavailing for the same reasons.

*See supra* Part III.B.2.  More broadly, viewing the record as a whole, no reasonable trier of fact

could conclude that the Secretary's proffered qualifications-based justification for Benton's non-

selection was pretextual.  It is undisputed that the application and review materials demonstrated a "clear separation" between the ultimate selectee, Freeman, and the other four candidates, and both Manno, as the ranking official, and the interview panel agreed that Freeman had the most extensive managerial experience, demonstrated more relevant personal achievement than the other candidates, and had an educational background that was superior or comparable to other candidates.  *See supra* Part I.B.2.  Indeed, Benton was the fourth-ranked candidate out of a field of five.  *See id.*  Ultimately, "[s]hort of finding that the employer's stated reason was indeed a pretext . . . the court must respect the employer's unfettered decision to choose among qualified candidates."  *Fischbach*, 86 F.3d at 1189.  On this record, no reasonable trier of fact could conclude that the Secretary's proffered justification for Benton's non-selection was pretextual. Accordingly, the Secretary is entitled to summary judgment on the claim.

> 4.      The Secretary Is Entitled to Summary Judgment on Benton's Claim Based on His Three-Day Suspension

Like Mason, Benton claims that his three-day suspension in March 2008 was imposed in retaliation for his participation in the 2003 Litigation.  *See* Fourth Am. Compl. (Civil Action No. 09-462) ¶ 17; Pls.' MSJ Opp'n at 62-64.  However, like Mason, Benton has failed to adduce sufficient evidence for a reasonable trier of fact to conclude that the Secretary's proffered justification for the suspension was not the actual reason and that the Secretary intentionally retaliated against him.   Indeed, Benton's arguments in support of his claim are coterminous with those tendered by Mason, *see* Pls.' MSJ Opp'n at 62-64, and are unavailing for the same reasons. *See supra* Part III.B.3.  As was the case with Mason, after tolerating Benton's prolix e-mails to senior IRS officials for months, and after encouraging Benton to pursue his grievances through the EEO apparatus or agency grievance process, Benton was issued a management directive

instructing him to cease sending such communications. *See supra* Part I.C.8. Nonetheless,

Benton continued to e-mail senior IRS officials with complaints, requests for information, and

demands to address his workplace grievances. *See id.* After repeated warnings, Farah issued a

letter proposing Benton's suspension without pay for three days, identifying thirteen instances in

which Benton was determined to have violated the management directive. *See id.* Like Mason,

Benton has adduced no evidence demonstrating that he was ever discouraged from raising his

myriad allegations of discrimination or retaliation in the workplace; the Secretary did not run

afoul of Title VII merely by directing Benton to raise those allegations through the appropriate

channels and not to senior IRS officials after tolerating Benton's communications for months.

Def.'s Stmt. ¶ 216; Pls.' Stmt. ¶ 216. *Cf. Rollins*, 868 F.2d at 399; *Rattigan*, 604 F. Supp. 2d at

49. While Benton may personally disagree with his supervisors' interpretation of the directive,

that interpretation is "reasonable in light of the evidence." *Brady*, 520 F.3d at 495 (citing *George*,

407 F.3d at 415). Benton has failed to adduce sufficient evidence to allow a reasonable trier of

fact to doubt that his supervisors "honestly and reasonably believed" that he had serially violated

the management directive. *Id.* at 496. For these reasons, and for the reasons set forth above in

connection with Mason's parallel claim, *see supra* Part III.B.3, Benton has failed to adduce

sufficient evidence for a reasonable trier of fact to conclude that the Secretary's proffered

justification for the suspension was not the actual reason and that the Secretary intentionally

retaliated against him. *See Brady*, 520 F.3d at 494. Accordingly, the Secretary is entitled to

summary judgment on the claim.

> 5.     The Secretary Is Entitled to Summary Judgment on Benton's Claim Based
>        on His Fourteen-Day Suspension

Benton claims that his fourteen-day suspension in August 2008 was imposed in retaliation

131

for his participation in the 2003 Litigation.  *See* Fourth Am. Compl. (Civil Action No. 09-462) ¶

17; Pls.' MSJ Opp'n at 64-65.  However, Benton has failed to adduce sufficient evidence for a

reasonable trier of fact to conclude that the Secretary's proffered justification for the suspension

was not the actual reason and that the Secretary intentionally retaliated against him.  Benton has

admitted that he committed various tax infractions over the years, including the one that

ultimately led to his fourteen-day suspension on August 4, 2008.  *See supra* Part I.C.9.  Benton's

claim that he "did not realize" the circumstances that led to his violation does not change the fact

that he has admitted to the underlying conduct at issue.  *Cf. Waterhouse*, 298 F.3d at 995 (where

plaintiff "did not contravene—and in fact admitted—many of the deficiencies the defendants cited

concerning her performance, she failed to establish that her employer's proffered reason was

unworthy of credence.") (internal quotation marks, notations, and citations omitted).

Furthermore, these incidents constituted at the very least his second, and likely his third, incident

of tax non-compliance.  Def.'s Stmt. ¶ 226; Pls.' Stmt. ¶ 226.  Regardless of whether the incident

was his second or third violation, both the proposed and actual suspension fell within the range of

recommended disciplinary action.  *See* Def.'s Ex. SS (IRS Guide to Penalty Determinations) at

12.  More broadly, Benton fails to adduce any evidence that would allow a reasonable trier of fact

to conclude that his suspension had any nexus to his participation in the 2003 Litigation.  On this

record, no reasonable trier of fact could find in Benton's favor.  Accordingly, the Secretary is

entitled to summary judgment on the claim.

> 6.      The Secretary Is Entitled to Summary Judgment on Benton's Claim Based
>          on the Termination of His Employment

Sixth, and finally, Benton claims that his termination in January 2009 was in retaliation for

his participation in the 2003 Litigation.  *See* Fourth Am. Compl. (Civil Action No. 09-462) ¶ 17;

Pls.' MSJ Opp'n at 62-64.   For the same reasons described above, *see supra* Parts I.C.10, III.B.3, and III.C.4, Benton has failed to adduce sufficient evidence that he was terminated because he engaged in protected activity.   On this record, the Secretary's proffered justification that Benton was terminated for serially sending e-mails to senior IRS official despite the contrary instructions of his supervisors is "reasonable in light of the evidence." *Brady*, 520 F.3d at 495 (citing *George*, 407 F.3d at 415).   Benton has failed to adduce sufficient evidence to allow a reasonable trier of fact to doubt that his supervisors "honestly and reasonably believed" that he had serially violated the management directive. *Id.* at 496.   For these reasons, and for the reasons set forth above, Benton has failed to adduce sufficient evidence for a reasonable trier of fact to conclude that the Secretary's proffered justification for the termination was not the actual reason and that the Secretary intentionally retaliated against him. *See Brady*, 520 F.3d at 494.   Accordingly, the Secretary is entitled to summary judgment on the claim.

* * *

In sum, Benton has failed to adduce sufficient evidence to permit a reasonable trier of fact to find in his favor on any of his claims.   Therefore, the Court shall enter summary judgment in the Secretary's favor and dismiss Benton's claims from this action.

D.      *The Secretary's Motion for Sanctions*

In his Motion for Sanctions, the Secretary seeks the exclusion of evidence concerning a meeting between Benton and his third-line supervisor, Fayne, on the basis that Benton admittedly secretly recorded the conversation but destroyed the recording rather than producing it in the course of discovery.   Because the Court concludes that the Secretary is entitled to summary judgment against all three plaintiffs even when considering the evidence the Secretary seeks to

133

have excluded, it is unnecessary to reach the merits of the Secretary's motion.  The motion will be denied as moot.

## IV.  CONCLUSION

For the reasons set forth above, the Court shall grant the Secretary's Motion for Summary Judgment, deny the Secretary's Motion for Sanctions, and dismiss all three actions in their entirety.  Appropriate Orders accompany this Memorandum Opinion.

Date:   September 12, 2011

<div style="text-align:right">

_____/s/_____

**COLLEEN KOLLAR-KOTELLY**
United States District Judge

</div>